Nos. 09-3351, 09-3344, 09-3350

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee/Cross-Appellant*,

STATE OF NEW YORK, STATE OF NEW JERSEY, STATE OF CONNECTICUT,

*Plaintiff-Intervenor Appellees/Cross-Appellants*,

and

HOOSIER ENVIRONMENTAL COUNCIL, OHIO ENVIRONMENTAL COUNCIL,

*Plaintiff-Intervenor Appellees*,

v.

CINERGY CORPORATION, PSI ENERGY, INC.,
AND THE CINCINNATI GAS & ELECTRIC COMPANY,

*Defendant-Appellants*.

Appeal from the United States District Court for the Southern District of Indiana,
Indianapolis Division, case no. 1:99-cv-1693,
the Honorable Judge Larry J. McKinney, presiding

DEFENDANT-APPELLANTS' OPENING BRIEF

Marc E. Manly
Catherine S. Stempien
Dean M. Moesser
Julie L. Ezell
DUKE ENERGY CORP.
526 South Church Street
Charlotte, NC 28202
(704) 382-8000

Mark D. Hopson
*Counsel of Record*
Peter D. Keisler
Frank R. Volpe
Peter C. Pfaffenroth
Ryan C. Morris
Lowell J. Schiller
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
(202) 736-8000 tel.
(202) 736-8711 fax
*Attorneys for Appellants*

December 11, 2009

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

*Cinergy Corp.; PSI Energy, Inc.; The Cincinnati Gas & Electric Company*

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

*Sidley Austin LLP; Taft Stettinius & Hollister LLP; Porter Wright Morris & Arthur LLP; Sommer Barnard PC; Hogan & Hartson, LLP; Plews, Shadley, Racher & Braun; Barnes & Thornburg LLP*

(3) If the party or amicus is a corporation:

i) Identify all its parent corporations, if any; and

*Cinergy Corp. is a wholly-owned subsidiary of Duke Energy Corporation. PSI Energy, Inc (now known as Duke Energy Indiana, Inc.) and The Cincinnati Gas & Electric Company (now known as Duke Energy Ohio) are both wholly-owned subsidiaries of Cinergy Corp.*

ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

*Duke Energy Corporation owns 10% or more of the stock of Cinergy Corp. PSI Energy, Inc (now known as Duke Energy Indiana, Inc.) and The Cincinnati Gas & Electric Company (now known as Duke Energy Ohio) are both wholly-owned subsidiaries of Cinergy Corp.*

---

Attorney's Signature: _____ Date: _____

Attorney's Printed Name: *Mark D. Hopson*          Counsel of Record: [Yes]  No

Address: *Sidley Austin LLP, 1501 K Street N.W., Washington, D.C. 20005*

Phone Number: *(202) 736-8188*          Fax Number: *(202) 736-8711*

E-Mail Address: *mhopson@sidley.com*

i

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

*Cinergy Corp.; PSI Energy, Inc.; The Cincinnati Gas & Electric Company*

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

*Sidley Austin LLP; Taft Stettinius & Hollister LLP; Porter Wright Morris & Arthur LLP; Sommer Barnard PC; Hogan & Hartson, LLP; Plews, Shadley, Racher & Braun; Barnes & Thornburg LLP*

(3) If the party or amicus is a corporation:

i) Identify all its parent corporations, if any; and

*Cinergy Corp. is a wholly-owned subsidiary of Duke Energy Corporation. PSI Energy, Inc (now known as Duke Energy Indiana, Inc.) and The Cincinnati Gas & Electric Company (now known as Duke Energy Ohio) are both wholly-owned subsidiaries of Cinergy Corp.*

ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

*Duke Energy Corporation owns 10% or more of the stock of Cinergy Corp. PSI Energy, Inc (now known as Duke Energy Indiana, Inc.) and The Cincinnati Gas & Electric Company (now known as Duke Energy Ohio) are both wholly-owned subsidiaries of Cinergy Corp.*

---

Attorney's Signature: _____ Date: _____

Attorney's Printed Name: *Julie L. Ezell*        Counsel of Record:  Yes  No

Address: *Duke Energy Shared Services, Inc., 1000 E. Main St., Plainfield, IN 46168*

Phone Number: *(317) 838-1100*        Fax Number: *(317) 838-6001*

E-Mail Address: *Julie.Ezell@duke-energy.com*

ii

# TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................iii

TABLE OF AUTHORITIES .......................................................................... v

JURISDICTIONAL STATEMENT ............................................................... 1

STATEMENT OF ISSUES PRESENTED..................................................... 2

STATEMENT OF THE CASE........................................................................ 3

INTRODUCTION ........................................................................................... 3

STATEMENT OF FACTS .............................................................................. 5

  A.  Statutory And Regulatory Background................................... 5

  B.  Factual Background. ................................................................. 9

    1.  Cinergy's Electricity Generating System. ................... 9

    2.  Cinergy's Component Replacement Projects............. 12

  C.  Procedural Background........................................................... 13

    1.  The NSR Enforcement Initiative. .............................. 13

    2.  The Applicable NNSR Test. ....................................... 14

    3.  The Rosen-Koppe Methodology. ................................ 15

    4.  The Judgment. ........................................................... 18

SUMMARY OF ARGUMENT ...................................................................... 20

ARGUMENT ................................................................................................. 22

I.  The District Court Applied The Wrong Legal Standard. ................. 22

  A.  Before 1994, Indiana's SIP Imposed A "Potential-To-Potential" NNSR Standard......................................................................... 23

  B.  The NNSR Provisions Of The Indiana SIP In Place At The Time Of The Projects Govern Plaintiffs' NNSR Claims................. 29

II.  The District Court Erred In Admitting The Rosen And Koppe Testimony. .......................................................................................... 32

A.    Rosen's And Koppe's Made-For-Litigation Methodology Is Presumptively Unreliable. .................................................... 34

B.    The Rosen-Koppe Methodology Has Never Been Tested, Has No Known Error Rate, And Has Not Been Peer-Reviewed. ........................ 35

C.    The Rosen-Koppe Methodology Is Biased And Unreliable. .................. 43

D.    The Rosen-Koppe Methodology Is Irrelevant Under The CAA And EPA's Implementing Regulations. .................................................. 52

CONCLUSION............................................................................................. 57

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Braun v. Lorillard Inc.,*
    84 F.3d 230 (7th Cir. 1996) ................................................................. 34

*Chapman v. Maytag Corp.,*
    297 F.3d 682 (7th Cir. 2002) .................................................... 33, 36, 43

*Claar v. Burlington N. R.R.,*
    29 F.3d 499 (9th Cir. 1994) ................................................................. 36

*Corporate Assets, Inc. v. Paloian,*
    368 F.3d 761 (7th Cir. 2004) ............................................................... 33

*Daubert v. Merrell Dow Pharms., Inc.,*
    43 F.3d 1311 (9th Cir. 1995) .................................................... 34, 35, 38

*Daubert v. Merrell Dow Pharms., Inc.,*
    509 U.S. 579 (1993) ...................................................................*passim*

*Fuesting v. Zimmer, Inc.,*
    421 F.3d 528 (7th Cir. 2005), *vacated in part on other grounds*, 448 F.3d
    936 (7th Cir. 2006) .......................................................................... 35

*Johnson v. Manitowoc Boom Trucks, Inc.,*
    484 F.3d 426 (6th Cir. 2007) ............................................................... 35

*Gen. Motors Corp. v. United States,*
    496 U.S. 530 (1990) ........................................................... 5, 6, 22, 30

*Kempner Mobile Elecs., Inc. v. Sw. Bell Mobile Sys.,*
    428 F.3d 706 (7th Cir. 2005) .......................................................... 33, 52

*Kumho Tire Co. v. Carmichael,*
    526 U.S. 137 (1999) ................................................... 32, 35, 36, 39, 40

*Metro. Wash. Coal. for Clean Air v. Dist. of Columbia,*
    511 F.2d 809 (D.C. Cir. 1975) ............................................................ 30

*N. Ind. Pub. Serv. Co. v. Colo. Westmoreland, Inc.,*
    667 F. Supp. 613 (N.D. Ind. 1987), *aff'd*, 845 F.2d 1024
    (7th Cir. 1988).................................................................. 10, 11, 43, 47

*In re Paoli R.R. Yard PCB Litig.,*
    35 F.3d 717 (3d Cir. 1994) ................................................. 49

*People Who Care v. Rockford Bd. of Educ.,*
    111 F.3d 528 (7th Cir. 1997) ............................................. 44

*Rosen v. Ciba-Geigy Corp.,*
    78 F.3d 316 (7th Cir. 1996) ............................................. 34

*United States v. Ala. Power Co.,*
    372 F.Supp.2d 1283 (N.D. Ala. 2005) ................................ 13

*United States v. Cinergy Corp.,*
    458 F.3d 705 (7th Cir. 2006) .............................................. 7

*United States v. Disantis,*
    565 F.3d 354 (7th Cir. 2009) ............................................. 22

*United States v. Ohio Edison Corp.,*
    276 F.Supp.2d 829 (S.D.Ohio 2003) .............................. 13, 29

*Wis. Elec. Power Co. v. Reilly,*
    893 F.2d 901 (7th Cir. 1990) ......................................... 8, 13

*Zenith Elecs. Corp. v. WH-TV Broad.,*
    395 F.3d 416 (7th Cir. 2005) .................................. 21, 39, 42

## STATUTES AND REGULATIONS

Pub. L. No. 95-95, §129(a)(1), 91 Stat. 685 (1977) .................... 23

16 U.S.C. §824d(a) ..................................................... 10

42 U.S.C. §7407(a) ...................................................... 5

42 U.S.C. §7408(a) ...................................................... 5

42 U.S.C. §7409 ......................................................... 5

42 U.S.C. §7410(a) ................................................... 6, 31

42 U.S.C. §7411(a)(4) ................................................... 6

42 U.S.C. §7413(b) ................................................... 5, 6

42 U.S.C. §§7470-7492 ................................................... 5

42 U.S.C. §7475(a) ................................................. 6, 22

42 U.S.C. §7479(2)(C) ............................................................................. 6

42 U.S.C. §§7501-7515............................................................... 5, 6, 30

42 U.S.C. §7502 ............................................................................. 6, 22

42 U.S.C. §7602(q) ........................................................................ 5, 22

Ind. Code §8-1-2-4 ............................................................................ 10

40 C.F.R. §51.24 (1979)................................................................... 7, 24

40 C.F.R. §51.21 (1979)................................................................... 7, 24

40 C.F.R. pt. 51, App. S (1979) ...................................................... 7, 23

40 C.F.R. §52.21 (1981)........................................................... 7, 45, 47

40 C.F.R. §52.24 (1981)................................................................. 45, 48

40 C.F.R. §51.105 (1992)................................................................. 6, 30

40 C.F.R. §51.165 (1992)................................................................. 6, 31

40 C.F.R. §51.166 (1992)..................................................................... 6

40 C.F.R. §52.21 (1992)........................................................... 6, 27, 52

40 C.F.R. §52.770 (1992)....................................................... 23, 25, 28

40 C.F.R. §52.770 (1995)...................................................................26

40 C.F.R. §52.793 (2009)...................................................................27

44 Fed. Reg. 3,274 (Jan. 16, 1979) ..................................................24

44 Fed. Reg. 20,372 (Apr. 4, 1979) ...................................... 23, 24, 29

44 Fed. Reg. 38,583 (July 2, 1979) ...................................................24

44 Fed. Reg. 51,924 (Sept. 5, 1979) .................................................24

44 Fed. Reg. 67,182 (Nov. 23, 1979) .................................................24

45 Fed. Reg. 20,432 (Mar. 27, 1980)..................................................26

45 Fed. Reg. 52,676 (Aug. 7, 1980) ...................................... 7, 24, 27

46 Fed. Reg. 54,941 (Nov. 5, 1981) ................................................................ 8, 26, 28

47 Fed. Reg. 6,621 (Feb. 16, 1982) ........................................................ 8, 23, 26, 27

47 Fed. Reg. 30,972 (July 16, 1982) ................................................................ 25

54 Fed. Reg. 2,214 (Jan. 19, 1989) ................................................................ 6, 29

57 Fed. Reg. 32,314 (July 21, 1992) ........................................................*passim*

59 Fed. Reg. 51,108 (Oct. 7, 1994)................................................................ 8, 26, 29

70 Fed. Reg. 61,081 (Oct. 20, 2005)................................................................ 9

325 Ind. Admin. Code § 2-1.1-1 (1981) ................................................................ 29

325 Ind. Admin. Code § 2-3-1 (1981) ................................................................ 29

326 Ind. Admin. Code §2-3-1 ................................................................ 29

Ind. Air Pollution Control Regulation APC-1 (recodified as 325 Ind. Admin.
   Code §1.1-1) ................................................................ 7, 23, 25, 28

Ind. Air Pollution Control Regulation APC-19 (recodified as 325 Ind. Admin.
   Code §2-1) ................................................................ 8, 23, 25, 29

## RULES

Fed. R. Civ. P. 50(a)(1)................................................................ 23

Fed. R. Evid. 702, 2000 amend................................................................ 33, 34

## OTHER AUTHORITIES

Stephen L. Johnson, EPA Policy Statement, *Peer Review and Peer
   Involvement at the U.S. Environmental Protection Agency* (Jan. 31, 2006),
   http://www.epa.gov/peerreview/pdfs/peer_review_policy_and_memo.pdf............ 38

Department of Justice Press Release, *U.S. Sues Electric Utilities In
   Unprecedented Action To Enforce The Clean Air Act* (Nov. 3, 1999),
   http://www.jus-tice.gov/opa/pr/1999/November/524enr.htm .................................. 3

EPA, *Guidance for Quality Assurance Project Plans for Modeling*, EPA QA/G-
   5 (Dec. 2002), http://www.epa.gov/quality1/qs-docs/g5m-final.pdf................. 37, 38

EPA, *Guidance on Systematic Planning Using the Data Quality Objectives
   Process*, EPA QA/G-4 (Feb. 2006), http://www.epa.gov/QUALITY/qs-
   docs/g4-final.pdf................................................................ 38

## JURISDICTIONAL STATEMENT

In 1999, the United States filed suit in the United States District Court for the Southern District of Indiana against Defendant-Appellants, alleging violations of Title I of the Clean Air Act. The district court had jurisdiction under 28 U.S.C. §§1331, 1345 and 42 U.S.C. §7413.

On May 22, 2008, a jury found Defendant-Appellants liable on claims relating to four component replacement projects at the Wabash River generating station. On May 29, 2009, the district court entered partial final judgment under Rule 54(b) as to those projects. On June 12, 2009, Defendant-Appellants moved for judgment as a matter of law or, in the alternative, a new trial, which the court denied on July 24, 2009. Separate claims concerning projects at other generating stations remain pending before the district court. This appeal reaches only the Wabash River projects on which the court entered partial judgment.

On September 21, 2009, Cinergy timely filed a notice of appeal. This Court has jurisdiction under 28 U.S.C. §1291.

## STATEMENT OF ISSUES PRESENTED

1.     Whether the district court erred as a matter of law by instructing the jury to determine whether Cinergy was liable under the Clean Air Act's non-attainment New Source Review provisions based on an incorrect legal standard that was not part of the only regulations enforceable under the Act, the approved Indiana State Implementation Plan.

2.     Whether the district court erred in admitting the expert testimony of Richard Rosen and Robert Koppe when their predictive methodology was created solely for litigation, was never tested or peer-reviewed, has no known error rate, and disregards the factors that actually determine the dispatch of electricity from power plants and the statutory and regulatory principles that govern this case.

## STATEMENT OF THE CASE

In 1999, the United States, on behalf of the Environmental Protection Agency ("EPA"), filed suit against Cinergy Corp., PSI Energy, Inc., and the Cincinnati Gas & Electric Company (collectively "Cinergy"). At trial, it claimed that Cinergy violated the New Source Review ("NSR") provisions of the Clean Air Act ("CAA") by undertaking fourteen component replacement projects at its electrical generating units without first seeking a permit. It contended that these component replacement projects constituted "modifications" of the units because the projects should have been expected to cause emissions increases of 40 tons or more per year of certain pollutants. A jury found Cinergy not liable with respect to most of the counts, but found that Cinergy violated the CAA with respect to four projects solely at its Wabash River station in Indiana in 1989, 1990, and 1992. As a remedy for these violations, the court then ordered Cinergy to retire the units and surrender Title IV emissions allowances.

## INTRODUCTION

This case is one of several "unprecedented" enforcement actions under the NSR provisions of the CAA. Dep't of Justice Press Release, *U.S. Sues Electric Utilities In Unprecedented Action To Enforce The Clean Air Act* (Nov. 3, 1999), http://www. justice.gov/opa/pr/1999/November/524enr.htm. It concerns a central question under the NSR program: whether and in what circumstances a utility that merely replaces a component at one of its generating units, without changing the efficiency, cost-structure, capacity, or other fundamental characteristics of the unit, has nonetheless "modified" that unit sufficient to subject it to regulation as a new or

modified source of emissions. Although EPA had for decades known that utilities maintain their plants through such replacements, not until 1999 did it bring any enforcement actions involving any of the many such projects across the country (some of which had been completed a decade or more before).

This sudden and massive change of course left the government with fundamental gaps in its theories and proof. The government's improper efforts to circumvent those deficiencies led to two overarching errors in this case.

First, the government relied upon the wrong legal standard for most of the claims on which Cinergy was found liable. Cinergy undertook and completed the projects at issue between 1989 and 1992, but the jury was instructed to apply a standard that the district court acknowledged did not become part of the governing State Implementation Plan ("SIP") until 1994. The SIP, however, is the only regulation enforceable under the CAA for those claims. The government offered no evidence that Cinergy's emissions increased under the standard actually contained in the SIP.

Second, even under the standard the jury was instructed to apply, the only evidence supporting the claim that Cinergy should have predicted the 40-ton increase in emissions necessary to trigger liability was expert testimony that should never have been admitted. The experts' methodology was created in "brainstorming sessions" with the government's counsel exclusively for this litigation and had never previously been used by EPA for any purpose. These experts never sought to validate their new theory through testing or any other scientific process, asserting it

was "simple math," A00913, that required no testing. Indeed, their methodology could not have withstood such scrutiny, because (among other dispositive flaws) it was designed consistently to predict generation increases without regard to how a utility actually allocates demand among its interdependent generating units, and it simply "assumed" away the statutory and regulatory causation requirement.

## STATEMENT OF FACTS

### A.     Statutory And Regulatory Background.

The 1970 Amendments to the CAA "made the States and the Federal Government partners" in regulating air quality. *Gen. Motors Corp. v. United States*, 496 U.S. 530, 532 (1990). They directed EPA to promulgate national ambient air quality standards ("NAAQS") for certain pollutants. 42 U.S.C. §§7408(a), 7409. They then charged each State with developing a SIP that specifies how it will achieve and maintain the NAAQS. 42 U.S.C. §7407(a).

The NSR program directs that State SIPs include provisions requiring pre-construction review and permitting for certain "new" and "modified" sources of air pollution. Areas designated as in "attainment" of the NAAQS for a pollutant fall under the Prevention of Significant Deterioration ("PSD") program, 42 U.S.C. §§7470-7492, as to that pollutant. Areas designated as in "nonattainment" for a pollutant fall under the Nonattainment New Source Review ("NNSR") program, 42 U.S.C. §§7501-7515, for that pollutant.

State SIPs are federally enforceable, but only after approval by EPA. *See* 42 U.S.C. §§7413(b), 7602(q). Likewise, revisions to a SIP are federally enforceable

only after EPA approves them. 40 C.F.R. §51.105;[1] *see also Gen. Motors,* 496 U.S. at 540. A utility that violates a State's PSD SIP provisions faces liability both for the SIP violations themselves, 42 U.S.C. §7413(b)(1), and for violations of other CAA provisions, *id.* §7413(b)(2), including §7475(a), which prohibits construction without a PSD permit. The NNSR program, in contrast, does not directly impose obligations on utilities and subjects a utility to federal liability *only* for violating the terms of the EPA-approved SIP. *Compare id.* §7475(a), *with id.* §§7501-15; *see also id.* §7413(b)(1).

Under either program, a pre-construction permit is required for certain "modification[s]" of an existing stationary source. 42 U.S.C. §7411(a)(4); *see id.* §§7475(a), 7479(2)(C) (PSD); *id.* §7502(c)(5) (NNSR). Because permitting decisions are made by States, the requirements for making the "modification" determination are contained within the relevant State's approved SIP. *See id.* §7410(a)(2)(C) (PSD); *id.* §7502(c)(5) (NNSR). Nonetheless, EPA promulgates regulations that provide guidance to States and has the authority to disapprove proposed SIPs that it deems inconsistent with that guidance. *See, e.g.,* 42 U.S.C. §7410(a); 40 C.F.R. §§51.165, 51.166, 52.21.

EPA's regulatory guidance on the standard for a "modification" has shifted repeatedly over time, contributing to what EPA itself has called a "moving target syndrome" in the often lengthy SIP approval process. 54 Fed. Reg. 2,214, 2,217 (Jan. 19, 1989). After the 1977 CAA Amendments, construction projects initially were

---

[1] Unless specifically noted, all C.F.R. references are to the 1992 edition, *see* ADD-71–212.

deemed "modifications" if they caused an increase in "potential" emissions (*i.e.*, increases in the unit's maximum emissions *capacity*) in excess of 100 tons per year for criteria pollutants such as sulfur dioxide ("$SO_2$") or nitrogen oxides ("$NO_x$")—a standard known as "potential-to-potential" because it required a comparison of the unit's potential emissions before and after the project. *See* 40 C.F.R. §§51.24(b)(2),(3), 52.21(b)(2),(3) (1979) (PSD); *id.* pt. 51, App. S §II(A)(3), (5) (1979) (NNSR).

In 1980, however, EPA promulgated new guidance providing that a "modification" instead occurs when a project would be expected to "result in" an increase in "actual" annual emissions above baseline levels. *See* 45 Fed. Reg. 52,676, 52,730-32, 52,746-47 (Aug. 7, 1980); *United States v. Cinergy Corp.*, 458 F.3d 705, 708 (7th Cir. 2006). Relevant here, federal guidance provides that States' PSD and NNSR permitting requirements should be triggered only when the projected increase in actual emissions of $SO_2$ or $NO_x$ is 40 tons or more per year above baseline levels. 45 Fed. Reg. at 52,732. Moreover, this increase in emissions must result directly from the project and not some other cause, such as responding to increased demand. 40 C.F.R. §52.21(2)(i) (1981).

Indiana adopted the SIP applicable to this case during this period of shifting guidance. This SIP contained the "potential-to-potential" standard contained in then-current EPA regulations. Indiana Air Pollution Control Regulation APC-1; APC-19. EPA abandoned that test while the Indiana SIP was pending, but EPA nonetheless *approved* the SIP provisions containing this "potential-to-potential"

standard for Indiana's NNSR program. 46 Fed. Reg. 54,941, 54,942 (Nov. 5, 1981); 47 Fed. Reg. 6,621 (Feb. 16, 1982). Although EPA observed that Indiana had committed to update its SIP and EPA would "rulemake on these revised [SIP] regulations ... upon their submittal," 46 Fed. Reg. at 54,942, EPA did not actually approve such a revision until 1994, 59 Fed. Reg. 51,108 (Oct. 7, 1994).

Such delays were not the only, or even the most important, problems that plagued the administration of the program. Even more significant were EPA's highly general and ever-changing substantive standards. For example, EPA began directing States to assess whether "like-kind" replacements (replacing worn components with newer versions of the same components) were "modifications" by comparing pre-project actual emissions with a source's post-project *potential* to emit (known as the "actual-to-potential" test). *Wis. Elec. Power Co. v. Reilly*, 893 F.2d 901, 915-18 (7th Cir. 1990) ("*WEPCo*"). This would almost always show an emissions "increase" because coal-fired power plants are never run at full potential output for an entire year. In *WEPCo*, this Court rejected EPA's approach, confirming that the determination of an increase must rest upon a realistic prediction of how the unit's *actual* emissions will change as a result of the replacement. *Id.* at 915 n.8, 917-18.

In 1992, EPA attempted to address the *WEPCo* decision and to "clarify" other aspects of its rules. EPA confirmed that where a utility undertakes a like-kind replacement, the States should compare "actual" emissions during a two-year "baseline" period pre-project with expected "actual" emissions for the two years

8

after the project. It also extended this "actual-to-future-actual" test to other projects. 57 Fed. Reg. 32,314, 32,314-17, 32,323, 32,326 (July 21, 1992). But EPA never published any formula illustrating how to apply it. *See, e.g.,* A00680-84.

Instead, EPA simply emphasized that States implementing this test should "[c]onsider all relevant information," 57 Fed. Reg. at 32,334, including "all available information regarding the unit's likely post-change capacity utilization," *id.* at 32,323. EPA, however, did confirm that its rules required "a causal link between the proposed change and any post-change increase in emissions." *Id.* at 32,326. And to ensure that the pre-project "baseline" is "representative," EPA emphasized that State reviewing authorities should look to years when a "source's capacity was [not] reduced due to physical problems." *Id.* at 32,323.

In 2005, EPA conceded that "[u]ncertainties inherent in the current major NSR permitting approach" had adversely affected utilities, because "it can be difficult for the owner or operator to know with reasonable certainty whether a particular activity would trigger major NSR." 70 Fed. Reg. 61,081, 61,093 (Oct. 20, 2005). EPA accordingly proposed a new emissions test designed to provide greater clarity (and which is substantially different from that applied below). *Id.* at 61,094.

**B.    Factual Background.**

1.    *Cinergy's Electricity Generating System.*

Cinergy is a public utility that serves Indiana and other Midwestern states. It does so through conventional plants and renewable energy resources, including wind. A01170-71. To address future electricity needs, Cinergy also promotes conservation and is developing smart grids. *Id.* Cinergy places the highest priority

9

on environmental compliance, and has consistently secured NSR permits when constructing new generating capacity. A00998.

Cinergy is obligated to generate an adequate and reliable supply of electricity to meet customer needs. Ind. Code §8-1-2-4. Many of the issues in this case turn upon the ways in which utilities meet those obligations. Specifically, because electricity cannot be stored, "the load on the system [*i.e.*, customer demand] and the amount of power generated must balance." *N. Ind. Pub. Serv. Co. v. Colo. Westmoreland, Inc.*, 667 F. Supp. 613, 618 (N.D. Ind. 1987) (Easterbrook, J.) ("*NIPSCo*"); *see also* A00987; A01145-46. Utilities must therefore adjust in real time the amount of electricity generated as customer demand fluctuates. A00987; A01136; A01146.

Electricity generating units are connected to customers through a common grid. A00986-87; A01144-45. These units are interdependently responsible for meeting customer demand, and not all units are operated continuously. A01140. The "availability" of these units—the amount of time they are capable of generating electricity—exceeds the actual time they are called upon for generation. To determine which combinations of units are dispatched to meet current demand (and to what degree), utilities balance well-established economic and engineering considerations, as described in detail in *NIPSCo, supra*. A00815-16; A00992. To produce electricity "as cheaply as possible," *NIPSCo*, 667 F. Supp. at 616; 16 U.S.C. §824d(a); Ind. Code §8-1-2-4, Cinergy endeavors to dispatch its most economical units first, A01138-39, but also purchases power from other utilities when doing so is cheaper than using its own units, A01048. Numerous factors affect the cost of

10

producing electricity from a unit, including fluctuating fuel prices, fuel contracts, and other variable operating and maintenance costs. A01138-39; *see also NIPSCo*, 667 F. Supp. at 617.

Engineering, voltage and other transmission-related considerations also influence how Cinergy dispatches its generating units. To ensure reliability of dispatch and transmission, Cinergy operates numerous units simultaneously to meet demand, rather than running one unit at its maximum before turning to the next unit. A01140. A dozen Cinergy units are typically online simultaneously, with the output of each rising and falling with demand; some units are being actively run, while others are at-the-ready for quick dispatch should demand increase suddenly. A00990; A01140.

Which units are used depends in part on the amount of time necessary to turn them on and off, which varies among units, as does the minimum electricity they must generate once activated. A01138-39. Relatedly, Cinergy must maintain "spinning reserves"—unused, but available, capacity from its presently-online units—to respond immediately to emergencies either on Cinergy's system or elsewhere on the grid. A01140; A01151-52; *NIPSCo*, 667 F. Supp. at 618.

Thus, Cinergy's engineers continuously make dispatch decisions based on short-term shifts in demand, cost and other operational considerations. A01132-38; A01146; A01154. The mixture of dispatched units also varies with structural changes within Cinergy's operations. A01148. Like other utilities, Cinergy employs

skilled professionals who use computer models to balance these considerations. A0992-93.

2.     *Cinergy's Component Replacement Projects.*

To maximize the availability of its generating units and satisfy its legal obligations to provide reliable service, Cinergy constantly maintains and repairs its units. A01012-15; A01037; A01050; A01054; A01070; A01080; A01123; A01153-54. Coal-fired generating units are large and complex facilities that experience numerous problems that affect their availability. These problems generally affect the unit in one of two ways: by forcing it offline and completely unavailable to provide service (a "forced outage"), A00801-02, or by causing a reduction in its available power output (a "derate"), A00843; A00849a; A01012; A01014. Forced outages and derates are random. A00866; A01011-12; A01019; A01037; A01080; A00713-14. Cinergy generally predicts a unit's future availability based on an average of the unit's availability over the previous five years. A00615-16; A00620-21; A00599-608. As part of its repair and maintenance program, Cinergy regularly replaces worn or aged components with new versions of these components, so-called "like kind replacements." A01019; A01028; A01032. Such changes do not alter the fundamental characteristics of the unit or change the way in which the units are dispatched. A01028; A01033-34; A01092-93; A01141-42; A01144. For instance, Cinergy would often replace the tubes that carry steam within a coal-fired plant, because they deteriorate under extreme conditions within a plant. A01075a.

12

### C.   Procedural Background.

#### 1.   *The NSR Enforcement Initiative.*

EPA has long known that utilities were maintaining their units through like-kind replacement projects, A00205, yet for decades the agency "avoided a fundamental issue addressed in the [CAA], that is, at what point plants built before 1970 must comply with new air pollution standards." *United States v. Ohio Edison Co.*, 276 F. Supp. 2d 829, 832 (S.D. Ohio 2003); *see United States v. Ala. Power Co.*, 372 F. Supp. 2d 1283, 1306 (N.D. Ala. 2005) ("EPA admits, as it must, that it has not spoken with one voice, or a consistent voice, or even a clear voice, on this issue."). Not until 1999, when the present initiative against numerous utilities began, did EPA bring any enforcement action under NSR for like-kind replacements. A00203-04. Indeed, in more than two decades under the NSR program, EPA had only found NSR to apply to one like-kind project, and it was "massive" and "unprecedented." *See WEPCo*, 893 F.2d at 911.

In pursuing this initiative, government litigators participated in six months of "brainstorming sessions" with their future witnesses in these cases, including Richard Rosen and Robert Koppe, to devise a method that would calculate whether a replacement project would result in a significant net emissions increase. A00629; A00670; A00685-86; A00689; A00942-43. According to Rosen, the purpose of these sessions was to develop a "mathematical interpretation" of the NSR regulations, and the meetings were "in the spirit of … think[ing] about what's the best way to make these computations at this point in time." A00938-39; A00943; A00947;

A00670. Rosen conceded he did not even consider how EPA had previously determined emissions changes. A00668.

Based on these new regulatory interpretations, EPA filed suit against Cinergy. It alleged that 55 component replacement projects at Cinergy's units were "modifications" for which Cinergy had not obtained permits required by the CAA and the SIP. A00130-200 (¶¶106, 127, 145, 163, 172, 203). Those projects included four like-kind replacements of steam tubes at Cinergy's Wabash River station, which the government claimed should have been expected to result in significant net emissions increases of $NO_x$, $SO_2$, and particulate matter. *Id.* (¶¶145, 150, 155). The projects replaced sections of steam tubes that were deteriorating with new tubing, but without otherwise changing the design or operating characteristics of the unit. *See, e.g.,* A01066a; A01077-78; A01093-94; A01123. The Wabash River station is located in Vigo County, Indiana, which, at the time of the projects at issue, was in attainment or unclassifiable for $NO_2$ but in non-attainment for $SO_2$. *See* A00281. Accordingly, whereas the $NO_x$ claims were governed by the PSD regulations, NNSR applied to the $SO_2$ claims.

## 2.    *The Applicable NNSR Test.*

Prior to trial, Cinergy requested that the court instruct the jury that for projects before 1994, Indiana's SIP for NNSR looked to a unit's "potential" to emit, not "actual" emissions, to determine whether a project was a "modification." *See* A00207-10. Reversing course from its Complaint, *see* A00147-49 (¶¶48-50), the government opposed this instruction and argued that the same "actual" emissions test applied to all projects. A00211-17. The district court upheld the government's

14

changed position, explaining that "[e]ven though it appears that the EPA did not formally approve the new regulations until 1994," it nonetheless would instruct the jury that "the same [actual-to-future-actual] test for emissions calculations should be applied for all projects." A00002. The government introduced no evidence to establish that the projects at issue satisfied the SIP's "potential" emissions standard.

### 3.    *The Rosen-Koppe Methodology.*

The sole evidence offered to demonstrate that "actual" post-project emissions should have been expected to increase past the specific 40-ton threshold was the testimony of Dr. Rosen, who in turn relied on the testimony of Mr. Koppe. The fundamental theory behind the Rosen-Koppe methodology is that like-kind replacement projects increase the availability of the entire unit by reducing the number of forced outages and derates, and that an increase in the *availability* of a unit results in a proportionate increase in *generation* from that unit, thereby yielding greater emissions. Rosen's and Koppe's calculations attempt to quantify the precise increase in emissions that Cinergy should have predicted from the greater availability supposedly gained from each like-kind component replacement.

Koppe first derived the increase in availability Cinergy would supposedly realize from the like-kind replacement. To do this, Koppe turned to the Generating Availability Data System ("GADS") database, in which utilities record unit outages and derates, their duration, and the affected component. A00405. For each project, Koppe reviewed the GADS data for the sixty months preceding a component replacement, identifying the outages and derates associated with the replaced

15

component. A00397; A00406. For the projects identified by the government, Koppe theorized that by replacing the component, Cinergy would gain back *all* the lost time associated with those outages or derates, and that the availability of the entire unit would increase by that recovered amount of time. A00401.

Rosen then used Koppe's "increased availability" assumption to derive the precise emissions increase expected from the project. Although his calculations formally proceeded in five "steps," one central premise drove Rosen's analysis—the "constant utilization" assumption he used to predict increased generation. Rosen multiplied the new annual number of hours of availability provided by Koppe for a two-year future period by the unit's historic "utilization factor"—the percentage of time in the past baseline period that Cinergy had used the unit to generate electricity relative to the amount of time the unit had been available. A000523; A000534-35; A00726.

Because the utilization factor is a measure of the percentage of time a unit generates electricity relative to its availability, any increase in availability multiplied by the historic utilization factor will *always* "predict" an increase in generation (the "capacity factor") proportionate to the increase in availability. *See, e.g.*, A00708 ("[I]f the utilization factor is assumed to be constant, then an increase in availability will yield an increase in capacity factor"). For example, if the unit historically had a utilization factor of 60% (because it previously was used 60% of the time it had been available), and Koppe predicted an increase in availability of 100 hours, then Rosen's calculation would predict 60 more hours of generation in

the future. Rosen would then use the remaining steps in his formula to determine the additional emissions that would result from the additional generation. A000534-35.

Cinergy moved to exclude Rosen's and Koppe's opinions under Fed.R.Evid. 702. Cinergy emphasized that their methodology bore none of the indicia of reliability identified in *Daubert*: it had been developed solely for litigation, and had never been tested, published, peer-reviewed, or in any other way "supported by appropriate validation." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590 (1993).

Cinergy further argued that the methodology could not withstand such scrutiny. Cinergy challenged the methodology for simply assuming that when the availability of a unit is presumed to increase, its actual utilization will increase proportionately. Cinergy contended that Rosen's assumption completely ignored the economic and engineering factors that actually drive utilization decisions. Rosen acknowledged that a more accurate estimate of increased generation would be based upon a system-wide model that calculated changes in utilization factor based on all relevant factors. A00673; A00706. He further acknowledged that a dispatch model (such as those commonly used by utilities to determine how to allocate generation among its units) could perform this more accurate prediction, including projecting generation from each unit, A00673; A00706; A00735; A00738, and that it would be "preferable" to use such models to forecast emissions increases, A00563. Nonetheless, Rosen stated that he was not given sufficient time or resources to perform this preferred analysis. A00676-77.

17

Cinergy further argued that Rosen's analysis was inconsistent with the very EPA regulations that Rosen claimed he was "mathematically interpreting." Cinergy noted Rosen's failure to consider whether the repairs at issue "caused" an emissions increase. Cinergy demonstrated that, for each of the Wabash River units at issue, the repairs did not change how Cinergy would dispatch the unit relative to normal, pre-repair operations, *see, e.g.*, A00385-86; A00294, and that each unit already had substantial excess availability, *see, e.g.*, A00319-24; A00346; A00393.

Cinergy also contended that the court need not even reach the flaws in Rosen's analysis because the "recovered availability" data provided by Koppe was untested and unreliable. Specifically, Cinergy argued that Koppe's approach was contrary to systems engineering theory and industrial practice, which recognize that for mature and complex systems like the generating units at issue here, repairing a particular component will not increase the overall availability of the unit because of the thousands of other components that could fail, including potentially the new component itself. *See, e.g.*, A000575-76; A00299.

The district court denied Cinergy's motion in a two-sentence order.

    4.    *The Judgment.*

After a nine-day trial, the jury returned a non-liability finding on ten of the fourteen projects the government pursued,[2] finding Cinergy liable for only Wabash River Units 2, 3, and 5. *See* A00115-17. All these projects involved the like-kind replacement of steam tubes. The district court assigned PSD ($NO_x$) and NNSR ($SO_2$)

---

[2] Although the government challenged 55 projects in its various complaints, it ultimately proceeded to trial on fourteen projects.

liability for the projects at Units 3 and 5, but only NNSR liability for the two projects at Unit 2. *See id.* The district court required Cinergy to shut down those units by September 30, 2009, reduce their operations prior to shutdown, and surrender certain CAA Title IV $SO_2$ emission allowances. *See* A00067.

## SUMMARY OF ARGUMENT

As the government acknowledged, this case sought an "unprecedented" application of NSR. But the government's dramatic new policy objectives exceeded what the law could support. The government's improper efforts to fill those fundamental gaps in its theories and proof gave rise to at least two errors below.

First, the government successfully advocated a legal standard that did not apply in Indiana at the time the Wabash River projects were undertaken. The applicable SIP provision for NNSR at the time of these projects required a comparison between each unit's "potential" to emit—*i.e.*, its maximum capacity—before and after the project, as the government initially admitted. The jury, however, was erroneously instructed to apply a different test, focusing on "actual" rather than "potential" emissions, that did not become part of the SIP for NNSR until long after these projects had been completed. Judgment should have been granted to Cinergy as to all NNSR claims because the government did not even attempt to show that Cinergy's projects increased "potential" emissions.

Second, to satisfy the "actual emissions" test, the government sponsored a new, made-for-litigation methodology of projected emissions increases that had never before been used by EPA and was instead created exclusively for these cases: it ensures that virtually every replacement of a component that was once associated with outages or derates will automatically be projected to cause an emissions increase, even though no such relationship exists in the real world. Although *Daubert* and this Court's decisions applying it have emphasized the importance of validating expert theories through testing, and although the government's experts

20

*could* have tested their newly-minted methodology, they never did so. Instead, remarkably, the experts claimed that their theory was so simple it did not require testing and that it could be "assumed" to have been tested because it had been subjected to rebuttal in other litigation from the same NSR enforcement initiative. But "there are important differences between the quest for truth in the courtroom and the quest for truth in the laboratory," *Daubert*, 509 U.S. at 596-97, and it is elementary that experts must "follow scientific approaches normal to their disciplines," *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005). That did not remotely occur here.

Indeed, this methodology could not have withstood any independent testing or other scientific scrutiny. It ignored the economic and operational factors that actually drive dispatch decisions among interdependent units—factors the government's expert conceded would have been "preferable" to take into account. It further ignored the causation requirement in the EPA's regulations, which provides that the emissions increase must be the result of the project at issue, and, again, simply "assumed" that causation was present. The testimony should have been excluded under Rule 702 as both unreliable and irrelevant. And because that testimony was the only evidence that claimed to quantify the expected emissions increase as exceeding the numerical threshold for liability, judgment should have been entered for Cinergy.

# ARGUMENT

## I.    The District Court Applied The Wrong Legal Standard.

The jury's liability finding suffers from a threshold error: the jury was instructed to apply the wrong legal standard.[3] Whether the projects in question— which occurred between 1989 and 1992—were "modifications" subject to permitting requirements must be determined according to the EPA-approved Indiana SIP. *See* 42 U.S.C. §§7475(a), 7502(c)(5), 7602(q); *Gen. Motors*, 496 U.S. at 540. Because the Wabash River station was in an area then designated as non-attainment for $SO_2$, the NNSR rules applied to all of the Wabash River $SO_2$ claims. *See supra* p. 14. On the NNSR claims at issue, however, the jury was instructed to apply a standard that EPA had not then approved for Indiana's SIP, and did not approve until 1994. The district court acknowledged that "EPA did not formally approve the new regulations until 1994," A00002, but nonetheless applied the post-1994 standard to projects that had been completed several years earlier.

Specifically, the jury was instructed to find Cinergy liable on each PSD and NNSR claim if it found that Cinergy should have predicted a project to result in an increase in "actual" emissions of 40 or more tons per year of the specific pollutant. *See* A00094; A00002. Yet at the time of the Wabash River projects, the Indiana SIP provisions governing NNSR "modifications" used a different standard. They required a "potential-to-potential" analysis that looked to whether the project caused an increase in the unit's "potential" to emit, *i.e.*, its maximum capacity, of 25

---

[3] This Court "review[s] de novo a district court's decision to give or refuse a jury instruction 'when the underlying assignment of error implicates a question of law.'" *United States v. DiSantis*, 565 F.3d 354, 359 (7th Cir. 2009).

tons or more per year. 325 Ind. Admin. Code ("IAC") 1.1-1; 325 IAC 2-1; 47 Fed. Reg. 6,621; 40 C.F.R. §52.770(c)(24). The government, however, presented no evidence that any of those projects caused an increase in a unit's *potential* to emit $SO_2$. To the contrary, the government only sought to demonstrate that the projects caused an increase in *actual* emissions. *See, e.g.*, A01162-63. Had the court applied the correct standard, Cinergy would have been entitled to a directed verdict in its favor. *See* Fed.R.Civ.P. 50(a)(1). Accordingly, judgment on these claims should be reversed and the remedy order should be vacated.[4]

### A.     Before 1994, Indiana's SIP Imposed A "Potential-To-Potential" NNSR Standard.

At the time of the Wabash River projects (1989-92), the Indiana SIP that EPA had approved provided that "modifications" under the NNSR program required a "potential-to-potential" analysis. *See supra* pp. 7-8. Although Indiana today requires an analysis of "actual" emissions, the regulatory landscape was far different when the projects occurred. When Congress amended the CAA in 1977, it provided that an EPA interpretive ruling, 40 C.F.R. Pt. 51 App. S, would initially apply as a placeholder NNSR regulation and would be replaced by States' revised SIPs as EPA approved them. *See* Pub. L. No. 95-95, §129(a)(1), 91 Stat. 685, 745 (1977) (codified as note under 42 U.S.C. §7502); 44 Fed. Reg. 20,372, 20,379 & n.36 (Apr. 4, 1979).

---

[4] The district court's remedy rests predominantly on the NNSR violations. First, the SO2 emission allowances surrender was intended to remedy only the NNSR violations. *See* A00060. Second, the jury found only NNSR liability at Unit 2. *See supra* pp. 18-19. Finally, even at Units 3 and 5, where the jury found both NNSR and PSD violations, the district court attributed substantially more harm to the NNSR violations than the PSD ones. A00050-51.

If, however, a State's plan failed to meet the requirements of 42 U.S.C. §§7501-15 after June 30, 1979, the State would face draconian consequences—a prohibition on all new construction. *See* 44 Fed. Reg. at 20,379-80. To help States avoid this prohibition, EPA announced that instead of disapproving a deficient NNSR SIP, it could conditionally approve it, subject to the State's commitment to correct the identified deficiencies in the future. *See* 44 Fed. Reg. 38,583 (July 2, 1979); 44 Fed. Reg. 67,182 (Nov. 23, 1979).

At that time, the federal placeholder regulation for NNSR used a "potential-to-potential" standard. EPA defined a "major modification" as "any physical change in, change in the method of operation of, or addition to a stationary source *which increases the potential emission* rate" of certain pollutants by 100 tons per year or more. 44 Fed. Reg. 3,274, 3,282 (Jan. 16, 1979) (emphasis added) (codifying App. S to 40 C.F.R. Pt. 51). A source's "potential to emit" was defined as the capability at "maximum capacity to emit." *See id.* Thus, an NNSR permit would not be required unless a project caused an increase in a source's maximum capacity to emit a pollutant. (The same standard applied under the PSD program, *see* 40 C.F.R. §§51.24(b)(3), 52.21(b)(3) (1979)). This "potential-to-potential" standard remained in EPA's rules until 1980, when EPA revised the federal NSR framework to make an increase in actual emissions the touchstone for permitting. *See* 44 Fed. Reg. 51,924, 51,934 (Sept. 5, 1979) (proposed rulemaking); 45 Fed. Reg. at 52,698-99 (final rules).

That revised federal framework, however, did not become part of Indiana's governing SIP for another 13 years. Instead, until 1994, the "potential-to-potential"

standard governed. In June 1979—before EPA had proposed changing the federal "potential-to-potential" framework—Indiana submitted to EPA a revised SIP, APC-19 (later recodified as 325 IAC 2-1), along with revisions to the SIP's general definitions section, APC-1 (later recodified as 325 IAC 1.1-1). *See* 40 C.F.R. §52.770(c)(24), (26); 47 Fed. Reg. 30,972, 30,978 (July 16, 1982). Consistent with the then-existing federal guidance, the revised Indiana SIP applied a "potential-to-potential" test, requiring a pre-construction permit only for a "modification" that "will result in a potential increase in emissions of 25 tons per year or more." 325 IAC 2-1 (APC-19), §§1(b) and 4. Nowhere did Indiana's rules suggest that a utility must calculate an increase in "actual" emissions.

The general definitions submitted on the same day as APC-19 confirm that the regulations were written to require an analysis of potential emissions. A "modification" was defined as "any physical change, or change in the method of operation of any facility which increases the *potential* or *legally allowed* emissions (whichever is more stringent) of any pollutant." 325 IAC 1.1-1 (APC-1), §43 (emphasis added). "Potential emissions" were in turn defined as emissions "based on maximum annual rated capacity unless hours of operation are limited by enforceable permit conditions." *Id.* §58. Similarly, "legally allowed emissions" meant "[t]he *emission rate* calculated using the *maximum rated capacity of the facility*," subject to such legally enforceable limitations as enforceable permit conditions. *Id.* §2 (defining "allowable emissions") (emphasis added).

In March 1980, EPA proposed to approve or approve conditionally the various definitions in APC-1 and to approve conditionally APC-19, all subject to Indiana revising portions not relevant here. *See* 45 Fed. Reg. 20,432, 20,433-35 (Mar. 27, 1980). Although EPA noted that revisions to the federal PSD regulations were underway and could affect the contents of Indiana's PSD SIP provisions, it made no such reference to any similar NNSR revisions. *See id.* at 20,434-36, 20,447-48. Indeed, even as to PSD, EPA proposed to review the plan "based upon its existing regulations," then "advise Indiana of any changes required in its plan" after promulgation of the new rules. *Id.* at 20,448.

As requested, Indiana corrected the unrelated deficiencies and, although the federal regulations had changed in the interim, EPA approved APC-1 and APC-19 in 1981 and 1982, respectively. *See* 46 Fed. Reg. at 54,943; 47 Fed. Reg. 6,621 (Feb. 16, 1982). These provisions remained in effect as Indiana's NNSR SIP until 1994, when EPA finally approved a revision to Indiana's SIP that employed an actual emissions standard. *See* 59 Fed. Reg. at 51,108; *see also* 40 C.F.R. §52.770(c)(94) (1995).[5]

In its Complaint, the government acknowledged that the pre-1994 Indiana SIP applied an NNSR test that looked to potential emissions, and that this test was different from the actual emissions standard that applied to the other claims pursued in this action. *See* A00147-49 (¶¶48-50). Moreover, in explaining the standard in place at the time of the projects, the government quoted at length from

---

[5] The new rules appear now at 326 IAC 2-3-1.

both the regulations and definitions submitted in 1979, including the definition of potential emissions. *Id.* (¶48).

Faced with an absence of evidence to meet the legal standard it had admitted applied to the Wabash River projects, however, the government changed tack before trial. Then, for the first time, the government argued that the actual emissions standard for post-1994 projects should be applied to all projects in its complaint. A00211-17. But this assertion is belied by EPA's actions in approving Indiana's SIP. Although EPA in 1980 revised both the federal PSD and NNSR regulation, it handled Indiana's pending changes to each of these programs very differently. For Indiana's PSD program, EPA expressly disapproved the SIP, then incorporated federal PSD regulations into the Indiana SIP by reference. *See* 45 Fed. Reg. at 52,740-41 (incorporating 40 C.F.R. §52.21(b) through (w) into the Indiana SIP).[6] These federal regulations are still incorporated today. *See* 40 C.F.R. §52.793 (2009).

EPA did *not* do the same for Indiana's NNSR rules. Instead, in February 1982, EPA approved APC-19 (325 IAC 2-1) to be implemented under the Indiana SIP. 47 Fed. Reg. 6,621 (Feb. 16, 1982). The only part of APC-19 not approved in this action was section 7, which dealt with the PSD program. Thus, sections 1(b) and 4, which provided that a pre-construction NNSR permit was only required for a "modification" that "will result in a potential increase in emissions of 25 tons per year or more," became part of the applicable Indiana SIP. The government has

---

[6] The federal provisions incorporated were drafted by EPA to apply "to any State implementation plan which has been disapproved with respect to prevention of significant deterioration of air quality [PSD]." 40 C.F.R. §52.21(a).

never disputed the effectiveness of this approval, which rendered the SIP governing law under the CAA NNSR provisions.

EPA also expressly approved Indiana's general definitions, APC-1 (325 IAC 1.1-1), several months earlier. *See* 46 Fed. Reg. at 54,943; *see also* 40 C.F.R. §52.770(c)(26). In that approval, EPA acknowledged that "[c]ertain of the definitions contained in 325 IAC 1.1-1 are inconsistent with EPA's most recent definitions," but it nonetheless approved the proposed definitions, observing that "Indiana is currently revising its NSR regulations ... to be consistent with EPA's most recent requirements." 46 Fed. Reg. at 54,942. EPA noted that Indiana's definitions met the requirements of the CAA "for purposes other than new source review," explained that it would review Indiana's new rules and new definitions in a subsequent proceeding, and then *expressly and unqualifiedly approved* the definitions at 325 IAC 1.1-1 for the interim. *Id.*[7] Indeed, in quoting these definitions in its complaint, the government itself has admitted that they became part of the relevant NNSR SIP. *See* A00147-48 (¶48). Accordingly, the district court was simply incorrect when it held that "EPA explicitly rejected Indiana's proposed definitions to the extent that they were contrary to federal law." A00002.

There is nothing unusual about how EPA handled the Indiana SIP. By its nature, the federal-state dynamic of the CAA creates the potential that a State may propose a SIP that conforms to the federal framework at the time it is proposed, but becomes outdated during EPA's reviewing process or thereafter. Indeed, EPA's SIP

---

[7] EPA listed only a single exception: EPA disapproved of Indiana's definition of the term "state implementation plan," noting that a definition for that term was not necessary.

approval process suffered from this problem to such a degree that the agency coined a term for it: "moving target syndrome." *See* 54 Fed. Reg. at 2,217 (noting frequency with which a SIP "conform[s] to the policy in place when it was submitted" but then a policy changes while the SIP is "under review" at EPA and the SIP thus "doesn't conform to a newly evolved policy"). Here, rather than force a halt to all new plant construction in Indiana by rejecting portions of the SIP, *see* 44 Fed. Reg. at 20,379-80, EPA reasonably chose to allow Indiana's plan to go into effect pending the approval of revised regulations. Indiana promptly executed a revision, *see* 325 IAC §§2-1.1-1, 2-3-1(l), and 2-3-1(o) (1981), but EPA did not approve that revision until after the projects at issue here, *see* 59 Fed. Reg. at 51,108. That the government may now wish EPA had acted sooner cannot be the basis for imposing liability on Cinergy. *Cf. Ohio Edison*, 276 F. Supp. 2d at 832 (criticizing EPA's "abysmal breakdown in the administrative process").

## B. The NNSR Provisions Of The Indiana SIP In Place At The Time Of The Projects Govern Plaintiffs' NNSR Claims.

The district court not only misinterpreted the requirements of the SIP but also made a more fundamental mistake: it erroneously held that even though the applicable SIP did not require Cinergy to analyze actual emissions until after 1994, Cinergy nonetheless could be held liable under such a standard because the standard could be found in other state and federal regulations. A00002. This decision is irreconcilable with the basic framework of the NSR program, under which a utility's obligation to meet certain preconstruction requirements is defined by the applicable SIP.

Because the CAA "made the States and the Federal Government partners" in regulating air quality, *Gen. Motors*, 496 U.S. at 532, the NSR program does not consist of a set of top-down federal regulations that impose direct requirements on utilities. Instead, such requirements by and large are imposed through SIPs, and a SIP is only applicable—and thus federally enforceable under §7413(b)(1)—to the extent it has been approved by EPA in accordance with §7410. Thus, "[r]evisions of a plan, or any portion thereof, will not be considered part of an applicable plan until such revisions have been approved by the Administrator … ." 40 C.F.R. §51.105. *See also Gen. Motors*, 496 U.S. at 540 ("There can be little or no doubt that the existing SIP remains the 'applicable implementation plan' even after the State has submitted a proposed revision."); *Metro. Wash. Coal. for Clean Air v. Dist. of Columbia*, 511 F.2d 809, 812 (D.C. Cir. 1975) ("revisions are not to be considered part of a plan until approved by the Administrator") (citation omitted).

Accordingly, it is irrelevant to an assessment of federal CAA liability whether Cinergy complied with the provisions of an unapproved revision to Indiana's SIP. As EPA itself has recognized, "there will always be a period during which a State-proposed revision and a federally-approved SIP will differ." Br. of United States at 36, *General Motors v. United States,* 496 U.S. 530 (1990).

It is likewise irrelevant whether Cinergy complied with provisions of the federal NNSR regulations that differ from those of the approved version of the Indiana SIP. As noted *supra* pp. 5-6, the statutory NNSR program merely sets forth the requirements that a State's SIP must contain. *See* 42 U.S.C. §§7501-15 (setting

forth requirements for States); *id.* §7410(a)(2)(I) (a SIP must meet the statutory NNSR requirements). Moreover, there are no federal NNSR regulations that directly apply to Cinergy. Although Appendix S to 40 C.F.R. Part 51 would have applied directly to Cinergy at one time, it did so as a placeholder pending SIP approval; it ceased to apply in Indiana after EPA approved the 1979 revisions to Indiana's NNSR SIP. *See supra* pp. 23-24. And the regulations at 40 C.F.R. §51.165 by their own terms provide conditions that each SIP must meet, not requirements directly applicable to utilities. *See, e.g.*, *id.* §51.165(a) ("State Implementation Plan ... provisions satisfying sections 172(b)(6) and 173 of the Act shall meet the following conditions ....").

The district court therefore erred when it judged Cinergy's NNSR compliance based on state and federal regulations that were not incorporated into the applicable SIP until well after the relevant pre-construction permits would have needed to be obtained. Cinergy could not have been liable under §7413(b)(2) because no NNSR regulations outside the SIP applied to it. And as to any assessment of liability under §7413(b)(1), any regulations never approved into the SIP are simply irrelevant.

## II.     The District Court Erred In Admitting The Rosen And Koppe Testimony.

Even if the "actual emissions" instruction had been correct as to the NNSR claims, the government failed to offer admissible evidence to establish a violation under that standard. That failure likewise invalidated the PSD claims (to which the error described in Section I, *supra*, does not apply).

Under Fed.R.Evid. 702, the district court's "gatekeeper" function requires it to ensure that any expert "testimony or evidence admitted is not only relevant, but reliable," including "whether the reasoning or methodology underlying the testimony is scientifically valid." *Daubert*, 509 U.S. at 589, 592-93. This gatekeeping role is particularly important in jury trials because for juries "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it." *Id.* at 595 (citations omitted).

In *Daubert*, the Supreme Court provided a non-exclusive set of factors to assist courts in deciding whether particular expert testimony is scientifically reliable: (1) whether the "'theory or technique … can be (and has been) tested'"; (2) whether "it 'has been subjected to peer review and publication'"; (3) whether, "in respect to a particular technique, there is a high 'known or potential rate of error' and whether there are 'standards controlling the techniques' operation'"; and (4) whether "the theory or technique enjoys 'general acceptance' within a 'relevant scientific community.'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149-50 (1999) (quoting *Daubert*, 509 U.S. at 592-94). Additional factors were identified in the Advisory Committee Commentary that accompanied the 2000 revision to Rule 702 in light of *Daubert*, including (1) whether the expert developed the opinions outside of

32

litigation or "'whether [the expert] developed [the] opinions expressly for purposes of testifying,'" and (2) whether "the expert has adequately accounted for obvious alternative explanations." Fed. R. Evid. 702, 2000 amend.; *see also Fuesting v. Zimmer, Inc.*, 421 F.3d 528, 534 (7th Cir. 2005), *vacated in part on other grounds*, 448 F.3d 936 (7th Cir. 2006).

"It is incumbent upon the trial court to carefully consider [the reliability] factors before admitting any expert scientific evidence." *Chapman v. Maytag Corp.*, 297 F.3d 682, 687 (7th Cir. 2002). Indeed, "[t]o satisfy its essential role, the gatekeeper must do more than just make conclusory statements. A more searching *Daubert* analysis is required." *Fuesting*, 421 F.3d at 535. Here, the District Court's ruling in its entirety was as follows:

> the Court finds that the parties' experts are qualified in their respective fields by reason of knowledge, education, or experience and that the assumptions and methodologies underlying their opinions have been subjected to some type of testing or verification or are premised on assumptions generally accepted within the relevant community. Further, the Court concludes that the arguments in opposition to the experts go to the credibility and the weight to be given to the testimony.

A00007. Had the court conducted the required analysis, the evidence could not have been admitted, and the district court abused its discretion in concluding otherwise. *Fuesting*, 421 F.3d at 534-37.[8]

---

[8] A "court abuses its discretion when it commits 'a serious error of judgment, such as reliance on a forbidden factor or failure to consider an essential factor,'" *Kempner Mobile Elecs., Inc. v. Sw. Bell Mobile Sys.*, 428 F.3d 706, 712 (7th Cir. 2005), or when it relies "on an incorrect legal principle or a clearly erroneous factual finding," *Corporate Assets, Inc. v. Paloian*, 368 F.3d 761, 767 (7th Cir. 2004). Further, where, as here, the district court has failed to undertake the "searching … analysis" required by *Daubert*, this Court has independently applied the *Daubert* reliability factors. *See Fuesting*, 421 F.3d at 536-37.

### A. Rosen's And Koppe's Made-For-Litigation Methodology Is Presumptively Unreliable.

An important factor in assessing the reliability of expert testimony is "'whether [the expert] developed [the] opinions expressly for purposes of testifying.'" Fed.R.Evid. 702, 2000 amend. (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995) ("*Daubert II*")); *see Fuesting*, 421 F.3d at 537 (expert "developed his opinion expressly for this litigation"); *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 318 (7th Cir. 1996) (*Daubert* requires judges to "distinguish between real and courtroom science"). The inquiry under Rule 702 and *Daubert* is designed specifically to stop the abuse of "hiring … reputable scientists, impressively credentialed, to testify for a fee to propositions that they have not arrived at through the methods that they use when they are doing their regular professional work rather than being paid to give an opinion helpful to one side in a lawsuit." *Braun v. Lorillard Inc.*, 84 F.3d 230, 235 (7th Cir. 1996); *see also Daubert II*, 43 F.3d at 1317 (expert's "normal workplace is the lab or the field, not the courtroom or the lawyer's office").

Because expert methodologies or theorems developed specifically for litigation lack key indicia of reliability, such as independent verification or objectivity, they are presumptively unreliable. *Daubert II*, 43 F.3d at 1316-17; *id.* at 1317-18 (requiring other objective evidence that the methodology is reliable when made for litigation). Methodologies and theories developed for litigation also suffer from the "'potential for abuse in light of the incredible benefits of hindsight,'" that is, that the methodology serves no other purpose than to resolve after the fact the specific issue

before the court. *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 435 (6th Cir. 2007).

Here, it is indisputable that Rosen and Koppe developed their emissions-increase methodology specifically for this litigation. Both admitted that the formula was developed during "brainstorming" sessions with the litigators over a six-month period in the early stages of the enforcement initiative. A00629; A00670; A00685-86; A00689; A00942-43. The meetings were "in the spirit of … think[ing] about what's the *best way to make these computations at this point in time*." A00670 (emphasis added); A00682 (methodology developed "[i]n the litigation"); A00943. The methodology has never appeared in any government regulation or guidance, or any academic article or peer-reviewed document. A00680-84. Because it was created for litigation, it should have been treated as presumptively unreliable. *See Kumho*, 526 U.S. at 152 (an expert must "employ[ ] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field").

### B.     The Rosen-Koppe Methodology Has Never Been Tested, Has No Known Error Rate, And Has Not Been Peer-Reviewed.

When expert theories or methods are created specifically for litigation, an especially strong showing of objective reliability under other factors is necessary, but no such showing can be made here. *See Daubert II*, 43 F.3d at 1317-18; *Johnson*, 484 F.3d at 435. The Rosen-Koppe methodology fails to satisfy the other *Daubert* factors: it has not been tested, has no known error rate, and has not been peer reviewed.

A "key question" in assessing the reliability of expert testimony is whether "a theory or technique … can be (*and has been*) tested." *Daubert*, 509 U.S. at 593 (emphasis added). As this Court explained, the "'first and most significant *Daubert* factor is whether the scientific theory has been subjected to the scientific method.'" *Fuesting*, 421 F.3d at 536 (citation omitted). The "absence of any testing indicates that [the expert's] proffered opinions cannot fairly be characterized as scientific knowledge." *Chapman*, 297 F.3d at 688. "Such insulation of [the] theory from the dispassionate crucible deeply, if not fatally, compromises [the] testimony's reliability." *Fuesting*, 421 F.3d at 536; *accord Claar v. Burlington N. R.R.*, 29 F.3d 499, 503 (9th Cir. 1994) (observing "scientists whose conviction about the ultimate conclusion of their research is so firm that they are willing to aver under oath that it is correct prior to performing the necessary validating tests could properly be viewed by the district court as lacking the objectivity that is the hallmark of the scientific method").

Closely related is whether the method has a "known or potential rate of error." *Daubert*, 509 U.S. at 594 (citing *United States v. Smith*, 869 F.2d 348, 353-54 (7th Cir. 1989)). That is, in assessing the reliability of expert testimony, a court should understand how often the methodology has "produced erroneous results." *Kumho*, 526 U.S. at 151.

As noted, the key features of the Rosen-Koppe methodology are the increased unit availability assumption (*i.e.*, that all past availability lost to an identified mechanical issue will be regained in the future) and the constant utilization

36

assumption (*i.e.*, that this increased availability will be utilized at the same rate as the lower availability was in the past). Both propositions can be tested, but neither were. A00702-03; *see also* A00695 ("Q. And did you compare those actual numbers to your projections to gauge reliability of your calculations? A. Not that I can remember, no."); A00711-12; A00716-17; A00703-04 ("I can't think of any statistical tests that I have run certainly not on this case"); A00637 (Koppe conceding he did not have "any data" that verified his theory); *see also* A00632; A00640-42; A00651-58. Similarly, neither Rosen nor Koppe even attempted to derive any error rate for their theorem. A00696-98; *see also* A00561 ("my equations do not require 'error rates' [because] they are generally just simple ratios or fractions").

Their failure to undertake any meaningful testing is particularly stark in light of the government's assertion below that "test[ing]" rather than "theorem" should be relied upon when "actual data" are available. A00271. Indeed, although Rosen opined that nothing in EPA's NSR regulations required that he and Koppe test the accuracy of their methodology, A00716-17, EPA, in fact, requires the testing of predictive models, places limits on "decision error," and mandates the highest degree of rigor when models "involve potentially large consequences," such as use in litigation. EPA, *Guidance for Quality Assurance Project Plans for Modeling*, EPA QA/G-5M, EPA/240/R-02/007 at 1, 4-5, 14, 34-35 (Dec. 2002), http://www.epa.gov/ quality1/qs-docs/g5m-final.pdf; EPA, *Guidance on Systematic Planning Using the Data Quality Objectives Process*, EPA QA/G-4 at i (Feb. 2006), http://www.epa.gov/ QUALITY/qs-docs/g4-final.pdf ("quality objectives" include "potential decision

errors" when "establishing the quality and quantity of data needed to support decisions"); *id.* at 45 (establishing process for setting "performance or acceptance criteria that the collected data will need to achieve in order to minimize the possibility of either making erroneous conclusions or failing to keep uncertainty in estimates to within acceptable levels").

Nor was the Rosen-Koppe methodology subject to any peer review. "[S]ubmission to the scrutiny of the scientific community is a component of 'good science,' in part because it increases the likelihood that substantive flaws in methodology will be detected." *Daubert*, 509 U.S. at 593-94. Publication in a peer-reviewed journal is a particularly significant factor when a methodology is developed for litigation because subjecting that theory to "the usual rigors of peer review" "is a significant indication that it is taken seriously by other scientists, i.e., that it meets at least the minimal criteria of good science." *Daubert II*, 43 F.3d at 1318. These principles apply with particular force here given the clear direction of EPA that peer review is "encouraged and expected" for "all scientific and technical information that is intended to inform or support Agency decisions." Stephen L. Johnson, EPA Policy Statement, *Peer Review and Peer Involvement at the U.S. Environmental Protection Agency* (Jan. 31, 2006), http://www.epa.gov/peerreview/ pdfs/peer_review_policy_and_memo.pdf; *see also* EPA, *Guidance for Quality Assurance Project Plans for Modeling* at 1, 2, 14 (models that "create a prediction" should be "peer reviewed" at every step of the process). Remarkably, Rosen

dismissed the relevance of peer review by asserting that his methodology "is such a simple application of mathematics that it does not require peer review." A00559.

When Rosen or Koppe attempted to defend their failure to test their theories, they confirmed how unscientific and unreliable their work is. Rosen "assume[d]" that his methodology had been tested because it was "tested by the rebuttal experts" in separate NSR enforcement litigation. A00692. But "there are important differences between the quest for truth in the courtroom and the quest for truth in the laboratory," *Daubert*, 509 U.S. at 596-97, and experts must "follow scientific approaches normal to their disciplines," *Zenith*, 395 F.3d at 419; *see also Fuesting*, 421 F.3d at 536. A "critique" in litigation is hardly the same as statistical testing to establish a theory's real-world reliability or error rate. *Kumho*, 526 U.S. at 152.

Koppe claimed to have assessed the validity of his assumptions of increased unit availability from the replacement of a component, but he conceded that he did so only during the course of litigation and only to the extent that time and resources permitted. A00651-58. Moreover, Koppe produced no evidence of any such testing, and could not even describe the tests he used or the results of his comparisons. A00637; A00651-58. Koppe further conceded that his method did not analyze the impact on availability of the numerous other outages that were occurring at the same time he was claiming an increase in availability. A00905-07. To the extent any such after-the-fact and undocumented "testing" occurred, it hardly rises to "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho*, 526 U.S. at 152.

Rosen also claimed validation for his methodology from Cinergy itself, A00526; A00530, but the relevant Cinergy practices only underscore the flaws in Rosen's approach. Cinergy uses computer dispatch models to project future generation and to assist it in conducting operational studies and making fundamental decisions about, for example, future plans for the purchase of fuel and power, and whether and where to build a new plant or retire an old one. A00389; A00291 (¶¶16-17); *see also* A00924-31; A00951-52; A01155-56; A00260-67. These tools account for the real-world economic and engineering factors that determine how much an individual unit in an interdependent system will generate to satisfy demand. A00389; A00924-31; A00735; A00738-39; A00260-67. They employ forecasts of future availability and make projections of future utilization—but unlike the Rosen-Koppe methodology, Cinergy engineers using the models, and the models themselves, do *not* assume either (a) that like-kind replacement projects recover all lost availability from outages, as Koppe assumed, or (b) that utilization is a constant percentage of availability, as Rosen assumed. A00289 (¶13); A00291 (¶¶16-17); A00390; A00309-311; *see also* A00954-55; A00703; A00706; A00735; A00738. These models do not make those assumptions because they are counterfactual and inconsistent with Cinergy's real-world experience and practices.

That is why Rosen was forced to acknowledge that, in comparison to his methodology, it would have been "preferable to use a computerized dispatch model … for the purpose of forecasting the generation levels from a generating unit that has undergone a repair or replacement." A00563; *see also* A00706; A00924-29

(describing the types of analyses that can be done by dispatch models). Indeed, Rosen repeatedly cited such models as the best way of reflecting the interdependence of generating units and estimating accurately how utilization might change with an increase in availability. A00723; A00729; A00738-40.

Despite these admissions, Rosen seized upon a different, inconsistent and far more rudimentary process that Cinergy used for the more limited purpose of comparing potential capital expenditure projects. Specifically, in choosing among possible maintenance projects at different plants, only some of which Cinergy could undertake within its capital budget, Cinergy would assign a monetary value to each based on potential costs and benefits for purposes of prioritizing among multiple possible projects. A00781; A00784; A00791-95; A00579; A00977-78; A00982-83; A01105-06. Unlike Cinergy's more sophisticated predictive models, the simplified capital budgeting process, consistent with the Rosen-Koppe methodology, assigned "benefits" to projects that included, *inter alia*, cost savings that would be achieved if availability previously lost due to the replaced component was recovered and if pre-repair utilization rates applied.

Rosen's reliance on this simplified cost-benefit analysis confirms the unscientific nature of his method. It was undisputed that these simplified calculations were never relied upon by Cinergy outside of the capital budgeting context and thus not used by Cinergy to forecast future generation or make other critical decisions such as fuel purchases and unit construction. *See supra* pp. 10-12, 41. Nor did Cinergy use the economic "benefit" associated with each capital expense to project future

revenue. *See, e.g.*, A00794-95. The cost-benefit analysis was nonetheless useful to Cinergy because it enabled the utility to compare different options for maintenance expenditures in a way that focused on the degree to which a component had caused outages in the past and the extent to which the particular unit had previously been utilized.

Rosen, by contrast, used these simplified assumptions not to make comparative judgments, but instead to calculate precise increases in future generation at individual units taken in isolation. But any reliance on Cinergy's cost-benefit analyses in this different context would be improper for the reasons given above. Further, as noted, the "most significant" inquiry under *Daubert* "is whether the scientific theory has been subjected to the *scientific method*." *Fuesting,* 421 F.2d at 536 (emphasis added, internal quotation marks omitted). Cinergy's capital budgeting process was not subject to testing or validation as a method of predicting future generation, and the government cannot demonstrate the scientific reliability of its methodology by pointing to a process that likewise has never been scientifically validated for that purpose. *Cf. Zenith Elecs.*, 395 F.3d at 419 (experts must "follow scientific approaches normal to their disciplines").

Indeed, applying Rosen's assumptions in order to predict actual generation increases produces impossible results. If Cinergy had actually authorized each of the hundreds of repair projects it considered during the period at issue in the Complaint, and the assumptions in its comparative analysis were applied to predict future generation, the result would be to predict enormous generation increases at

42

every generating unit in the system even if demand were flat or falling—an utterly implausible outcome. *See NIPSCo*, 667 F. Supp. at 618 ("the load on the system and the amount of power generated must balance").

Rosen ultimately conceded that the use of these cost-benefit calculations for ranking capital projects "does not mean this methodology is correct for use under the NSR regulations." A000526. Rather, he asserted that the capital ranking analysis was "correct" because it employed assumptions that were consistent with those he was using. *Id.* His untested methodology, however, was neither a reliable means for projecting future generation nor a "correct" application of the NSR regulations.

### C.   The Rosen-Koppe Methodology Is Biased And Unreliable.

Any independent scientific review would have exposed the Rosen-Koppe methodology as fatally flawed and unreliable. It ignores virtually all of the engineering and economic factors that actually determine how much electricity a unit will generate. Indeed, that methodology was a *deus ex machina* introduced to fill a critical gap in the government's proof. It will *always* predict a generation increase whenever a component associated with prior outages is replaced—even though no such causal relationship exists in the real world. Such a biased methodology cannot be applied "reliably to the facts of the case" and should have been excluded under Fed. R. Evid. 702. *See Chapman*, 297 F.3d at 686-87.

Rosen. Rosen conceded that his methodology would necessarily yield an increase in generation when applied to the repair projects at issue. *See* A00708; A00917-19. Rosen predetermined this result as a matter of mathematics by applying a unit's

pre-repair utilization factor to his (hypothesized) increased post-repair availability. *See supra* pp. 16-17. Rosen thus assumed that if a unit's availability increases as a result of a repair project, some portion of that "recovered availability" will then be used to generate electricity.

This analysis ignores the bases on which the "dispatch" decisions allocate demand among the multiple generating units in a utility system. *See supra* pp. 10-12; *see also People Who Care v. Rockford Bd. of Educ.*, 111 F.3d 528, 537-38 (7th Cir. 1997) ("[A] statistical study that fails to correct for salient explanatory variables ... has no value as causal explanation and is therefore inadmissible in federal court."). An increase in availability, standing alone, does not mean that a unit will be dispatched more than it was historically. To the contrary, the fact that prior demand was satisfied by running a unit at a certain level in the past suggests strongly that increased generation from the unit is *not* necessary to satisfy the same level of demand in the future. This is especially true where, as here, the repairs at issue did not make any fundamental changes to generating units that would allow them to generate electricity at a lower cost or otherwise change their place in the dispatch order, A00294-95 (¶¶23-24); A00384-86; A01019-20; A01028; A01032-33; A01086; A01092; A01111-12; A01114-15, and where units had substantial excess availability prior to the projects—*i.e.*, they were frequently not run even when available, A00321-22 & A00346; A01024-26; A01096-97; A00959-67 (Rosen conceding that Cinergy's units had substantial excess capacity). Nor can it be assumed that the unit will need to be run more in order to satisfy increased

demand, because, as Rosen acknowledged, EPA's rules expressly exclude consideration of demand growth in the prediction of emissions increases. A000527 (citing 40 C.F.R. §52.21(b)(33)(ii)); *see also* 57 Fed. Reg. at 32,327; 40 C.F.R. §§52.21(b)(2)(iii)(*b*), 52.24(f)(5)(iii)(*b*) (1981).

A reliable assessment whether a unit will be run more as a result of a presumed increase in availability requires an analysis of the engineering and economic factors that guide how electrical generating units will be dispatched to determine whether, for that unit, there is reason to believe that increasing the unit's availability will cause it to be dispatched more than it was in the past. But it is precisely those factors—such as the relative costs of the units and other sources of electricity available to Cinergy, the operating characteristics of Cinergy's individual units, and the need to maintain "spinning reserves"—that were ignored in Rosen's analysis. *See supra* pp. 10-12, 17, 44.

Rosen conceded these real-world factors dictate how generating units are in fact dispatched. A00703-04; A00738-40; *compare* A00563 ("I agree that all of the complexities that Mr. Harris lists in Table 1 can affect how a generating unit operates"), *with* A00310. He also acknowledged that he never examined the dispatch order of Cinergy's units. A00720; A00775; A00970. And he admitted that he could have performed a more accurate prediction that took these factors into account (using a model like those regularly used by utilities) and that it would be "preferable" to use such models to forecast emissions increases, A00563; *see also* A00706; A00723; A00729; A00735; A00738-40. He testified simply that he lacked

sufficient resources or time to do so. A00673; A00676-77; *see also* A00761-63 (stating he did not even ask the government about calculating emissions using a dispatch model because he "just sort of assumed" that it was too expensive).

These concessions confirm that Rosen's analysis should have been excluded under Fed.R.Evid. 702. Without analyzing the factors that influence the decision to dispatch electricity from a unit, Rosen had no reliable basis from which to conclude that each project should have been predicted to increase generation and emissions. *Cf.* A00308-10; A00317-20; A00384-86; A00291 (¶¶16-17); A01015; A01019-21; A01027-28; A01037-38; A01057; A01086; A01092-93; A01112; A01114-15. Indeed, many of the relevant factors ignored by Rosen would have suggested that generation at the repaired units might *decrease* after a repair. A00702-03 (conceding that parameters ignored by his constant utilization factor could cause decrease in generation). For example, Rosen ignored binding constraints on how Cinergy units may be dispatched, such as thermal discharge permits limiting Cinergy's use of the Wabash River units when temperatures are high. A01066; A01068; A01083-84. He also ignored that natural gas prices can decrease relative to coal prices and make coal plants more costly, and thus less likely to be dispatched. A01112; A01122; A01140; A01142. He ignored that during the time period at issue in the Complaint Cinergy constructed new generating units and increased the capability of Wabash River Unit 1, thereby potentially decreasing the amount of energy that existing units need to provide. A00738 (acknowledging new capacity impacts utilization of existing units); *see also* A00998; A01087. And he failed to

46

consider the fact that Cinergy was moving from relying predominantly on its own units for electricity in the 1980s to purchasing electricity from neighboring utilities in the 1990s, thereby potentially reducing its own generation. A00738; A00766 (acknowledging off-system sales impacts utilization of generating units); *see also* A01148.

Rosen's decision to ignore the factors that actually drive electricity generation decisions led to an additional and especially basic error—he ignored the *interdependence* of generating units that comprise a single system. *Cf.* A00308-11; A00291 (¶¶16-17); A01140-41; A1143; A01145-49. In assessing a possible change in interdependent systems, one cannot look at one unit and hold everything else constant as Rosen did. In particular, an individual generating unit is not like a manufacturing plant where, for example, if a broken assembly line conveyor is repaired, the plant might then be expected to produce more of its product. To the contrary, if one unit in an interdependent utility system is to generate more, another must generate less. That is particularly clear here because (a) the demand for electricity and the electricity generated "must balance," *see NIPSCo*, 667 F. Supp. at 618, and (b) the demand must be assumed to be flat or falling because EPA's regulations require that any potential growth in demand be excluded from the calculations, 57 Fed. Reg. at 32,327; 40 C.F.R. §§52.21(b)(2)(iii)(*f*), 52.24(f)(5)(iii)(*f* (1981). One cannot, therefore, predict how much a single unit will generate without considering what other units will generate.

Rosen ignored that reality. He analyzed a series of projects at different generating units and looked at each unit as if it were a stand-alone utility, without regard to what might be occurring at other generating units. *See* A000525-26; A000533-35. He did so even though he was predicting increases at multiple units during the same general period of time. A000539-40. It is, of course, physically *possible* for dispatch engineers to make substantial shifts of generation disproportionately toward units that have recently undertaken like-kind component replacements. But Rosen never attempted to show—and could not have shown— that any utility actually behaves in that way (or rationally would), rather than make decisions (as they do) on the basis of cost considerations, operating characteristics, reserve needs, and similar factors. Indeed, in a hypothetical system in which each unit recently undertook a replacement of a component previously associated with outages, Rosen's methodology would predict an outcome that could never occur: each unit, as well as the system as a whole, would increase generation even if demand were constant.

Rosen's failure to consider the relevant dispatch factors and unit interdependence is particularly stark given the government's position that, "[f]or *all* of the Cinergy units" at issue, availability "increased substantially" during the applicable period because of systemic improvements in maintenance, management and operating practices. A00414 (emphasis added); *see also, e.g.*, A00404; A00408- 09; A00411; A00388. Even assuming *arguendo* that a particular repair increased a given unit's availability, as Rosen does, it was nonetheless the case that Cinergy's

*other* generating units likewise contemporaneously experienced substantial availability increases for independent reasons. But under Rosen's theory, *all* these other units would also be predicted—nonsensically—to generate more electricity while demand remains flat. Testimony relying on such a manifestly illogical theory should not have been presented to the jury.

<u>Koppe</u>.  Although Rosen's "constant utilization" assumption by itself renders the methodology unreliable, it is not the methodology's only such failing. The "recovered availability" theory propounded by Koppe is likewise fundamentally flawed, and independently renders the analysis biased and unreliable. *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994) ("any step that renders the analysis unreliable ... *renders the expert's testimony inadmissible*" (emphasis added)).

This theory assumed that the entire generating unit recovers, for a two-year period, the precise number of hours previously lost to outages and derates associated with the replaced component in a pre-project two-year "baseline" period. A00397; A00523. This assumption was demonstrably wrong. Koppe's own data show that, in many cases, numerous and substantial outages and derates associated with the repaired component itself continued to occur after the repair. *See, e.g.*, A00430; A00434; A00437; A00439-40; A00443; A00445-46; A00449; A00452; A00461-62; A00465; A000575-76. If the repairs did not even stop the outages at issue—let alone address the thousands of other randomly-failing components in the units—one cannot reliably predict that these projects will "recover" all previously "lost"

49

availability. Indeed, in an independent 1982 report, Koppe acknowledged that a replacement may "not provide the full gain or perhaps creates a worse situation" and that "the risk of not achieving higher levels of productivity as a result of the improvement must be considered and treated accordingly." A00235; *see* A00826-27 (Koppe conceding that a repair itself may fail or not be completely effective); A00846-47 (Koppe "at a loss" for why outages continued seven months post-repair); *see also* A00861-63; A00882-83; A01016-18.

Koppe's testimony at trial only further underscored that his analysis was unreliable and contrary to EPA's NSR rules. At trial, Koppe asserted that these "clusters" of problems that can occur soon after a replacement could be ignored because in "the long term after the project" and "many years in the future" these problems will be eliminated. A00826-27; *see also* A00861-63; A00882-83. But that is irrelevant. EPA's test requires a determination of how much emissions are projected to change in the two years following the project, 57 Fed. Reg. at 32,323; *see also* A00910, not "many years in the future," and Rosen improperly used Koppe's "long-term" calculations of recovered availability to predict emissions increases for those two-year periods.

Moreover, even if one could assume that utility component repairs are always effective, it is undisputed that forced outages at coal-fired units are random events and can occur at any time from hundreds of different factors. A00302-07; A00287 (¶8); A00589-94; A00713-15; A00808-09; A00866; A01007-08; A01019; A01037; A01042; A01080; A01126. It is also undisputed that such outages are extremely

frequent. *See, e.g.*, A00865; A01069; A01008; A01011; A01107-08. Thus, as Koppe acknowledged, one of the thousands of other components that make up complex generating systems and that was not replaced could fail and cause an outage, A00479; A00830; A00852-53; A00868; *see also* A00287-89 (¶¶8-11); A00299-302; A01011-12. In aggregate, the outages caused by these other component failures are significant and can exceed the outages caused by the steam tube replacements challenged by the government. *See, e.g.*, A00868-75; A00877-99; A01011-12. This is particularly true because as a coal-fired generating plant ages, it is to be expected that many of its older parts will wear out. A00884; *see also* A00479 (hundreds of components can be replaced during a shutdown); A01001; A01039 (tens of thousands of component repair projects occurred during this period). As such, there was no basis to presume that the handful of repair projects analyzed by Koppe would somehow boost unit availability well in excess of historical levels.

This is why, rather than assume as Koppe did that a repair will restore the amount of unit availability previously lost as a result of the component being fixed, Cinergy—like other utilities, A00523-25—used a several-year average of the unit's historic availability as the best proxy for future availability in generation forecasting models, A00615-16; A00620-21; A00599-604; A00607-08; A01037. Such a long-term average reflects any sustained and verifiable improvement in overall unit availability while accounting for the fact that generating units are complex machines consisting of hundreds of subsystems subject to frequent and random failures—the reality that Koppe's assumptions improperly ignored.

### D. The Rosen-Koppe Methodology Is Irrelevant Under The CAA And EPA's Implementing Regulations.

The Rosen-Koppe methodology should also have been excluded under Rule 702 for an additional reason: the methodology does not show that the predicted emissions increases are caused by the repair projects. Its predictions of emissions increases were therefore irrelevant to whether the projects at issue were "modifications" that triggered NSR. *See Daubert*, 509 at 591-92 ("Rule 702's 'helpfulness' standard requires a valid scientific connection to the *pertinent inquiry* as a precondition to admissibility") (emphasis added); *Kempner Mobile Elecs., Inc. v. Sw. Bell Mobile Sys.*, 428 F.3d 706, 713 (7th Cir. 2005) (affirming exclusion of plaintiff's expert testimony "as irrelevant and inapplicable to [plaintiff's] theory of liability").

The CAA and implementing regulations require a showing that each like-kind change would be expected to "result in" significant emissions increases. *See, e.g.*, 40 C.F.R. §52.21(2)(i). As EPA has concluded, this means that "NSR will not apply unless EPA finds that there is a causal link between the proposed change and any post-change increase in emissions." 57 Fed. Reg. at 32,326.

Thus, for example, where an increase in emissions will be a result of "independent factors" other than the physical change in the plant (such as a growth in demand) and the unit would "have been able to accommodate" that projected increase "even absent the particular change," the increase must be "excluded from the projection of future actual emissions." *Id.* By contrast, for example, if a physical change "significantly alters the efficiency of the plant" and is "the predominant

cause of the change in emissions"—because it will make the plant less costly to run and the plant will therefore be dispatched more often—the resulting increase can trigger NSR. *Id.* at 32,326-27. But even where a project will improve a unit's efficiency, EPA emphasized, causation "must be resolved on a case-by-case basis and is dependent on the individual facts and circumstances of the change at issue." *Id.* at 32,327.

Rosen never conducted any causation analysis, much less a factual and case-specific one, to demonstrate that increasing the availability of a unit will cause an increase in generation. He provided no basis for concluding that like-kind component replacements, which are not intended or expected to alter the unit's efficiency or otherwise change its place in the dispatch order, would nonetheless lead the unit to be dispatched more often.

The government did not deny below that Rosen was required to show causation for his predictions. Instead, the government asserted that his analysis satisfied that requirement because it:

> by design, isolates the emissions expected to result from the project itself. Dr. Rosen assumes that post-project Cinergy will operate the unit for the same percentage of available hours as it did before the project. This excludes the impact of increases in operation attributable to increases in demand and isolates the effect of the project. By definition then, an increase calculated by Dr. Rosen cannot be "unrelated" to the project. Thus, even if one assumes that the unit could have generated emissions equal to the post-project emissions, the calculated increase attributable to the project is an increase that can trigger New Source Review.

A00277 (citations omitted). This is no defense at all. To the contrary, it confirms that Rosen merely "assume[d]" that generation increases would follow from

53

availability increases, and that those increases would therefore satisfy the causation requirement only "by definition." That explanation begs the question, because it acknowledges that this assumption was critical without providing any basis for thinking it valid. Rosen's entire formula was driven by his assumption that a utilization rate that had applied to a unit in the past, at one level of availability, would also apply to that unit in the future, at a different presumed level of availability—even though the availability of the other, interdependent units in the system was increasing at the same time. But Rosen never sought or was able to justify that essential assumption.

The absence of a causation analysis was particularly glaring here for at least two reasons. First, none of the units at issue had ever been called upon to generate at anything near the full extent of their availability. As Rosen conceded, all the units had extensive "headroom"—excess availability that was never actually utilized—and could have accommodated substantial increases in generation even if the projects in question had never been done. A00959-67; *see also* A01024-26; A01096-98. For example, Rosen's calculations predicted a 1.54% increase in generation from the 1989 project at Wabash River Unit 2; however, Unit 2 already could have accommodated a 27.9% increase in generation without the project. The other Wabash River units could have similarly accommodated Rosen's projected generation increase without making the replacement. A01096-97; A000580 & A000582-84; A00319-24; A00346; *see also* A00959. There was no basis to assume that a modest addition of availability would suddenly be used when the ample

extant availability had not been. This is particularly true under EPA's requirement that growth in demand be excluded given that any assumed generation increase by one unit must therefore be accompanied by corresponding generation decreases in Cinergy's other interconnected units.

Second, even accepting *arguendo* that a unit becomes more available as a result of a single like-kind replacement, *but see supra* pp. 49-51, other aspects of EPA's rules establish that such an alleged availability increase does not cause an emissions increase within the meaning of NSR. In addressing the selection of the "baseline emissions period"—*i.e.* the two-year pre-project period from which a projected emissions "increase" is measured—EPA has explained that periods in which "the source's capacity was reduced due to physical problems" should not be used as baselines because such periods do not represent "normal operations." 57 Fed. Reg. at 32,323.[9] The entire Rosen-Koppe theory, by contrast, is that "normal operations" *include* the periods in which the particular component at issue is causing forced outages, and that repairing that component causes an emissions increase within the meaning of NSR. As Rosen conceded, use of a baseline that did not reflect "reduct[ions] due to physical problems" would produce results "less favorable to the government." A00727. Because their theory is inconsistent in this and other respects with the legal framework it purports to apply in a manner that

---

[9] EPA thus concluded on remand from *WEPCo* that it would be inappropriate to evaluate WEPCo's life extension project by using the period immediately prior to the project because an earlier period "prior to the source curtailments due to [WEPCo's] discovery of cracks in the rear steam drums" was "more representative of normal source operations." A00254. EPA later reaffirmed that "normal source operations" means operations when the replaced components were not yet causing problems. A00240-41.

produces inflated emissions results, it should have been excluded as irrelevant to the issues the jury was charged with deciding.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's judgment and remand with instructions to enter judgment in Cinergy's favor.

Respectfully submitted,

Marc E. Manly
Catherine S. Stempien
Dean M. Moesser
Julie L. Ezell
DUKE ENERGY CORP.
526 South Church Street
Charlotte, NC 28202
(704) 382-8000


December 11, 2009

Mark D. Hopson
   *Counsel of Record*
Peter D. Keisler
Peter C. Pfaffenroth
Ryan C. Morris
Lowell J. Schiller
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
(202) 736-8000 tel.
(202) 736-8711 fax
   *Attorneys for Appellants*

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 13,855 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Circuit Rule 32, and the type style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word in twelve point Century Schoolbook font.

December 11, 2009                    _____
                                     Mark D. Hopson

## CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30(d)

Pursuant to Circuit Rule 30(d), the undersigned counsel hereby certifies that all materials required by Circuit Rules 30(a) and 30(b) are included in the Required Short Appendix.


December 11, 2009                              _____
                                              Mark D. Hopson

**CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 31(e)(1)**

Pursuant to Circuit Rule 31(e)(1), the undersigned counsel hereby certifies that appendix materials required by Circuit Rules 30(a) and 30(b) are not available in searchable digital format.


December 11, 2009                                    _____
                                                                    Mark D. Hopson

## CERTIFICATE OF SERVICE

Pursuant to Federal Rules of Appellate Procedure 25 and 27, I, Peter C. Pfaffenroth, hereby certify that on December 11, 2008, I served two copies of this brief by first class mail, postage pre-paid, to the following counsel at the following addresses:

PHILLIP A. BROOKS
JUSTIN A. SAVAGE
JAMES A. LOFTON
JASON A. DUNN
THOMAS A. BENSON
LOREN A. REMSBERG
Environmental Enforcement Section
Environment & Natural Resources Div.
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20530
(202) 514-5293

TIMOTHY M. MORRISON
United States Attorney
Southern District of Indiana

THOMAS E. KIEPER
Assistant United States Attorney
Southern District of Indiana
10 West Market Street, Suite 2100
Indianapolis, IN 46204-3048

**Attorneys for the United States of America**

MICHAEL MYERS
Assistant Attorney General,
Environmental Protection Bureau
The Capitol
Albany, NY 12224
(518) 402-2594
**Attorney for State of New York**

JON MARTIN
Deputy Attorney General
Richard J. Hughes Justice Complex
25 Market Street, P.O. Box 093
Trenton, NJ 08625-4503
(609) 984-2845
**Attorney for State of New Jersey**

SCOTT N. KOSCHWITZ
Assistant Attorney General
55 Elm Street
P.O. Box 120
Hartford, CT 06141-0120
(860) 808-5101
**Attorney for State of Connecticut**

KEITH GUTHRIE
13242 South 600 East
Elizabethtown IN 47232
(812)579-5926
**Attorney for the Hoosier Environmental Council and the Ohio Environmental Council**

_____
Peter C. Pfaffenroth