Nos. 09-3344, 09-3350, 09-3351

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee/Cross-Appellant,*
and
STATE OF NEW YORK; STATE OF NEW JERSEY; and
STATE OF CONNECTICUT;
*Plaintiff-Intervenors-Appellees/Cross-Appellant*s,
and
HOOSIER ENVIRONMENTAL COUNCIL; and
OHIO ENVIRONMENTAL COUNCIL,
*Plaintiff-Intervenors-Appellees,*

v.

CINERGY CORP.; PSI ENERGY, INC.; and
THE CINCINNATI GAS & ELECTRIC CO.,
*Defendants-Appellants/Cross-Appellees.*

Appeal from the United States District Court for the Southern District of Indiana,
Civil Action No. 1:99-CV-01693, Hon. Larry J. McKinney, presiding

## OPENING/ANSWERING BRIEF FOR APPELLEES/CROSS-APPELLANTS
## THE UNITED STATES AND THE STATES OF NEW YORK, NEW JERSEY
## AND CONNECTICUT

IGNACIA S. MORENO
  *Assistant Attorney General*

Katherine J. Barton
Thomas A. Benson
Phillip A. Brooks
Sarah D. Himmelhoch
Justin A. Savage
Jason A. Dunn
  *Attorneys, Environment & Natural*
  *Resources Division*
  *Department of Justice*
  *P.O. Box 7611*
  *Washington, D.C. 20044-7611*
  *(202) 514-1111*

February 19, 2010

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - iii -

JURISDICTIONAL STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 1 -

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 2 -

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 3 -

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 4 -

    A.    Statutory and Regulatory Background. . . . . . . . . . . . . . . . . . . . . - 4 -

        1.    The Clean Air Act NSR provisions. . . . . . . . . . . . . . . . . . - 4 -

        2.    The NSR regulations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 6 -

    B.    Factual Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 7 -

        1.    Age-related deterioration and utility life extension efforts.
            . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 7 -

        2.    Cinergy's efforts to extend the lives and improve operations of
            the Wabash units. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 8 -

        3.    Cinergy's methodology for estimating future generation from
            availability improvement projects. . . . . . . . . . . . . . . . . . . - 10 -

    C.    Procedural Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 11 -

        1.    The district court's dismissal of Plaintiffs' penalty claims.
            . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 11 -

        2.    Cinergy's interlocutory appeal to establish the emissions
            increase test that applied to its renovations. . . . . . . . . . . . - 12 -

        3.    The expert testimony of Mr. Koppe and Dr. Rosen. . . . . . - 14 -

        4.    The judgment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 16 -

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 17 -

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 18 -

I.   The district court properly instructed the jury to consider  "actual" emissions
     increases resulting from Cinergy's renovation projects. . . . . . . . . . . . . . - 18 -

     A.   Standard of review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 18 -

     B.   Cinergy waived its new argument for application of a "potential"
          emissions standard by failing to raise it in the prior appeal. . . . . - 19 -

     C.   Regardless of whether the issue was preserved, the district court
          correctly instructed the jury to apply the actual emissions test.
          . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 22 -

          1.   Cinergy's "potential" test is contrary to EPA's approval of
               Indiana's SIP and the Act. . . . . . . . . . . . . . . . . . . . . . . . . . . - 22 -

          2.   Cinergy's test would produce absurd results. . . . . . . . . . . . - 25 -

II.  The district court correctly admitted Plaintiffs' expert testimony that
     Cinergy's renovations would be reasonably expected to increase actual
     annual emissions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 26 -

     A.   Standard of review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 28 -

     B.   The district court applied the *Daubert* standard and is entitled to
          abuse of discretion review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 28 -

     C.   The district court acted within its discretion by focusing on the general
          acceptance of the experts' techniques and their experience in the utility
          field. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 30 -

          1.   Mr. Koppe and Dr. Rosen's methodology was not "made-for
               litigation." . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 31 -

          2.   Mr. Koppe and Dr. Rosen's opinions grew naturally out of their
               professional experience and are based on generally accepted
               techniques in the utility industry. . . . . . . . . . . . . . . . . . . . . - 35 -

          3.   Cinergy's challenges go, at best, to the weight not the
               admissibility of the testimony provided by Mr. Koppe and Dr.
               Rosen. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 41 -

III.   Plaintiffs' penalty claims are not barred by the statute of limitations. . .   - 51 -

     A.    Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 51 -

     B.    Standard of review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 52 -

     C.    The NSR provisions of the CAA apply NSR requirements to facility
            operations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 52 -

     D.    The NSR regulations govern facility operations. . . . . . . . . . . . . . . - 57 -

     E.    Cinergy's illegal modifications give rise to ongoing violations under
            Seventh Circuit authority. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 58 -

     F.    Imposing penalties for Cinergy's ongoing violations is consistent with
            the purpose of the CAA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 60 -

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 63 -

# TABLE OF AUTHORITIES

**CASES**                                                                       **Page**

*Adams v. Ameritech Servs., Inc.*, 231 F.3d 414 (7th Cir. 2000) . . . . . . . . . . . . .  40, 44

*Alabama Power Co. v. Castle*, 636 F.2d 323 (D.C. Cir. 1979)  . . . . . . . . . 5, 22-23, 60

*Ammons v. Aramark Uniform Servs., Inc.,* 368 F.3d 809 (7th Cir. 2004) . . . . . . . .  29

*Ancho v. Pentek Corp.*, 157 F.3d 512 (7th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . .  29

*Bazemore v. Friday*, 478 U.S. 385 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  44

*Blevins v. Bartel*, 422 F.3d 445 (7th Cir. 2005)  . . . . . . . . . . . . . . . . . . . . . . . . . . .  52

*Braun v. Lorrillard Inc.*, 84 F.3d 230 (7th Cir. 1996)  . . . . . . . . . . . . . . . . . . . . . .  30

*Carr v. Alta Verde Indus., Inc.*, 931 F.2d 1055 (5th Cir. 1991) . . . . . . . . . . . . . . .  60

*Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984)  . . . .  23

*Citizens Against Ruining the Env't v. EPA*, 535 F.3d 670
    (7th Cir. 2008*) (CARE)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 54, 56

*Connecticut v. Am. Elec. Power Co., Inc.*, 582 F.3d 309 (2nd Cir. 2009) . . . . . . . .  60

*Cooper v. Nelson*, 211 F.3d 1008 (7th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . .  44

*Cullen v. Ind. Univ. Bd. of Trs.*, 338 F.3d 693 (7th Cir. 2003)  . . . . . . . . . . . . . . . .  44

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) . . . . . . . . . . . . . . *passim*

*Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311
    (9th Cir. 1995) (*Daubert II*) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  35

*DePaepe v. Gen. Motors Corp.*, 141 F.3d 715 (7th Cir. 1998)  . . . . . . . . . . . . . . . .  46

*Fuesting v. Zimmer, Inc.*, 421 F.3d 528, *rev'd on other grounds*,
    448 F.3d 936 (7th Cir. 2006)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30

*Harmon Indus., Inc. v. Browner*, 19 F. Supp. 2d 988 (W.D. Mo. 1998),

*aff'd*, 191 F.3d 894 (8th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*Heard v. Sheahan*, 253 F.3d 316 (7th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*i4i Limited P'ship v. Microsoft Corp.*, 589 F.3d 1246 (Fed. Cir. 2009) . . . . . . . . . . 43

*In re Scrap Metal Antitrust Litigation*, 527 F.3d 517 (6th Cir. 2008) . . . . . . . . . . 40

*Kruz v. DeFelice*, 538 F.3d 667 (7th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999) . . . . . . . . . . . . . . . . . 26-28

*Lewis v. Citgo Petroleum Corp.*, 561 F.3d 698 (7th Cir. 2009) . . . . . . . . . . . . . . . 28

*Lewis v. City of Chicago*, 528 F.3d 488 (7th Cir. 2008) . . . . . . . . . . . . . . . . . . . 52, 59

*Naeem v. McKesson Drug Co.*, 444 F.3d 593 (7th Cir. 2006) . . . . . . . . . . . . . . . . . 30

*Nat'l Parks Conservation Assoc. v. TVA*, 480 F.3d 410 (6th Cir. 2007) . . . . . . 57, 59

*Nat'l Parks Conservation Assoc. v. TVA,* 502 F.3d 1316 (11th Cir. 2007) . . . . . . . 58

*Nat'l Parks Conservation Assoc. v. TVA*, No. 3:01-cv-71, 2008 WL 4059826
(E.D. Tenn. Aug. 28, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30-31

*Navistar Int'l Transp. Corp. v. EPA*, 858 F.2d 282 (6th Cir. 1988) . . . . . . . . . . . . . 24

*Neal v. Honeywell*, 191 F.3d 827 (7th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . 19-20

*Newell Recycling Co., Inc. v. U.S. EPA*, 231 F.3d 204 (5th Cir. 2000),
*cert. denied*, 534 U.S. 813 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*New York v. EPA*, 413 F.3d 3 (D.C. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 21

*New York v. EPA*, 413 F.3d 3 (D.C. Cir. 2005), *reh'g denied*,
431 F.3d 80 (D.C. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*NutraSweet Co. v. X-L Eng'g Co.*, 227 F.3d 776 (7th Cir. 2000) . . . . . . . . . . . . . . 38

*Palmer v. Bd. of Educ.*, 46 F.3d 682 (7th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . 59

*Roback v. V.I.P. Transp. Inc.*, 90 F.3d 1207 (7th Cir. 1996) . . . . . . . . . . . . . . . . 35, 39

*Rosen v. Ciba-Geigy*, 78 F.3d 316 (7th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . 30, 34

*Schlosser v. Fairbanks Capital Corp.*, 323 F.3d 534 (7th Cir. 2003) . . . . . . . . . 25-26

*Sierra Club v. Franklin County Power*, 546 F.3d 918 (7th Cir. 2008) . . . . . . . . . . 54

*Sierra Club v. Portland Gen. Elec. Co.*, –F. Supp. 2d.–, 2009 WL
    3245971 (D. Or. Sept. 30, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53, 54, 55

*Smith v. Ford Motor Co.*, 215 F.3d 713 (7th Cir. 2000) . . . . . . . . . . . . . . . . . . 39, 44

*Sokaogon Gaming Enter. Corp. v. Tushie-Montgomery Assoc., Inc.*,
    96 F.3d 656 (7th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Target Market Publ'g, Inc. v. ADVO, Inc.*, 136 F.3d 1139 (7th Cir. 1998) . . . . . 29-30

*Trustees of the Chi. Painters & Decorators Pension v. Royal Int'l Drywall*,
    493 F.3d 782 (7th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*United States v. Am. Elec. Power Serv. Corp.*, 137 F. Supp. 2d 1060
    (S.D. Ohio 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*United States v. Brumley*, 217 F.3d 905 (7th Cir. 2000) . . . . . . . . . . . . . . . 38-39, 47

*United States v. Cinergy Corp.*, 458 F.3d 705 (7th Cir. 2006) . . . . . . . . . . . . *passim*

*United States v. Crotteau*, 218 F.3d 826 (7th Cir. 2000) . . . . . . . . . . . . . . . . . . . . 28

*United States v. Cruz-Velasco*, 224 F.3d 654 (7th Cir. 2000) . . . . . . . . . . . . . . . . 29

*United States v. Duke Energy Corp.*, 278 F. Supp. 2d 619, 652
    (M.D.N.C. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*United States v. Mannava*, 565 F.3d 412 (7th Cir. 2009) . . . . . . . . . . . . . . . . . . 25-26

*United States v. Marine Shale Processors*, 81 F.3d 1329
    (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53, 55, 59

*United States v. Ohio Edison Co.*, 276 F. Supp. 2d 829
    (S.D. Ohio 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30-31, 41

*United States v. Olofson*, 563 F.3d 652 (7th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . 18

- vi -

*United States v. S. Ind. Gas & Elec. Co.*, No. IP99-1692-C-M/F,
2002 WL 1760752 (S.D. Ind. July 26, 2002) (SIGECO) . . . . . . . . . 12, 52, 56

*United States v. Walton*, 217 F.3d 443 (7th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . 28

*United States v. X-Citement Video, Inc.*, 513 U.S. 64 (1994) . . . . . . . . . . . . . . . . . 25

*Walker v. Soo Line R.R. Co.*, 208 F.3d 581 (7th Cir. 2000) . . . . . . . . . . . . . . . . . . 38

*Wis. Elec. Power Co. v. Reilly*, 839 F.2d 901 (7th Cir. 1990) ("WEPCO") . . . . . . 6, 11,
24, 60

## STATUTES and REGULATIONS

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-2

28 U.S.C. § 1292(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 19, 21

28 U.S.C. § 1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 1345 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 2462 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 11, 16

42 U.S.C. § 7401 *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

42 U.S.C. § 7401(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

42 U.S.C. § 7410(a)(2)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

42 U.S.C. § 7410(a)(2)(D) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

42 U.S.C. § 7410(k) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

42 U.S.C. § 7411(a)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 5, 23

42 U.S.C. § 7413 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 18, 55, 59

42 U.S.C. § 7413(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-6, 53

42 U.S.C. § 7413(d)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-6

42 U.S.C. § 7413(e)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

42 U.S.C. § 7416 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

42 U.S.C. §§ 7470-7479 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-5

42 U.S.C. § 7471 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

42 U.S.C. § 7475(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

42 U.S.C. § 7475(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 53

42 U.S.C. § 7475(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

42 U.S.C. § 7475(a)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 53, 55

42 U.S.C. § 7475(a)(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

42 U.S.C. § 7477 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 55

42 U.S.C. § 7479(2)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

42 U.S.C. § 7479(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

42 U.S.C. § 7501-7515 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-5

42 U.S.C. § 7501(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

42 U.S.C. § 7502 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

42 U.S.C. § 7502(c)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

42 U.S.C. § 7503(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

42 U.S.C. § 7503(a)(1)-(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

42 U.S.C. § 7503(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51, 55

42 U.S.C. § 7602(k) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

42 U.S.C. § 7604 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

42 U.S.C. § 7604(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

42 U.S.C. § 7604(a)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

42 U.S.C. § 7604(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

42 U.S.C. § 7604(f)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

42 U.S.C. § 7661 *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

42 U.S.C. § 7661c(a) and (b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

40 C.F.R. § 51.18(j)(1)(vi) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

40 C.F.R. § 51.18(j)(1)(vii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

40 C.F.R. § 52.21 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6-7, 20

40 C.F.R. § 52.21(a)(2)(iii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

40 C.F.R. § 52.21(j)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

40 C.F.R. § 52.21(m)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

40 C.F.R. § 52.21(m)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

40 C.F.R. § 52.21(r)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

40 C.F.R. § 52.24(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

40 C.F.R. § 52.793 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6-7

40 C.F.R. § 70.1(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

45 Fed. Reg. 52,676 (Aug. 7, 1980) . . . . . . . . . . . . . . . . . . . . . . . . . 6-7, 22, 23, 24

46 Fed. Reg. 54,940 (Nov. 5, 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 22

47 Fed. Reg. 6621 (Feb. 16, 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 22

57 Fed. Reg. 32,314 (July 21, 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 49

325 Ind. Admin. Code § 2-1 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

325 Ind. Admin. Code § 2-1, Section 2 (1981) . . . . . . . . . . . . . . . . . . . . . 22

- ix -

325 Ind. Admin. Code § 2-1, Sections 4(b)(4) and 5(b)(1)(C) (1981) . . . . . . . . . . . 57

325 Ind. Admin. Code § 2-1, Section 8 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

325 Ind. Admin. Code § 2-1, Section 10 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

325 Ind. Admin. Code § 2-2 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

325 Ind. Admin. Code § 2-3 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Ind. Air Pollution Control Regulation APC-1, (recodified as
    325 Ind. Admin. Code §1.1-1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Ind. Air Pollution Control Regulation APC-19 (recodified as
    325 Ind. Admin. Code §2-1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 22

## LEGISLATIVE HISTORY

136 Cong. Rec. 36,083 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

## RULES

Fed. R. Civ. P. 54(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Fed. R. Evid. 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26-28

## OTHER AUTHORITIES

1 Fowler v. Harper, et al., *The Law of Torts* § 1.30 (3d ed. 1996) . . . . . . . . . . . . . 60

19 J. Moore et al., *Moore's Federal Practice*, § 203.32 (3d ed. 2010) . . . . . . . . . . . 19

William L. Prosser, *Handbook of the Law of Torts*, § 90 (3d ed. 1964) . . . . . . . . . 60

## JURISDICTIONAL STATEMENT

The jurisdictional statement of defendants-appellants' Cinergy Corp., PSI Energy, Inc., and Cincinnati Gas & Electric Co. (collectively, Cinergy)[1/] is not complete and correct, because it omits statutory provisions granting federal jurisdiction and does not mention the cross-appeals. The district court has jurisdiction over this Clean Air Act (CAA or Act) enforcement action pursuant to 28 U.S.C. §§ 1331 and 1345, because the United States brought claims under 42 U.S.C. §§ 7413 and 7477, and because Plaintiff-Intervenors the States of New York, New Jersey, and Connecticut, Hoosier Environmental Council, and Ohio Environmental Council brought similar claims under the Act's citizen suit provisions, 42 U.S.C. § 7604.

On May 22, 2008, a jury found Cinergy liable for New Source Review (NSR) violations at the Wabash River Generating Station (Wabash Plant). On May 29, 2009, the district court entered partial final judgment on the Wabash violations under Fed. R. Civ. P. 54(b). The district court denied Cinergy's motion for judgment as a matter of law and a new trial on July 24, 2009.

Cinergy, the United States, and the State Plaintiff-Intervenors timely filed notices of appeal on September 21, 2009. This Court consolidated the appeals and has jurisdiction under 28 U.S.C. § 1291. Separate claims concerning other plants are the subject of a partial consent decree in the district court.

---

[1/] In 2006, the Cinergy defendants merged into Duke Energy Corporation and are now Duke subsidiaries (see Cinergy Rule 26.1 Statement), but since that makes no difference here, this brief continues to refer to "Cinergy."

## STATEMENT OF THE ISSUES

Between 1989 and 1992, Cinergy renovated several generating units at the Wabash Plant, a coal-fired power plant in Indiana originally constructed in the 1950s. By the time of the renovations, Wabash units 2, 3, and 5 were experiencing breakdowns due to age-related deterioration, reducing hours of operation and, hence, annual electricity generation. To address these problems, Cinergy modified the units, replacing deteriorated components with new, modern ones that were intended to improve operations. However, Cinergy did not obtain NSR permits or comply with stringent emission limitations required by the CAA's NSR program, which applies when modifications like these are expected to increase actual annual emissions.

In 2006, in an interlocutory appeal filed by Cinergy (Case No. 06-1224), this Court held that the NSR emission "increase" test requires a determination of whether Cinergy's renovations were expected to increase actual annual emissions, which would occur if the renovations enabled the units to increase their hours of operation. *United States v. Cinergy Corp.*, 458 F.3d 705, 708-09 (7th Cir. 2006).

In May 2008, a jury found that Cinergy should have expected changes at Wabash units 2, 3, and 5 to increase actual annual emissions of sulfur dioxide ($SO_2$) and/or oxides of nitrogen ($NO_x$). Following a remedy trial, the district court issued a partial final judgment as to the Wabash units. The issues on Cinergy's appeal are:

1.     Whether Cinergy waived its argument that the actual annual emissions test does not apply to all NSR claims at the Wabash Plant by not raising

it in the prior appeal and, if Cinergy did not waive its new argument, whether the trial court correctly instructed the jury to apply the actual annual emissions test to all NSR claims.

2.      Whether the trial court abused its discretion in admitting expert testimony demonstrating, based upon standard engineering techniques used by Cinergy and others in the utility industry, that Cinergy should have expected that replacing deteriorated components that had been limiting hours of operation would increase annual electricity generation from the Wabash units, thereby increasing annual emissions.

The issue on the Plaintiff-Appellants cross-appeal is:

1.      Whether the district court erred in holding that NSR violations are "one-time" violations of the CAA, such that civil penalties were time-barred under 28 U.S.C. § 2462, where the NSR program imposes ongoing obligations to secure a permit and meet emission limitations.

## STATEMENT OF THE CASE

Plaintiffs alleged that Cinergy violated NSR requirements by conducting large renovation projects at power plants in Indiana and Ohio without obtaining permits, installing pollution controls, and meeting emission limitations required for every project that constituted a "modification." The CAA defines "modification" as any change that results in an increase in the actual amount of pollution emitted from a plant. 42 U.S.C. § 7411(a)(4).

- 3 -

This is the second appeal in this case.  In the first appeal taken by Cinergy pursuant to 28 U.S.C. § 1292(b), this Court affirmed the trial court's order that actual annual emissions would be the legal standard to determine emission "increases" in the case.  *Cinergy*, 458 F.3d at 705.  Liability issues were tried to a jury in May 2008, which found that renovations of Wabash units 2, 3, and 5 were modifications.  Following a remedy trial, the district court required the prompt shutdown of the violating units, concluding that Cinergy had caused irreparable harm as a result of emitting more than 350,000 tons of pollution in excess of NSR emission limitations.

## STATEMENT OF FACTS

### A.     Statutory and Regulatory Background.

####     1.     *The Clean Air Act NSR provisions.*

The CAA, 42 U.S.C. § 7401 *et seq.*, was enacted "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population."  42 U.S.C. § 7401(b)(1).  In 1977, Congress amended the CAA by establishing the NSR program, which addresses the impact on ambient air quality resulting from newly constructed or modified pollutant-emitting facilities.  The NSR program consists of the Prevention of Significant Deterioration (PSD) program in areas that satisfy ambient air quality standards set by the Environmental Protection Agency (EPA), 42 U.S.C. §§ 7470-7479, and the Nonattainment NSR (NNSR) program for areas that violate air quality standards, 42 U.S.C. §§ 7501-7515.  *See Citizens Against Ruining the Env't*

- 4 -

*v. EPA*, 535 F.3d 670, 673 n.3 (7th Cir. 2008) (*CARE*).  Because a plant may emit

one pollutant that does not violate EPA air quality standards and another pollutant

that does, the same plant can be subject to both PSD and NNSR.

Under the PSD program, "[n]o major emitting facility * * * may be

constructed" or modified without first meeting several requirements.  42 U.S.C.

§ 7475(a); *see* 42 U.S.C. § 7479(2)(C).  Among those requirements, a facility must

obtain a permit "setting forth emission limitations" and must be "subject to the best

available control technology," or BACT, "for each pollutant subject to regulation."

*Id.* § 7475(a)(1), (4).  Under the more stringent NNSR program, new and modified

sources must meet the "lowest achievable emission rate" rather than apply BACT,

and must obtain emission offsets from other sources.  *Id.* § 7503(a)(1)-(2); *CARE*,

535 F.3d at 673 n.3.  The PSD and NNSR provisions share a statutory definition of

"modification" that is triggered by "changes that increase actual emissions." *New

York v. EPA*, 413 F.3d 3, 40 (D.C. Cir. 2005); *see* 42 U.S.C. §§ 7411(a)(4), 7479(2)(C),

7501(4); *Ala. Power Co. v. Castle*, 636 F.2d 323, 353, 400 (D.C. Cir. 1979).

The United States has authority to enforce NSR requirements in federal

court, including obtaining injunctive relief and civil penalties of up to "$25,000 per

day."  42 U.S.C. § 7413(b); *see also id.* § 7413(d)(1).  The CAA also authorizes citizen

suits for, *inter alia*, the violation of any emission standard or limitation established

under the Act or any requirement to obtain a permit as a condition of operations.

42 U.S.C. § 7604(a)(1), (f).

- 5 -

2.     *The NSR regulations.*

States implement many of the CAA's provisions through the adoption of a
State Implementation Plan (SIP).  Among other requirements, SIPs must contain
emissions limitations and other measures necessary to meet NSR requirements,
and are subject to approval by EPA.  42 U.S.C. §§ 7410(a)(2)(C), (D), and (k), 7471,
7502.  The Act allows states to implement their own regulations, but no SIP can be
less stringent than the federal program.  42 U.S.C. § 7416.

On August 7, 1980, EPA issued regulations requiring NSR permits for any
"major modification," which was defined for both PSD and NNSR as any physical or
operational change that would increase actual annual emissions over "significant"
threshold amounts (40 tons per year for $SO_2$ and $NO_x$).  45 Fed. Reg. 52676, 52700
(1980); *Cinergy*, 458 F.3d at 707-08; *New York*, 413 F.3d at 13-14.[2]  EPA
contemporaneously disapproved Indiana's PSD program because it was not as
protective as the federal program, making Indiana subject to EPA's PSD
regulations at 40 C.F.R. § 52.21.  *See*  40 C.F.R. §§ 52.793; 45 Fed. Reg. at 52741.
Two years later, EPA partially approved Indiana's general construction and
operating permit regulations, which included approval of Indiana's NNSR
requirements (APC-19: Permits, PSD, Emission Offset).  47 Fed. Reg. 6621 (Feb. 16,

---

[2]  In 1992, EPA clarified the NSR emissions increase provisions in response to
*Wisconsin Elec. Power Co. v. Reilly,* 893 F.2d 901, 916-18 (7th Cir. 1990) (*WEPCO*).
The 1992 revisions generally allow electric utility sources that satisfy certain data
reporting requirements to use an actual-to-projected-actual emissions test rather
than a more stringent actual-to-potential test.  57 Fed. Reg. 32314, 32323 (July 21,
1992).

1982).  EPA disapproved, for NSR purposes, the definitions section of Indiana's SIP

(APC-1).  *See* 46 Fed. Reg. 54940, 54942 (Nov. 5, 1981).  The definitions that were

disapproved for NSR purposes included the state's definition of "modification."  *See*

*id.; see also* Cinergy Regulatory Addendum (ADD), at 7-8.

**B.     Factual Background.**

The Wabash plant includes a number of coal-fired generating units.  Wabash

units 2 and 3 are 90 megawatts each, and unit 5 is 103 megawatts.  A megawatt is a

measure of electrical output that represents one million watts, and utilities sell

electricity in terms of megawatt-hours.  The three units began operating between

1953 and 1956.  *See* Cinergy Appendix (A) at A00280-81.  At the time of the

modifications, the Wabash plant was subject to NNSR for $SO_2$ and PSD for $NO_x$.

A00018, 20.

*1.     Age-related deterioration and utility life extension efforts.*

By the mid-1980s, Cinergy knew that aging coal-fired units were

experiencing increased forced outage rates – the rate at which a unit is forced off-

line due to component failures – thereby decreasing the amount of time the units

were "available."  A00015; *see also* Appellees/Cross-Appellants' Joint Supplemental

Appendix (SA) SA0022.  "Availability" is a universally accepted measure in the

electric utility industry of the percentage of time a unit is ready and able to

generate electricity.  SA0061, SA1501, SA1515-16, SA1518-19, SA1615-16.  The

frequency of availability-limiting forced outages typically begins rising at about 30

years of operation.  A00015, SA0022, SA0037; SA0191; SA0200.

Faced with an aging fleet of existing units on the one hand, and increased

regulatory requirements for new units on the other, Cinergy and other utilities

began developing "life extension" programs to evaluate whether it was more

economic to refurbish old, deteriorated units rather than build new units.  SA0017,

SA0032; SA00189; SA0200; SA0226.  According to a survey conducted by the Edison

Electric Institute, a utility trade association, ninety-five percent of such programs

were developed after 1980 and the most frequent goals reported were "life

extension, improved availability, and improved reliability."  SA0241.  By

refurbishing deteriorated plants, Cinergy expected to obtain as much as "an

additional thirty years of service life at levels of availability, reliability, and

efficiency comparative to original design."  SA0192.

> 2.    *Cinergy's efforts to extend the lives and improve operations of the*
>        *Wabash units.*

Cinergy understood that life extension would "prevent or avoid forced

outages," SA0025, and in 1986 began developing a general process for evaluating

potential life extension projects based on their ability to improve availability and

other operating parameters.  SA0197; SA0216.  After the Wabash plant passed the

30-year mark, Cinergy performed a study to determine how to extend that plant's

life through 2008, "15 years beyond its [then] current life expectancy of 1993."

SA0263, SA0282.  The Wabash units were experiencing increased forced outage

rates, and Cinergy identified specific "rehabilitation" and "modernization" projects to "restor[e] * * * availability, reliability, and capacity factors at or near design status." SA0283-84.

Cinergy expected that renovating the deteriorated Wabash units would improve availability and increase generation by reducing outages – Cinergy wanted to fix the units so they could run more. For instance, at Wabash 2, which was 36 years old at the time, Cinergy identified an increasing trend of failures of a major boiler component known as the radiant superheater, and evaluated the "availability gain" and savings due to "less forced outages" that were expected to result from replacing the deteriorated superheater. SA0318-21; SA0347. Cinergy had similar expectations for improved operation for all of the renovations at issue here. *See*, *e.g*, SA0331 ("availability gain" at Wabash 2 due to "less number of forced outages"); SA0341 ("availability improvement" and "reduced forced outage rates" expected at Wabash 2); SA0348 ("modernization" to "increas[e] the mean time between failures" at Wabash 2); SA0349; SA0351 (Wabash 3 renovation justified based on availability data identifying "failures and lost generation"); SA0353 (Wabash 3 renovation would address "unavailability"); SA0355; SA1531-38, SA1545-46 (describing Wabash 5 problems); *see also* SA0693-709, SA0713-26 (discussing projects).

3.    *Cinergy's methodology for estimating future generation from availability improvement projects.*

Cinergy developed a standard capital budgeting methodology to ensure economically justified investments in its existing generating sources.  SA0086.  A key part of that process involves a routinized methodology to quantify the benefits of, *inter alia*, availability improvements, which calculates the additional electricity generation attributable to specific projects and translates that generation into an estimate of revenue from megawatt-hours gained from the improvements.  SA0086; SA0997; SA0369-70; SA0384; SA0523-24; SA1640-47; SA1650.  The first step of Cinergy's methodology calls for an engineer's judgment on the number of megawatt-hours lost due to the specific problem that will be remedied by a proposed project.  The value of those lost megawatt-hours is calculated by determining the extra cost of replacement power that had to be generated by, or purchased from, a more expensive source to meet the demand that could not be met by the unit that was forced out of service.  SA0086.[3/]  Not all of the regained availability will necessarily be utilized, however; thus Cinergy multiplies the historic megawatt-hours lost due to the deteriorated component by a "utilization factor" to estimate the increased

---

[3/]  Replacement power cost is the difference between the cost of generating power from the off-line unit and the more expensive cost of generating or purchasing power to replace that unit's generation.  Because units are dispatched predominantly based on cost (economic dispatch), outages of low-cost coal units such as the Wabash units result in increased replacement generation costs.  SA0063; SA0086, SA0023; SA0369; SA0384; SA1355-56; SA1643-44; SA1646.

generation that will result from the availability improvement, and calculates the revenue savings from that increased generation. SA0086; *see also* SA1644-47.

Using this capital budgeting methodology, Cinergy predicted it would run the deteriorated units more once they were fixed, resulting in an economic benefit that justified the capital investments. SA0384; SA0396-99; SA0524; SA1650; SA0997. Although that increased revenue stream was tied to burning more coal and hence increased annual emissions, Cinergy did not seek an NSR permit or an applicability determination for its renovations. *Cf. WEPCO*, 893 F.2d at 904 (reviewing EPA applicability determination). In pre-trial decisions rejecting Cinergy's "fair notice" defense, the district court found that Cinergy chose not to seek such permits even though it was aware that projects that would be expected to significantly increase actual annual emissions trigger NSR requirements. SA0564; SA0571; *see also* SA0589, SA0602 (1989 testimony discussing risk that projects that affect "efficiency, availability or reliability, or restore[] operating capacity" may trigger NSR).

### C.    Procedural Background.

#### 1.    *The district court's dismissal of Plaintiffs' penalty claims.*

In 2005, the district court granted summary judgment for Cinergy on civil penalties. The court held that the statute of limitations at 28 U.S.C. § 2462 barred penalties for the Wabash and other NSR claims arising from modifications constructed more than five years before the filing of Plaintiffs' complaints. SA0001. The district court relied (SA0006-7) on its prior decision in *United States v. S. Ind.*

- 11 -

*Gas & Elec. Co.*, No. 99-1692, 2002 WL 1760752, at *4 (S.D. Ind. July 26, 2002)
(*SIGECO*).  There, the court correctly recognized that failure to obtain a permit that
imposes operating conditions "is a continuing violation for each day of operation
without the permit," but wrongly held that NSR violations are not ongoing because
failure to comply with NSR is a discrete, one-time violation that is complete at the
time of construction.  *Id.* at *4-8.

> 2.    *Cinergy's interlocutory appeal to establish the emissions increase
>        test that applied to its renovations.*

In 2005, the parties filed cross-motions to establish the test for determining
whether Cinergy's renovations should have been expected to "increase" emissions.
The district court held that EPA's actual annual emissions increase test applied to
all of Cinergy's alleged modifications, and Cinergy asked the court to certify the
question for interlocutory appeal as a "controlling question of law."  SA0609.  The
district court granted Cinergy's request, holding that "resolution of [the emissions
increase] issue controls how the parties must calculate emissions increase to
determine the facts of this case for trial." SA0618.  Cinergy thereafter persuaded
this Court to hear the appeal, arguing that the appeal would establish which test
the jury should apply to its projects.  SA0635-36.

Cinergy argued on appeal that all of its modifications, whether covered by the
PSD or NNSR program, were governed by EPA's 1980 NSR regulations (SA1063),
which Cinergy asserted established an hourly emissions test that was triggered by
an increase in "capacity," not actual annual emissions.  *E.g.*, SA1051; 1055; 1063-65.

- 12 -

This Court rejected Cinergy's argument and affirmed the actual annual emissions test.  Specifically, this Court held that Cinergy's test would allow a plant to increase its actual annual emissions without being subject to NSR, and would provide an artificial incentive to renovate old plants that are experiencing reduced hours of operation due to "more frequent breakdowns," contrary to the CAA's expectation that "old plants will wear out and be replaced by new ones that will be subject to the more stringent pollution controls that the [CAA] imposes on new plants." *Cinergy*, 458 F.3d at 709.

Thereafter, the district court held a jury trial to determine, *inter alia*, whether Cinergy reasonably should have predicted that its renovations would increase actual annual emissions.  SA0576.  Despite this Court's decision holding that the actual annual emissions test applied to all of its projects, Cinergy submitted proposed jury instructions seeking to apply a test for NNSR claims at the Wabash plant which, like the test already rejected by this Court, turned on whether its renovations would increase the $SO_2$ that could be emitted at maximum capacity.  A00209.  Acknowledging that this Court had already resolved that the actual emissions test applied, the district court rejected Cinergy's attempt to reargue the emission increase test.  A00002.

3.    *The expert testimony of Mr. Koppe and Dr. Rosen.*

The Plaintiffs presented expert testimony from Mr. Robert Koppe and Dr. Richard Rosen – each with over 30 years of experience in the electric utility industry – explaining why Cinergy should have expected that improving the condition of the deteriorated Wabash units would increase availability and generation, and hence emissions.

As discussed *supra* pp 8-9, age-related deterioration of the Wabash units had produced more frequent breakdowns that were reducing the units' annual output. *Cf. Cinergy*, 458 F.3d at 709. Cinergy spent years determining what could be done about these problems, and decided to renovate the units. *See supra* pp 7-9. Mr. Koppe explained the common-sense logic behind Cinergy's decision: if an old, worn out component that repeatedly forces a unit off-line is replaced with a new one, reasonable utilities expect that the new component will eliminate or reduce outages due to that component. As a result, the unit would be available more hours to generate electricity. SA0644-46; SA1510; SA1551-52. Consistent with Cinergy's own capital budgeting process, Dr. Rosen explained that given how Cinergy used each of the units, if availability increases, the unit will be expected to operate more on an annual basis. SA0369; SA0377-78; SA0384-85; SA0523-24; SA1629; SA1649-50. Dr. Rosen explained that increases in operation result in burning more coal, and that burning more coal would result in more annual emissions of $SO_2$ and $NO_x$. SA0389; SA0524; SA1657-58.

- 14 -

Cinergy moved to exclude Mr. Koppe's and Dr. Rosen's testimony under *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579 (1993), and the parties submitted extensive briefing on the qualifications of the experts and the methodology they used to estimate the effect of Cinergy's improvements on emissions. SA0797; SA0813. While Cinergy attempted to portray Mr. Koppe and Dr. Rosen as presenting made-for-litigation junk science, Mr. Koppe made clear that Cinergy and other utilities used the same basic approach that he did, citing examples of his own work as well as work with industry leaders such as the Electric Power Research Institute (EPRI). SA0673-75; SA0691-92; SA0731-32; SA0875-76; SA0935-0936; SA0977-79. Dr. Rosen testified that he used essentially the same methodology that Cinergy had used to predict the amount of generation that was expected to result from its availability improvements, and that this methodology is consistent with basic, industry-accepted principles. SA0384; SA0515, SA0523-24; SA1640-50; SA0086; SA0997.

After considering the extensive record and hearing oral argument, the district court found that Mr. Koppe and Dr. Rosen were qualified in their respective fields and that their "assumptions and methodologies" had been "subjected to some type of testing or verification or are premised on assumptions generally accepted within the relevant community." A00007.

### 4.    *The judgment.*

Fourteen projects were tried to the jury in May 2008.  After a nine-day trial, the jury held that Cinergy should have predicted increases of $SO_2$ and $NO_x$ as a result of renovating Wabash Units 3 and 5, and increases of $SO_2$ as a result of renovating Unit 2. A00115, 118.  After a bench remedy trial, the district court found that Cinergy had illegally emitted more than 350,000 tons of pollution in excess of NSR emission limitations, causing irreparable harm.  A0013, 23-32, 47-50.  Nonetheless, Cinergy refused to install pollution controls or apply for NSR permits, instead proposing as a remedy a delayed retirement that was little more than its existing business plan.  A00055-57.  The district court rejected this proposed remedy and required Cinergy to shut down the units by September 30, 2009, restrict their operation in the interim, and surrender certain emission "allowances" to mitigate harm caused by the violations.  A00010, A00066-67.  Although it determined that the continued operation of the illegally modified units had resulted in emissions far in excess of NSR emission limitations, the district court did not impose any penalty because construction had commenced outside the five-year statute of limitations period, 28 U.S.C. § 2462.  A00010; SA0001.[4/]

---

[4/]  While Cinergy's brief mentions (Br., at 18) that Plaintiffs only prevailed on the Wabash River claims at the May 2008 trial, the court vacated the portion of the May 2008 verdict adverse to the Plaintiffs and ordered a new trial on those claims due to Cinergy's misconduct at the trial, including misleading the jury.  SA0990-1014; 1020; 1024.  At the retrial in May 2009, Plaintiffs prevailed on claims at one of Cinergy's other plants in Indiana, the Gallagher Generating Station.  SA1030-31.  About a month before the Gallagher remedy trial was to begin, the Parties entered

(continued...)

## SUMMARY OF THE ARGUMENT

1.      This Court has already held that the actual annual emissions test applied to all of Cinergy's renovations.  Cinergy's failure to present its new argument for a different test for $SO_2$ emissions from the Wabash plant in its prior appeal renders this argument waived.  Even if Cinergy's argument was not waived, the district court correctly rejected Cinergy's test as contrary to EPA's approval of the Indiana SIP and the CAA.

2.      The district court did not abuse its discretion when it admitted the testimony of Plaintiffs' experts.  The underlying methodologies applied by Mr. Koppe and Dr. Rosen were subject to sufficient verification and were premised on assumptions generally accepted within the utility industry.  In analyzing Cinergy's renovations, Mr. Koppe and Dr. Rosen used the same tools and analytical methods they and others in the utility industry, including Cinergy, had used to determine the impact of availability improvements on expected generation.  The analytical approach was founded on Cinergy's own data, and was the same approach that Cinergy used to calculate expected generation increases when it evaluated whether to perform the renovations.  The testimony easily met *Daubert*.

3.      The district court erred in finding that Plaintiffs' penalty claims under the CAA's NSR provisions are barred by the statute of limitations simply because

---

[4] (...continued)
into a partial consent decree, now pending in the district court, to resolve all aspects of the case not on appeal.  SA1036.

construction commenced on the illegal modifications outside the limitations period.
The NSR provisions of the Act, as well as the NSR regulations governing Cinergy's
modifications, impose ongoing obligations that apply to the construction and
operation of major emitting facilities, and require continuing compliance with NSR
emission limitations and other requirements.  Cinergy illegally emitted
approximately 350,000 tons of pollution in excess of the applicable NSR emission
limitations.  Each day of illegal operation constituted a new violation and subjected
Cinergy to daily penalties under 42 U.S.C. § 7413.

## ARGUMENT

### I.    The district court properly instructed the jury to consider  "actual" emissions increases resulting from Cinergy's renovation projects.

The district court's jury instructions faithfully followed this Court's prior
mandate that the "actual" emissions increase test applies to Cinergy's renovations.
While Cinergy now argues (Br. at 20, 22-31) that the Indiana SIP compels a
"potential-to-potential" emissions test triggered by "capacity" increases, that
assertion arrives too late in this second appeal of this case; it is waived.  Regardless,
the jury instructions were consistent with the Indiana SIP and established law.

### A.    Standard of review.

Review here is *de novo*.  *United States v. Olofson*, 563 F.3d 652 (7th Cir.
2009).

**B.     Cinergy waived its new argument for application of a "potential" emissions standard by failing to raise it in the prior appeal.**

As the trial court held, the emissions test issue was "previously determined." A00002.  *Neal v. Honeywell* forbids Cinergy's second bite at this apple.  191 F.3d 827 (7th Cir. 1999).  *Neal* held that "[a]fter receiving permission to take * * * an appeal [under § 1292(b)] and losing, a party cannot contend that the answer is irrelevant."  *Id.* at 830; *see* 19 J. Moore *et al.*, Moore's Federal Practice, § 203.32 (3d ed. 2010) (discussing *Neal*).  Cinergy's first appeal resulted in a decision from this Court which answered the question of how "the parties must calculate emissions increases * * * for the trial.'"  SA0618; *see Cinergy*, 458 F.3d at 708-11.  In this second appeal, Cinergy simply ignores this Court's answer: actual annual emissions govern the NSR analysis, not potential emissions.  *Cinergy*, 458 F.3d at 708-11. Indeed, Cinergy obtained this Court's permission for its first appeal by representing that resolution of its appeal would "control[] how the parties must calculate emissions increases to determine the facts of this case for trial," SA0636 (internal quotation omitted).  Furthermore, Cinergy seeks reversal of the verdict because the Court purportedly instructed the jury on the "wrong legal standard" for emissions increases (Br. At 22), the precise scenario that Cinergy promised its first interlocutory pre-trial appeal would avoid.  SA0623; SA0636; SA0639; SA0611-12; SA0614.

*Neal* reasoned that where, as here, a party's "current position [on a second appeal] contradicts the premise of its interlocutory appeal," further appellate review should be denied. 191 F.3d at 830. The premise of Cinergy's first appeal was that EPA's 1980 NSR regulations were the binding, "controlling" legal authority for determining the emission increase test for all the claims at issue, and it asked this Court to determine the legal standard under those rules.[5/] Yet the company now argues that the 1980 NSR regulations are mere "guidance" and that a different legal standard controlled its $SO_2$ emissions under the NNSR program based on its newly created interpretation of the Indiana SIP. Br. at 6, 7, 25, 31. As in *Neal*, Cinergy "told [this Court] that the case turned on the difference between" the parties' interpretations of the 1980 regulations; the Court "picked [EPA's interpretation] which resolves the * * * dispute." 191 F.3d at 830.

To be sure, the prior briefing and the Court's opinion focused on EPA's 1980 PSD regulations, 40 C.F.R. § 52.21. However, that was by design, as the parties agreed that those regulations were materially "identical" to the applicable NNSR regulations for purposes of the emissions test, SA1063; SA1120-21; SA0625, and Cinergy asserted that the same test controlled all of its alleged modifications under both the PSD and NNSR programs, *see supra* note 5, a position reflected in this

---

[5/] SA1063 (Cinergy interlocutory appeal brief arguing that EPA's 1980 NSR regulations "apply to the projects at issue in this case"); SA1081-87 (arguing for emissions test based on EPA's 1980 rules); SA1104 (describing EPA's 1980 NSR rules as "control[ing] the issues in this case"); SA1113 (arguing that the "the 1980 [NSR] Rules . . . are the controlling rules in this case.").

Court's opinion. *Cinergy*, 458 F.3d at 707 (holding that "[o]ther regulations are applicable to some of Cinergy's facilities but are materially identical to section 52.21, *see New York v. EPA*, 413 F.3d 3, 13 (D.C. Cir. 2005) (per curiam), and so needn't be discussed separately.").

In any case, that Cinergy has now created a new argument for its "capacity" increase test based on a new reading of the Indiana SIP provides no reason for rehashing the emissions test issue. In *Sokaogon Gaming Enter. Corp. v. Tushie-Montgomery Assoc., Inc.*, this Court made clear that parties waive any grounds not presented to the district court in moving to certify the appeal of a legal question under 28 U.S.C. § 1292(b). 86 F.3d 656, 658 (7th Cir. 1996). Both of Cinergy's appeals have argued for a potential emissions test under NSR tied to "capacity" increases. Compare SA1051, 1054-55, 1065, 1071, 1075, 1082 (Cinergy interlocutory appeal brief arguing that emissions increase requires change in "capacity"), *with* Br. at 7, 20 (same). Cinergy could have and should have raised its current reading of the Indiana SIP in its first appeal four years ago.[6/] It is too late now.

_____

[6/] Plaintiffs have not conceded that the Indiana NNSR SIP requires a potential-to-potential test. Compare Br., at 27 with A00215 and SA1139 (arguing that Indiana SIP requires a comparison to actual baseline emissions). Moreover, in summary judgment briefing, the United States pointed out the Indiana SIP provisions that Cinergy now raises on appeal, but argued that the trial court did not have to determine the test under the SIP because an actual annual emissions test was required under any circumstance, and thus the Court could enter an across-the-board legal ruling on the proper test. SA1156. Cinergy could have sought to press its newly raised interpretation of the Indiana SIP, but it never did so in the first appeal, seeking, as the United States did, a categorical ruling on the correct test.

**C.    Regardless of whether the issue was preserved, the district court correctly instructed the jury to apply the actual emissions test.**

      1.    *Cinergy's "potential" test is contrary to EPA's approval of Indiana's SIP and the Act.*

The district court correctly held that Cinergy's test was inconsistent with the Indiana SIP as approved by EPA. Cinergy cites (Br., at 25) the definitions of "modification," "potential emissions," and "allowable emissions" found in the definitions section of Indiana's SIP at 325 I.A.C. 1.1-1 (APC-1) (*see* Cinergy ADD-3, 7, 9), but the district court correctly held that EPA had "explicitly rejected" these provisions for all NSR purposes. A00002. *See* 46 Fed. Reg. at 54942 (approving these definitions only for "purposes *other than* new source review") (emphasis added). Cinergy also cites (Br., at 25-26) EPA's approval of Indiana's NNSR regulations found at 325 I.A.C. 2-1 (APC-19) (*see* Cinergy ADD-15), yet EPA disapproved the only definition of "major modification" included in those provisions (which Indiana had proposed for PSD purposes). *See* 47 Fed. Reg. at 6621; 325 I.A.C. 2-1, Section 2 (Cinergy ADD-16).

EPA's rejection of these modification definitions precluded a potential-to-potential standard. EPA explained in the preamble to its 1980 PSD and NNSR rules that, in light of *Alabama Power* and the statutory definition of "modification," it interpreted the statute as focusing on increases in actual emissions, and that NNSR requirements, like PSD requirements, would be triggered by increases in "actual emissions." 45 Fed. Reg. at 52700. A significant feature of the NSR

- 22 -

program was the use of actual rather than potential baseline emissions, *id.* at 52677, 52680, 52699-52700, and EPA therefore promulgated the "actual emissions" test as a minimum requirement for approval of state NNSR regulations.   *See id.* at 52743-44 (promulgating 40 C.F.R. § 51.18(j)(1) (vi) and (vii)).

Because there was no EPA-approved NSR definition of modification in either of the SIP provisions Cinergy cites, the only applicable definition was the one provided in the statute, which requires an actual emissions increase test for NNSR. 42 U.S.C. § 7411(a)(4) ("any physical change * * * which increases the amount of any air pollutant emitted"); *see* 45 Fed. Reg. at 52700, 52743-44.  In the statutory definition and elsewhere in the Act, Congress made clear that it "intended to apply NSR to changes that increase *actual emissions instead of potential or allowable emissions.*"   *New York*, 413 F.3d. at 39-40 (emphasis added), *reh'g denied*, 431 F.3d. 801, 802 (D.C. Cir. 2005) (CAA requires "a comparison of actual (or projected actual) emissions") (Williams, J., concurring); *id.* at 39 ("the CAA unambiguously defines 'increases' in terms of actual emissions"); *Alabama Power*, 636 F.2d at 353, 400. The actual emissions test for modifications is compelled by the language of the statute.  Under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842 (1984), "that is the end of the matter."  The district court properly rejected Cinergy's "potential" increase test and applied the actual increase test required by the Act.

Cinergy's citation (Br., at 25) to the provision in APC-19 that a permit was required for a modification that "will result in a potential increase in emissions" is not to the contrary. The word "potential" alone in this context does not mandate Cinergy's potential-to-potential test. As discussed above, EPA had already announced that it interpreted the CAA to impose NSR requirements on "modifications" that increase actual emissions and had rejected "for NSR purposes" the Indiana definition of "modification" that included a potential-to-potential test. The Indiana SIP must be interpreted with due regard for the underlying statutory definition and EPA's rejection of the potential-to-potential test, particularly given that EPA had also announced that approved NNSR SIPs must be carried out "in accordance with the requirements of" the statute. 40 C.F.R. § 52.24(b) (Cinergy ADD-131), *see* 45 Fed. Reg. at 52700, 52743-44; *Navistar Int'l Transp. Corp. v. EPA*, 858 F.2d 282, 288 (6th Cir. 1988). As required by the statute and EPA's direction, the text of the Indiana SIP is consistent with a reading in which actual baseline emissions are compared to the unit's potential future emissions, resulting in a comparison of actual-to-potential emissions.[7] Indeed, that is exactly how Cinergy

---

[7] An actual-to-potential test presumes that a physical change leads to operation every single hour of the year, *i.e.*, 8760 hours, regardless of whether such continuous operation occurred in the past. *WEPCO*, 893 F.2d at 916. In *WEPCO*, this Court held that for power plants that had "begun normal operations" a more realistic actual-to-projected-actual comparison was required. *Id.* at 917. It is more difficult to trigger NSR under an actual-to-projected-actual comparison than an actual-to-potential comparison because a change is not simply presumed to result in operation every single hour of the year. SA0564. Cinergy does not dispute that the district court applied the less stringent actual-to-projected-actual test here.

- 24 -

itself contemporaneously understood the applicable SIP provisions. SA0547-48

(Cinergy believed a comparison to "past actual" emissions was required).

> ### 2. Cinergy's test would produce absurd results.

In addition to being contrary to the statute and EPA's approval of the

Indiana SIP, Cinergy's potential-to-potential or "capacity" test (Br. at 22) would

lead to absurd results.  Cinergy contends that its test only governed with respect to

the NNSR program, which applies to plants located in "nonattainment" areas where

air quality is so poor that it violates federal standards; in cleaner "attainment

areas," Cinergy asserts that the "actual" emissions test applied.  Br., at 27.

Accepting Cinergy's view would lead to a situation in which federal law granted

utilities a free hand to increase "actual" air pollution *only* in those communities of

Indiana where air quality was already poor.  This loophole would have provided an

"artificial incentive" to renovate rather than replace a deteriorated plant, *Cinergy*,

458 F.3d at 709, particularly in communities where people could least afford to

breathe additional pollution.  The district court properly rejected such a reading to

avoid an absurd result that would be contrary to the statutory requirement to

measure actual emissions increases.  *See United States v. X-Citement Video, Inc.*,

513 U.S. 64, 68-69 (1994) (rejecting even the "most natural grammatical reading" of

a statute to avoid "absurd" results); *Schlosser v. Fairbanks Capital Corp.*, 323 F.3d

534, 537-38 (7th Cir. 2003); *United States v. Mannava*, 565 F.3d 412, 416-417 (7th

Cir. 2009).[8]

## II. The district court correctly admitted Plaintiffs' expert testimony that Cinergy's renovations would be reasonably expected to increase actual annual emissions.

Federal Rule of Evidence 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Rule 702 was amended in 2000 after the Supreme Court's decision in *Daubert v.*

*Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and the "many cases

applying *Daubert*," including *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).

Fed. R. Evid. 702 advisory committee's note.

*Daubert* addressed the admissibility of "scientific" expert testimony under the

then-extant version of Rule 702. *See* 509 U.S. at 588-97. The Supreme Court

concluded that, to be reliable, such expert testimony must be "supported by

appropriate validation – *i.e.*, 'good grounds,' based on what is known," as

distinguished from "subjective belief or unsupported speculation." *Id.* at 590.

*Daubert* articulated a number of factors for consideration by the district courts in

---

[8] Nor is there any injustice in applying the actual emissions test. As the district court held, had Cinergy timely sought NNSR permits, Indiana would have applied state regulations that indisputably set forth the actual emissions increase test. *See* IAC 325 2-1, 2-2, 2-3 (1981) (Cinergy ADD-53).

making that reliability determination, but stressed that "[t]he inquiry envisioned by Rule 702 is * * * a flexible one," and that the Court did not "presume to set out a definitive checklist or test." *Id.* at 593, 594.

Subsequently, *Kumho Tire* held that *Daubert* applies "to all expert testimony," including testimony based on "technical, or other specialized knowledge." 526 U.S. at 147. The Supreme Court explained that "*Daubert* made clear that its list of factors was meant to be helpful, not definitive," and, in agreement with the view of the Solicitor General, it observed that "[t]he factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Id.* at 150.

In this case, Mr. Koppe and Dr. Rosen collectively testified that Cinergy's renovations of the deteriorated 1950s era Wabash units would reasonably have been expected to increase the hours of operation of the units and hence annual emissions. The methodologies relied upon by Mr. Koppe and Dr. Rosen were generally accepted in the utility industry, as the district court found. Their techniques have been used in the utility industry for decades to predict the increased annual generation due to replacing deteriorated components, including by Cinergy itself in its capital budgeting process, as Cinergy concedes in its brief. The district court followed the standards provided in *Daubert*, *Kumho Tire* and Fed. R.

Evid. 702 and did not abuse its discretion in allowing Mr. Koppe and Dr. Rosen to

testify.

### A.     Standard of review.

"[T]his court reviews *de novo* whether the district court understood the legal

requirements of Rule 702, and then reviews decisions to admit or exclude expert

testimony for abuse of discretion."  *Kruz v. DeFelice*, 538 F.3d 667, 675 (7th Cir.

2008).  "[T]he trial judge must have considerable leeway in deciding in a particular

case how to go about determining whether particular expert testimony is reliable,"

and the district court has "broad latitude" to adjust the *Daubert* "gatekeeper"

factors to fit the facts of the case at issue.  *Kumho Tire*, 526 U.S. at 152-53; *see*

*Lewis v. Citgo Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009) (discretion

includes the "choice of factors to include within * * * [the Daubert] framework").

Merely pointing to evidence contrary to the district court's findings shows no

abuse of discretion: this Court "will not reverse unless the record contains no

evidence on which [the district court] rationally could have based [its] decision, or

where the supposed facts found are clearly erroneous."  *United States v. Crotteau*,

218 F.3d 826, 832 (7th Cir. 2000) (quoting *United States v. Walton*, 217 F.3d 443,

449 (7th Cir. 2000) (brackets in original).

### B.     The district court applied the *Daubert* standard and is entitled to abuse of discretion review.

In applying Fed. R. Evid. 702, trial courts must ensure that expert testimony

is relevant and rests on a reliable foundation.  *Daubert*, 509 U.S. at 597.  Cinergy

- 28 -

wrongly suggests that the district court did not "conduct the required" *Daubert* analysis and invites this Court to conduct its own review.  Br. at 33 & n.8. However, this Court has rejected such requests where, as here, "[t]he district court identified the relevant analysis and focused its inquiry on whether * * * [the expert's] testimony was reliable."  *Ammons v. Aramark Uniform Servs. Inc.*, 368 F.3d 809, 816 & n.4 (7th Cir. 2004).  After extensive *Daubert* briefing, the district court held oral argument to specifically address the "expertise" of Mr. Koppe and Dr. Rosen, the "nature" of their "methodology," and the helpfulness of their testimony to the jury, SA0797; SA0813 (the entire *Daubert* hearing transcript is reproduced at SA0795-0850).  Ultimately, the court held that the experts were qualified and that the methodologies underlying their opinions had been subjected to "testing or verification or are premised on assumptions generally accepted within the relevant community."  *Id.*  After hearing the experts' testimony at trial twice,[9] the district court entertained post-trial briefing on the same issues, rejecting Cinergy's arguments again.  A00127; SA1162-66.

While Cinergy criticizes this process as too conclusory (Br. At 33), the trial court acted within its discretion.  *See United States v. Cruz-Velasco*, 224 F.3d 654, 659-660 (7th Cir. 2000); *see also Ancho v. Pentek Corp.*, 157 F.3d 512, 518 (7th Cir. 1998) (rejecting argument for *de novo* review of judge's concise oral ruling on *Daubert*); *Target Market Publ'g, Inc. v. ADVO, Inc.*, 136 F.3d 1139, 1141-43 (7th Cir.

---

[9]  The district court heard Mr. Koppe and Dr. Rosen testify at the May 2008 trial and the May 2009 partial retrial.  *See supra* note 4 (discussing retrial).

- 29 -

1998) (affirming terse *Daubert* order).  The decision that Cinergy relies upon to attack the district court's *Daubert* process, *Fuesting v. Zimmer, Inc.*, is inapposite because it involved a trial court that focused almost exclusively on an expert's credentials, rather than the reliability of the expert's opinions.  421 F.3d 528, 535-37 (7th Cir. 2005), *rev'd on other grounds*, 448 F.3d 936 (7th Cir. 2006).  Here, the trial court focused the parties' *Daubert* arguments on both the experience of the experts and the reliability of their underlying methodologies and opinions before concluding that their testimony was admissible.  SA0797; SA0813; A0007.

## C.    The district court acted within its discretion by focusing on the general acceptance of the experts' techniques and their experience in the utility field.

The district court's determination that the underlying techniques used by Mr. Koppe and Dr. Rosen were admissible because they were generally accepted in the field can be disturbed only if the record reveals it was manifestly erroneous, *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 608 (7th Cir. 2006), a showing that Cinergy cannot make.  Mr. Koppe and Dr. Rosen's opinions were well-grounded in generally-accepted industry practice, and were far from the sort of "off the cuff," unmoored conclusions that are properly excluded under *Daubert*.  *See Naeem*, 444 F.3d at 608; *Braun v. Lorrillard Inc.*, 84 F.3d 230, 235 (7th Cir. 1996); *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 318-19 (7th Cir. 1996).  Indeed, virtually identical challenges have been considered and rejected by other district courts.  *See United States v. Ohio Edison Co.*, 276 F. Supp. 2d 829, 878-81, 85 (S.D. Ohio 2003) (holding

Defendants liable); *Nat'l Parks Conservation Ass'n v. Tenn. Valley Auth.,* No. 3:01-cv-71, 2008 WL 4059826, at *4 (E.D. Tenn. Aug. 28, 2008) (denying *Daubert* challenge to Mr. Koppe).

1.    *Mr. Koppe and Dr. Rosen's methodology was not "made-for litigation."*

Cinergy's lead argument is that, as a threshold matter, Mr. Koppe's and Dr. Rosen's methodology was "made-for-litigation" and therefore unreliable.  Br. at 34. Cinergy made the same argument below, and the district court did not abuse its discretion in rejecting it.  The methodology employed by Mr. Koppe and Dr. Rosen was adapted and derived from standard industry principles, and was not in any sense "created" for this case within the meaning of *Daubert*.  Mr. Koppe and Dr. Rosen used accepted utility methodologies to answer a question uniquely arising under the CAA's NSR provisions:  would the renovations at issue be expected to increase actual annual emissions over the NSR tons-per-year permitting threshold? As this Court has already held, answering that question requires an evaluation of (1) the anticipated effect of the renovations on each unit's availability to operate, *i.e.*, whether the "change enabled [each unit] to operate" more and (2) a "reasonable estimate" of how much of such additional operating ability would be expected to be utilized.  *Cinergy*, 458 F.3d at 708.  While Mr. Koppe and Dr. Rosen's evaluation under this standard proceeded in five steps, Cinergy concedes (Br., at 15-16, 36-37) that its *Daubert* challenge focused only on: (1) Mr. Koppe's judgment as to the amount of expected improvements in availability due to Cinergy's renovations, and

- 31 -

(2) Dr. Rosen's use of each unit's historic "utilization factor" to estimate how much of that improved availability would actually result in increased generation.[10]

As discussed in more detail below, to develop his engineering judgment on the expected improvements in availability due to replacing deteriorated components, Mr. Koppe used the same engineering techniques that he had used for years performing similar evaluations. To estimate how much of this availability would actually be used, Dr. Rosen similarly employed industry-accepted concepts that express the relationship between availability, utilization of availability, and generation to estimate the amount of generation that would be expected to result from Cinergy's renovations. This basic relationship, well-accepted and widely-used in the utility industry, is expressed mathematically as:

*Annual Availability x Utilization Factor = Capacity Factor*

SA0377-78; SA0383-84; SA0388-89; SA1624-25. Annual availability is a measure of the amount of time a unit is ready and able to operate, expressed as a percentage of full power hours. SA0662-63; SA1615-16. The utilization factor is the percentage of availability that is actually used (a utilization factor of 1.0 or 100% would mean that a unit always produces power whenever it is available). SA0377-78; SA0388-89; SA1624-25. The resulting "capacity factor" is a measure of the actual annual electricity generation from the unit, and is similarly expressed as a percentage of a generating unit's total energy output over the course of a year "divided by the total

_____

[10] Dr. Rosen also translated Cinergy's expected generation increases into emissions (SA0388-89), but Cinergy did not dispute this aspect of Dr. Rosen's testimony.

energy it could have generated" had it operated at maximum capacity.  SA0061; SA0388; SA0662; SA1617-18.[11/]

To estimate the effect of an availability improvement on each unit's capacity factor, Dr. Rosen multiplied the expected increase in availability provided by Mr. Koppe times a utilization factor that was based on historic baseline operations, to calculate the expected change in capacity factor caused by each project.  SA0377-78; SA0383; SA0388-89; SA0521; SA1623-29 (explaining example).  As discussed below, this is essentially the same analytical process used by Cinergy itself in determining the economic value of increased generation resulting from availability improvements.  SA0384; SA0523-24; SA0997; SA1650.

Cinergy does not dispute that Mr. Koppe and Dr. Rosen relied on widely used and fundamental relationships between availability and annual generation. Indeed, Cinergy concedes that it actually instructs its engineers to use these relationships to predict annual generation increases when evaluating whether to perform availability improvements as part of the capital budget process, and that its own project justification process is "consistent with" the process employed by Mr. Koppe and Dr. Rosen.  Br. at 41; *see also id.* (admitting that projects were justified based on an expectation of "recovered" availability and operation at "pre-repair utilization rates"); *see also* SA1691-92.  Cinergy similarly conceded at the *Daubert*

---

[11/] For example, actual annual generation from a 100 megawatt unit with a 75 percent capacity factor is calculated as follows: 100 megawatts times 8,760 hours (hours in a year) times 0.75 capacity factor = 657,000 megawatt-hours.  SA0388-89; SA0662; SA1619.

- 33 -

hearing that it may be a "fair point" that Cinergy relies on these same relationships to economically justify availability improvement projects based on increased generation. SA0846. These concessions alone demonstrate that the *Daubert* standard has been met and that any criticisms of Mr. Koppe's and Dr. Rosen's opinions go to the weight of their testimony and not its admissibility.

Yet Cinergy nevertheless cites snippets of deposition testimony concerning "brainstorming" sessions (Br., at 35) to imply that Mr. Koppe and Dr. Rosen "created" this methodology for litigation. Read fully and in context, Cinergy's snippets simply show the experts' efforts to organize "commonly known" and "commonly accepted" concepts used by the utility industry for decades to help answer the particular question posed by the NSR regulations in this case, and reveal that Mr. Koppe and Dr. Rosen made clear, repeatedly, that the analytical methodology they employed was not "created" for this litigation. SA1391-92; SA1401-05; SA1409; SA1411-12; SA1415; SA1439-40; SA1444-45; SA1448. While Cinergy cites to Mr. Koppe's testimony on meetings "with the litigators" (Br., at 35, citing A00629), Mr. Koppe explained that he was not asked to create a new methodology, but rather used concepts that he had "used for scores of utilities" and that were "similar to what [he had] seen most utilities . . . using." SA0673-74; SA0935; SA1440; SA1448.

Similarly, Cinergy's citations to Dr. Rosen's testimony reveal that he relied on "basic definitions of commonly used industry terms" that are generally accepted in the utility industry to estimate the amount of generation, and hence emissions,

- 34 -

that would be expected to result from Cinergy's availability improvement projects. SA1415; SA1409-1412; SA1420-21; SA1615-17. Dr. Rosen used the same generally-accepted principles that Cinergy itself used to decide whether the renovations made economic sense. The only difference between what Cinergy itself did when it evaluated the projects and what Dr. Rosen did was that Dr. Rosen used these relationships to translate expected increases in generation into *emissions*, whereas Cinergy used these relationships to translate changes in generation into *revenue*. SA0086; SA0997; SA0523-24; SA1424-25; SA1650. Applying well-established and generally-accepted principles to answer the particular question at hand is "hardly a novel methodology." *Roback v. V.I.P. Transportation Inc.*, 90 F.3d 1207, 1215-16 (7th Cir. 1996).

> 2. *Mr. Koppe and Dr. Rosen's opinions grew naturally out of their professional experience and are based on generally accepted techniques in the utility industry.*

The purpose of the *Daubert* inquiry is to ensure experts "adhere to the same standards of intellectual rigor that are demanded in their professional work." *Ciba-Geigy*, 78 F.3d at 318. Mr. Koppe's and Dr. Rosen's opinions grew "naturally and directly" out of work they "conducted independent of the litigation" and are admissible. *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995) (*Daubert II*).

Mr. Koppe's analysis drew on his thirty-plus years of experience working in the utility industry, where he developed a specialty in evaluating how component

replacements affect unit availability.  SA0644; SA1439-40; SA 1499-1502; SA1505-06; SA 1507.  Mr. Koppe was one of the principal developers of a standard industry clearinghouse for availability data known as the Generating Availability Data System (GADS).  *See* SA1515; SA1516-17; SA0727-0732.  GADS allows utilities to track the individual causes of losses of availability so that these causes can be reduced or eliminated.  SA1518-19.  Approximately 90 percent of all electric utility generating units in North America use GADS, including Cinergy's units.  SA1519.

From the mid-1970s through the 1990s, Mr. Koppe used GADS as a tool in his evaluation of availability issues for the utility industry and others.  SA1505-06; SA1508-09; SA1512-15; SA1522-24; SA1527; SA1547-48; SA1565; SA1606-07; SA0673-74.  Until his work on these enforcement cases, Mr. Koppe "had never heard of a utility that claimed that availabilities could not be increased or that such increases could not be reasonably predicted."  SA0935.[12]

Just as he had in his professional life for several decades prior to working on this case (*e.g.*, SA0673-76; SA0729-0732; SA0935-36; SA1509-10; SA1512-15; SA1564-65), Mr. Koppe reviewed unit condition assessment reports such as Cinergy's Wabash life extension studies (*e.g.*, SA0257-346; SA1168-1220), operating history of the units as recorded in GADS, and documentation created by Cinergy engineers to justify the renovations.  SA0665-672; SA0693-708; SA0713-726;

---

[12] A Cinergy trial witness admitted that replacing components that were causing unavailability would increase availability from historic deteriorated levels. SA1711-12; SA1721; SA1724.

SA1519-34; SA1603; *see also supra* pp 8-9.  All of this information was used to develop an engineering judgment as to the probable effect on availability of the component replacements at issue.  SA0693-708; SA0713-726; SA1530-47; SA1558-61; SA1565-87.

Dr. Rosen similarly relied on his three decades of experience analyzing utility operations.  SA0363-65.  Dr. Rosen explained that Cinergy and other utilities use a unit's "utilization factor" to calculate how much increased generation made possible by a renovation will actually be used.  SA0377, SA0384; SA0388-89; SA0526; SA1642-48.  To estimate how much additional generation was reasonably expected to result from Cinergy's availability improvements, he used the historic baseline annual utilization factor of each of the units.  SA0379-86; SA0499; SA0526; SA1617; SA1627-29.  Dr. Rosen explained that using such a constant utilization factor was consistent with his own professional experience, and it was consistent with the approach developed by EPRI in a study published in 1985 describing how other utilities perform incremental analyses of generation increases from availability improvements.  SA0379-84; SA1356; SA1371-72; SA1627-29; SA1671-73; SA1676.

Importantly, Dr. Rosen's methodology was also consistent with Cinergy's own capital budgeting process for determining the economic value of availability improvement projects.  SA0086; SA0997; SA0384; SA0499; SA0523-24; SA0957; SA1640-50; SA1660-64.  Just like Dr. Rosen, Cinergy begins with an evaluation of GADS data to make an engineering judgment of the specific amount of "availability improvement" in megawatt hours "expected to be regained in the project."  SA0086,

SA0089-90; SA1660.  The "utilization factor" is then used to "compute the change in a unit's generation resulting from improved availability".  SA0086; SA0093-96. Specifically, the "improved availability (mwh/year)" is adjusted by a single "utilization factor" for each year and multiplied by the cost of replacement generation in order to measure the value of the improved availability resulting from the project.  SA0090; SA0093-96; SA1644; SA1647-50.

That Mr. Koppe's and Dr. Rosen's testimony grew out of their extensive professional experience, and was consistent with generally-accepted and standard techniques used by Cinergy and others in the industry is a sufficient indicator of reliability under *Daubert*.  *See Trustees of the Chi. Painters & Decorators Pension v. Royal Int'l Drywall*, 493 F.3d 782, 788 (7th Cir. 2007) (extensive experience in drywall taping renders opinion estimating hourly rate of drywall installation "sufficiently reliable"); *Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 590-91 (7th Cir. 2000) ("demonstrated professional experience" in the area of electrical safety sufficient to allow expert testimony of electrical engineer at power company); *NutraSweet Co. v. X-L Eng'g Co.*, 227 F.3d 776, 789 (7th Cir. 2000) (twenty years experience interpreting aerial photos for evidence of waste disposal made interpretation "sufficiently reliable"); *United States v. Brumley*, 217 F.3d 905, 911-12 (7th Cir. 2000) (seven years experience in investigating drug dealing practices gave opinion sufficient indicia of reliability); *Roback*, 90 F.3d 1207 at 1215-16

(expert may testify even to results of a "unique" model if it is comprised of "standard components").

Cinergy nevertheless asserts that Mr. Koppe's and Dr. Rosen's testimony was unreliable under *Daubert* because they did not publish, submit to peer review, or test the error rate of the two "key features" of their opinions (Br., at 15-16, 36-37), *i.e.*, Mr. Koppe's conclusion that Cinergy should have expected its "availability improvement" projects to actually improve availability, and Dr. Rosen's use of each unit's historic annual utilization factor to estimate how much of that improved availability would actually translate into increased generation. If an engineer "merely appl[ies] well-established engineering techniques" to the particular facts of the case, then "his failure to submit those techniques to peer review establishes nothing" about the reliability of his analytical technique. *Smith v. Ford Motor Co.*, 215 F.3d 713, 720-21 (7th Cir. 2000). Rather, in engineering cases such as this one, district courts should consider, as the trial court appropriately did here, other factors "such as the general acceptance of the techniques in the relevant engineering" community and "the extent of the experts' practical experience performing those techniques." *Id.*

Mr. Koppe's and Dr. Rosen's use of standard engineering techniques that Cinergy itself uses is sufficient to support the district court's admissibility determination, as discussed above. But there are ample additional indicia of reliability. The data and contemporaneous expectations of availability improvements Mr. Koppe and Dr. Rosen relied on came from Cinergy itself, and

- 39 -

used standard industry data. *Adams v. Ameritech Servs., Inc.*, 231 F.3d 414, 427 (7th Cir. 2000) ("The underlying information * * * came from the defendants ultimately, and as such we see no problem in [the expert's] decision to rely on it."); *see also In re Scrap Metal Antitrust Litigation*, 527 F.3d 517, 531 (6th Cir. 2008) (industry's similar use of data supports admissibility). The data that Mr. Koppe relied on were specifically reported by Cinergy to the GADS clearinghouse, SA1530; SA1533-34; SA1565, and Cinergy's engineers used the same data when estimating increased generation from availability improvements in order to justify the projects. SA0086; SA0351; SA1227-28; SA0936; SA1642-50; SA1660-65.

Mr. Koppe and Dr. Rosen also identified industry publications, including studies by EPRI and a treatise published by the boiler manufacturer Babcock and Wilcox, STEAM: ITS GENERATION AND USE, (40th ed. 1992), that validated their approach and demonstrated that renovations of deteriorated components increase unit availability and generation. SA0225-26; SA0233; SA0875-77; SA0977-79; SA1251; SA1371-72; SA1606-07. Mr. Koppe also explained that history had generally verified his own analyses of availability improvements, and that when he compared his results in his professional life to actual real world performance, "the availabilities of those units were generally consistent with what I was projecting." SA1511; see SA1528; SA1590-92; SA0675-76. He further explained that when he looked at the post-project data in this case he "found that the availabilities and the generation of the units increased very substantially after most of the projects." SA1435-36; *see* SA1433-34; SA0700.

- 40 -

In any event, Cinergy's argument that Mr. Koppe and Dr. Rosen's opinions were inadmissible for lack of precision or error rate testing is beside the point. Compliance with NSR requires a prediction. The level of precision required to determine whether Cinergy needed to seek a permit is "not prescience, but merely a reasonable estimate of the amount of additional emissions that the change will cause." *Cinergy*, 458 F.3d at 709; *see Ohio Edison*, 276 F. Supp. 2d at 880. Here, the jury found that the magnitude of the predicted emission increases, all of which were well above the 40 tons-per-year significance level, was sufficient to determine that Cinergy reasonably should have obtained permits for its changes. A00120-22; SA1610-11; SA0466; SA0472; SA0478-79; SA0484-85.

> 3. *Cinergy's challenges go, at best, to the weight not the admissibility of the testimony provided by Mr. Koppe and Dr. Rosen.*

Use of a dispatch model: Cinergy claims (Br. at 44-45) that Dr. Rosen failed to account for how Cinergy actually dispatches its units in real time, and that Dr. Rosen should have instead used a more sophisticated computerized system-dispatch model which, when provided various assumptions about unit availability, demand, costs, and other factors, simulates the operation of an entire utility system. While dispatch models are capable of predicting real-time generation at levels of detail much shorter than a year, nothing suggests that the results of such a model are the only relevant evidence of expected average *annual* generation under the NSR program. Given the NSR program's focus on annual emissions, Dr. Rosen's use of an estimated annual average utilization, which necessarily smooths out shorter-

- 41 -

term fluctuations in dispatch, is an appropriate level of detail for the "reasonable estimate" of future annual utilization required by the NSR emission increase test. *Cinergy*, 458 F.3d at 708-09.[13]

In any case, Dr. Rosen explained that for purposes of isolating the effect of a particular project on annual generation, his conceptual approach was functionally equivalent to a system planning model. SA1632-35; *see also* SA0499. This view was supported by another long-time expert generation planner familiar with dispatch models, Mr. Myron Adams, who stated that the logic of Mr. Rosen's approach was a reasonable way to estimate incremental generation from a project, and the same logic was used at the utility where he worked for some 40 years. SA1269; SA1281-82; SA1469-72; SA1475-78; SA1481-84. Similarly, Cinergy's own system planning expert, Kenneth Slater (whom Cinergy declined to call at trial for "tactical" reasons (SA1292 at ¶¶2, 4)), admitted in his deposition that if the forced outage rate for a unit is decreased, a dispatch model will also predict increased generation for that unit. SA1231-33. Perhaps most tellingly, when it evaluated whether to perform the projects, Cinergy itself did not consider it necessary to run a computerized dispatch model. Instead, it used the same approach as Dr. Rosen to isolate the effect on generation resulting from individual availability improvements. SA0086; SA0997; SA0499; SA0524; SA0526. While Cinergy was certainly entitled to present evidence

---

[13] The NSR rules require a prediction of the effect of a change as compared to average annual baseline emissions during a two-year period prior to the change. *Cinergy*, 458 F.3d at 708; A00096.

that a dispatch model might have resulted in a "'better' or more 'accurate' estimate," the trial court appropriately left it for the jury to "decide for itself" whether Cinergy should have expected generation increases based on the available evidence. *i4i Ltd. Partnership v. Microsoft Corp.*, 589 F.3d 1246, 1271 (Fed. Cir. 2009).[14]

Dr. Rosen's choice of utilization factors: Cinergy cannot dispute that *some* estimate of utilization is necessary to determine how much of a particular unit's availability will be utilized in the future. The real issue was, as Dr. Rosen acknowledged (SA1396-97; SA1623), whether the value he selected for the annual utilization factor was reasonable. Dr. Rosen did not use an unrealistic 100 percent utilization factor; instead he used a more realistic utilization factor based on how each unit had historically operated. Specifically, Dr. Rosen used the same annual utilization that each unit had experienced during the pre-project NSR "baseline" period as an estimate of how the unit would be utilized in the future. SA0379-86; SA0499; SA0526; SA1416-17; SA1616-17; SA1627-29. Dr. Rosen's use of a constant utilization factor is consistent with what Cinergy itself did when it evaluated the economic impact of its availability improvements. SA0086; SA0997; SA0384;

---

[14] Notably, despite arguing that it could have answered the question more precisely, Cinergy did not proffer the results of any computer-based models to refute Dr. Rosen's conclusions. Instead, Cinergy urged the jury to accept the judgment of its own engineers, who testified that they did not think generation would increase. SA1490-93; SA1695; SA1698-1700; SA1746-48. Cinergy also failed to actually produce coherent system planning records that would have allowed Plaintiffs to run a system dispatch model. SA1300-02 (detailing production issues).

SA0499; SA0523-24; SA0957; SA1393-94; SA1640-50; SA1660-64.[15/]  While Cinergy

claims (Br., at 44-48) that Dr. Rosen ignored other factors that could have affected

utilization, any dispute over the reasonableness of Dr. Rosen's analysis in light of

whatever facts Cinergy felt Dr. Rosen had insufficiently addressed went to the

weight to be given his testimony, not its admissibility.  *See Cullen v. Ind. Univ. Bd.

of Trustees*, 338 F.3d 693, 701 n.4 (7th Cir. 2003) (citing *Bazemore v. Friday*, 478

U.S. 385, 400 (1986) ("Normally, failure to include variables will affect the analysis'

probativeness, not its admissibility."); *Adams*, 231 F.3d at 423 (same); *Smith*, 215

F.3d at 718 ("The soundness of the factual underpinnings of the expert's analysis

and the correctness of the expert's conclusions based on that analysis are factual

matters to be determined by the trier of fact"); *Cooper v. Nelson*, 211 F.3d 1008,

1021 (7th Cir. 1999) (potential effect of other factors is "susceptible to exploration

on cross-examination").

In any case, Dr. Rosen's use of each unit's historic utilization factor was

conservative.  Cinergy invested millions to renovate these units with the

expectation that the investments would be recouped by generating more electricity,

and, according to Cinergy's expert during the period from 1982 through 1999, which

covered the period well before and after the projects at issue, demand for electricity

generation on Cinergy's system was rising at a "compound growth rate of 3.1

_____

[15/]  Cinergy's brief concedes that Dr. Rosen's use of "pre-repair utilization rates" was
"consistent" with its own economic evaluations.  Br. at 41.  As Cinergy argued in
another context, the "past is the best indicator of the future" when it comes to
predicting how its plants will operate.  SA0807.

percent." SA1266. This would support the expectation that the average utilization of the units following the renovations would, if anything, be higher than the pre-renovation demand. SA0385; SA0957-58; SA1441-42. In fact, annual utilization actually did increase after the projects. SA1443.

Furthermore, in determining that it was reasonable to predict that the units would be utilized in the future in the same manner as they had been used in the past, Dr. Rosen considered that changes in things like relative fuel costs might affect the utilization of Cinergy's units, but determined that Cinergy had not demonstrated that there were any expected fuel changes that would significantly affect the relative dispatch order of the units. SA0499. Indeed, Cinergy continues to maintain that the renovations did not cause the units to "change their place in the dispatch order" (Br. At 44); *see also* SA1703.

Finally, Cinergy suggests (Br., at 44, 47) that increased availability from its renovated units would not actually be utilized, because "the fact that prior demand was satisfied by running a unit at a certain level in the past suggests strongly that increased generation from the unit is not necessary to satisfy the same level of demand in the future." Cinergy's suggestion is mere argument "not backed up" by evidence and is insufficient to sustain a *Daubert* challenge. *DePaepe v. Gen. Motors Corp.*, 141 F.3d 715, 719-20 (7th Cir. 1998). In fact, it is contrary to the record. The basic concept of "economic dispatch" means that lower cost units tend to be dispatched first. SA0063; Br., at 10. When units (such as the ones at Wabash River) are forced out of service, the demand on the system must be met by running

- 45 -

more expensive power plants or purchasing more expensive power from third parties, resulting in "replacement energy costs" to make up for the energy that the unit could not supply. SA0063; SA0086, SA0023; SA0369; SA0384; SA1355-56; SA1643-44; SA1646. The very fact that the Wabash River renovations were economically justified based upon replacement energy cost means that the units would have generated more at that historic level of demand if they had been available to run. SA0353 (Wabash 3 renovation predicated on "economic justification); SA0347 (Wabash 2 renovation has a favorable cost/benefit based upon "lost generation"); SA0138 (providing replacement energy costs for Wabash River units); SA0997; *see also supra* pp 8-9.

Cinergy's attack on its own project justifications: Cinergy also denigrates (Br. at 41) the reliability of the economic evaluations of its own engineers, who, like Dr. Rosen, use an annual utilization factor to predict "the change in a unit's generation resulting from improved availability." SA0086. Cinergy asserts that these evaluations, which its management uses to decide whether to approve capital expenditures, are too "rudimentary" when compared to system dispatch models. Br., at 41. Regardless of whether computer models would provide another reasonable approach, it is undisputed that Cinergy relies on these capital budget guidelines to make multi-million dollar decisions on whether to renovate plants, and that those decisions are based on a prediction of increased generation from availability improvements. SA0524; SA0957; SA1275-76; Br. at 41. While Cinergy now describes its investments as little more than a crap shoot because the outages

- 46 -

at the plant are just "random" (Br., at 12, 50-51), the credibility of that argument was appropriately left for the jury to decide. *See Brumley*, 217 F.3d at 912 ("Through cross-examination and testimony from his own witness, Brumley was free to reveal any weaknesses or errors in the [expert's] opinion."); SA1691-92; SA1731-32; SA1735-36 (Cinergy witnesses making this argument to the jury).

Cinergy's causation argument:  Cinergy also asserts (Br. at 52-55) that Dr. Rosen purportedly did not establish a causal relationship between replacing deteriorated components and increased generation.  In fact, the causal link is demonstrated by Cinergy's own project justifications and capital budget guidelines, under which Cinergy approves renovations based on their expected impact on generation, and specifically uses "utilization factor" to compute "the change in a unit's generation *resulting from improved availability*."  SA0086 (emphasis added). Cinergy's approach to causation is virtually identical to the approach taken by Dr. Rosen.  SA0997; SA1648-50.  Like Dr. Rosen's approach and the approach taken by other utilities (SA0384; SA1371-72), Cinergy's evaluations use a single, static annual utilization factor to isolate just that portion of an expected generation increase that is due to an availability improvement project.  The dollar value of the megawatt-hours of "Improved Availability" is calculated for a given year using a constant annual utilization factor for each of the first 10 years after the project, and a second, slightly higher utilization factor for each of the next 10 years. SA0089-93; SA1651-57.

By holding utilization factor constant even though demand was expected to increase, Dr. Rosen conservatively calculated only that portion of increased generation definitively caused by the change in availability, and excluded any increases that might have also been related to overall increases in system demand. SA0383; SA0499; SA1628-29. Dr. Rosen's calculations thus controlled for potential demand growth, and, like Cinergy's own evaluations, resulted in only that portion of the expected generation increase that was directly caused by Cinergy's availability improvements.[16]

Cinergy also claims that its availability improvements did not cause generation increases because the Wabash units purportedly could have "accommodated" any increased generation if only they had actually "been called upon to generate" up to their full capacity during the baseline period. Br. at 54. But the fact that Cinergy may or may not have had the *potential* to emit more in the baseline period is irrelevant to whether the renovations at issue here were expected to cause increases in *actual* emissions. A0096; SA0960; *see also supra* pp. 22-23. Moreover, the "capable of accommodating" defense to which Cinergy alludes only applies to increases that are "unrelated" to the renovation, 57 Fed. Reg. at 32326, a showing which Cinergy was unable to make here, given that Mr. Koppe and Dr. Rosen (like Cinergy) calculated only the increased generation resulting from

---

[16] A Cinergy company witness agreed that holding utilization factor constant eliminates the effects of demand from the capacity factor equation. SA1739-40.

Cinergy's availability improvements.[17]  *See supra* pp 47-48.  In any case, like its

other attacks, Cinergy was permitted to make its "accommodation" argument to the

jury through cross examination and the testimony of its own company witnesses.

A01096; SA1679.  The jury rejected it.

    <u>Cinergy's critiques of Mr. Koppe</u>:  With respect to Mr. Koppe, Cinergy asserts

(Br. at 45, 49-51), that he always predicts an availability increase when a

component is replaced, and ignores the possibility of other forced outages in the

future.  But Mr. Koppe actually explained that the majority of projects undertaken

at a power plant will have no significant effect on unit availability.  SA0945-48;

SA1595-96; SA1461.  Indeed, directly contrary to its "*deus ex machina*" claim (Br.,

43), Cinergy successfully obtained summary judgment on numerous claims because

Plaintiffs' methodology showed no increases for particular pollutants.  SA1309-22;

SA1326-32.  Unlike most projects, the renovations at issue here involved

replacement of major components that were responsible for a significant percentage

of all the forced outages at the unit in the years leading up to the replacements.  For

instance, after reviewing assessments of the pre-project condition of Wabash unit 5,

Mr. Koppe concluded that the entire generating unit was consistently experiencing

---

[17]  Relatedly, Cinergy asserts (Br. at 55) that Dr. Rosen's baseline calculations should have excluded the outages caused by the deteriorated components that were replaced as part of the renovations.  There is no support for such a contra-factual calculation where, as here, the predicted future generation is expected to result from eliminating those "breakdowns."  *Cinergy*, 458 F.3d at 709.  In any case, Cinergy admitted at trial that it had not identified any other baseline that was representative of normal operation.  SA1707.

approximately 1100 hours per year of outage time in the years leading up to the project, and that the components that were replaced as part of the renovation had been responsible for nearly half of that outage time, or 500 hours.  SA1558-61; SA0947.  While some additional unanticipated outages would occur in the future, Mr. Koppe explained that the outages caused by "everything else" had remained relatively constant and were expected to remain constant in the future, so that eliminating the cause of nearly 500 hours of outage time would be expected to significantly improve the availability of the unit.  SA1561.

This conclusion – that replacing deteriorated components that are major degraders of overall unit availability will result in better unit operation – is consistent with everyday experience, Cinergy's own economic evaluations, and industry practice with major life extension projects like these.  The question of whether Cinergy's renovations were actually expected to do what they were designed to do – improve operation by replacing deteriorated components – was properly left for the jury.

## III.  Plaintiffs' penalty claims are not barred by the statute of limitations.

### A.  Introduction.

The district court's dismissal of Plaintiffs' penalty claims rests upon the premise that Cinergy's failure to obtain a permit under the CAA is a one-day "discrete" statutory violation that is complete on the day that construction commenced without a permit.  SA0007.  As shown below, that premise is incorrect. The type of NSR permits that Cinergy failed to obtain set "emission limitations"

that prescribe the units' emissions following construction.  42 U.S.C. §§ § 7475(a)(1), (4), 7503(a)(2); *CARE*, 535 F.3d at 673 n.3.  The failure to obtain such a permit necessarily results in daily illegal emissions.  Indeed, in this case, 350,000 tons of pollution were illegally emitted in excess of the applicable NSR emission limitations, irreparably harming public health.  A00047-54.  Cinergy's violations therefore did not begin and end on a single day, but were ongoing.  As shown below, the district court's "discrete" violation holding is inconsistent with the Act's permitting requirements, as both the Fifth and the Sixth Circuits have recognized. The NSR permitting regime is the mechanism chosen by Congress to review major modifications and impose environmental controls on facilities.  It is the mechanism that prevents the precise ongoing violations here.

The CAA requires a modified facility to secure an NSR permit as a condition of construction and operation, and the NSR provisions impose ongoing obligations to comply with NSR emission limitations and other requirements.  Cinergy violated these requirements each day it illegally operated its modified facilities, subjecting it to daily civil penalties even though the violations began more than five years prior to Plaintiffs' complaints.  This Court should reverse the district court's contrary finding and remand for a determination of the appropriate civil penalties for the NSR violations at the Wabash Plant.[18]

**B.    Standard of review.**

_____

[18] Any penalties for other non-Wabash NSR violations in the case were resolved by the parties' partial consent decree.  *See supra* note 4.

Legal rulings on summary judgment are reviewed *de novo*. *Blevins v. Bartel*, 422 F.3d 445, 449 (7th Cir. 2005).

### C.    The NSR provisions of the CAA apply NSR requirements to facility operations.

The district court recognized that "failure to obtain an operating permit is a continuing violation for each day of operation without the permit." SA0006-7, (quoting *SIGECO*, 2002 WL 1760752, at *4). It erred in treating NSR permits, which impose limits on a source's operation even though they are obtained prior to construction, differently.[19/] In fact, the NSR program creates a single permitting requirement, which is satisfied before construction or modification so that emission control requirements can be taken into account early in the design and construction process. An NSR preconstruction permit, once issued, either serves as an operating permit for the facility in question or establishes conditions on the operation of the source that must be incorporated into the operating permit. As the Fifth Circuit aptly noted in discussing the differences between NSR preconstruction permits and another type of operating permit required by the Title V provisions of the Act, 42 U.S.C. 7661 *et seq.,* the NSR requirements themselves impose conditions on the operations of a source. *United States v. Marine Shale Processors*, 81 F.3d 1329, 1355-56 (5th Cir. 1996); *see also Sierra Club v. Portland Gen. Elec. Co.*, -- F. Supp. 2d -- 2009 WL 3245917, at *8 (D. Or. Sept. 30, 2009).

---

[19/] Variations of the term "continuing violation" have been used to describe different legal rules. *See Lewis v. City of Chicago*, 528 F.3d 488, 492-93 (7th Cir. 2008). For clarity, this brief describes the issue as whether Cinergy's violations were "ongoing."

The most significant PSD requirement provides that a permit must set forth "emission limitations" identified by the reviewing authority based on emissions reductions achievable with the "best available control technology" (BACT). 42 U.S.C. § 7475(a)(1), (4). The language of the statute defines BACT as an "emission limitation based on the maximum degree of reduction of each pollutant" emitted from a facility. 42 U.S.C. § 7479(3). An "emission limitation" is defined in turn as a "requirement * * * which limits the quantity, rate, or concentration of emissions of air pollutants *on a continuous basis*, including any requirement relating to the operation or maintenance of a source to assure *continuous* emission reduction." 42 U.S.C. § 7602(k) (emphases added). The use of the word "continuous" demonstrates that compliance with BACT is an ongoing duty that does not apply (and end) only at the time of construction. To meet the BACT requirement, a facility must both install and – more importantly – operate the required control technology. *Id.*; *Cf. CARE*, 535 F.3d at 673 n.3 (no source may be modified "unless a permit *prescribing emission limitations* has been issued") (emphasis added). Thus, although NSR permits are issued prior to construction, the statute's prescription on future

emissions plainly governs the operation of a source post-construction.[20/]  The district court effectively read these operating restrictions out of the statute.

The plain language of the NNSR statutory provisions also make clear that NSR permits govern operation as well as construction.  42 U.S.C. § 7502(c)(5) requires NNSR permits "for the construction and operation of new or modified major stationary sources anywhere in the nonattainment area."   42 U.S.C. § 7502(c)(5), see 42 U.S.C. § 7503(a) ("permits to construct and operate").  Although NNSR permits must, like PSD permits, be obtained prior to construction, the requirements are directed at improving air quality and ensuring that the operation of the new or modified source complies with stringent emission limitations identified as the "lowest achievable emission rate" (LAER).  *See* 42 U.S.C. § 7503(a)(2).

Other NSR provisions also make clear that they apply on an ongoing basis to a source's operation, rather than only for a finite time to the source's construction or modification.  For example, the statute allows issuance of a permit only if "the owner or operator of such facility demonstrates * * * that emissions from

_____

[20/]  In *Sierra Club v. Franklin County Power*, 546 F.3d 918, 928 (7th Cir. 2008), this Court noted a line of cases with holdings similar to the reasoning of the district court, and observed that they stood for the proposition that preconstruction violations first ripen upon construction.  However, the Court did not address whether violations of NSR which occur based on operating a plant without complying with NSR requirements are ongoing in nature.  For a recent discussion of the split in the case law on the applicability of the statute of limitations to NSR penalty claims, see *Portland Gen. Elec. Co.*, 2009 WL 3245917 at *6 (collecting cases).

construction *or operation* of such facility" will not compromise compliance with applicable air quality standards. 42 U.S.C. § 7475(a)(3) (emphasis added). The statute also requires an owner or operator to monitor emissions, further establishing that the NSR requirements apply to facility operations. 42 U.S.C. § 7475(a)(7).

The language and legislative history of the CAA's enforcement provisions are in accord. The citizen and federal enforcement provisions of the CAA impose civil penalties for each day a violation continues, further supporting the conclusion that the Act imposes ongoing obligations. 42 U.S.C. § 7413(b) and (e)(2); *Marine Shale*, 81 F.3d at 1357. The legislative history for 42 U.S.C. § 7477 similarly makes clear that Congress understood "existing law" to allow EPA to "take[] enforcement action *against operating sources* that are in violation of [NSR] requirements" (emphasis added). 136 Cong. Rec. 36,083, 36,084 (1990); *see also* 42 U.S.C. § 7604(a)(1)(A) (authorizing citizen suits for any "violation of * * * an emission standard or limitation," a category that includes limitations such as BACT and LAER as well as "any requirement to obtain a permit as a condition of operations," *id.* § 7604(f)(4)).

The district court failed to appreciate that the plain language of the statute's NSR provisions creates ongoing operational requirements, and instead wrongly cited the permitting provisions appearing in Title V of the CAA, which it incorrectly treated as the Act's substantive operating-permit provisions under which Plaintiffs were required to sue. *SIGECO*, 2002 WL 1760752, at *5. However, this Court

- 55 -

subsequently explained that Title V does not impose substantive new requirements but simply "consolidates all applicable requirements [of the Act] in a single document to facilitate compliance." *CARE*, 535 F.3d at 672; *see* 42 U.S.C. § 7661c(a) and (b); 40 C.F.R. § 70.1(b). The NSR program's ongoing operational requirements must be included in Title V permits, but those ongoing requirements exist and are enforceable independently, by virtue of the NSR provisions of the CAA and 42 U.S.C. § 7413. The district court's contrary interpretation would inappropriately limit the scope of NSR by requiring NSR penalty claims to be litigated as Title V violations. *See CARE*, 535 F.3d at 678-79 (NSR violations may be litigated independently of the Title V permitting process under EPA's broad enforcement authority, because "[i]t is reasonable to interpret Title V to complement, not to limit, the EPA's enforcement authority"). The district court's interpretation is particularly untenable because Title V was not enacted until 1990, 13 years after Congress passed the NSR program. In suggesting that the NSR program's operating requirements derive from Title V, instead of from the NSR provisions themselves, the district court misunderstood the relationship between the two programs, and the language and structure of the Act.

**D.      The NSR regulations govern facility operations.**

The NSR regulations also apply to the operation of modified facilities. First, the regulations require the application of emission limitations to modified facilities. The PSD regulations require that each modification "shall apply BACT," 40 C.F.R. § 52.21(j)(3), while the approved portions of the Indiana NNSR regulations provide

- 56 -

that no "construction or operation permit" may be issued unless the applicant "will apply emission limitation[s]" that achieve LAER.  325 I.A.C. 2-1, Section 8.  *See* ADD-32; *see also* 325 I.A.C. 2-1, Sections 4(b)(4), 4(g) and 5(b)(1)(C).    Under the plain language of the regulations, the obligation to apply BACT or LAER applies to the operation of a facility.  *See Nat'l Parks Conservation Ass'n. v. TVA*, 480 F.3d 410, 418 (6th Cir. 2007) (regulatory requirement that facility "shall apply BACT" gives rise to a recurring violation that "manifests itself anew each day a plant operates without BACT limits on emissions"); *Portland Gen. Elec. Co.*, 2009 WL 3245917 at *9.

Second, the regulations provide that any source operating not in accordance with an NSR permit application shall be subject to enforcement action:

> Any owner or operator who *constructs or operates* a source or modification *not in accordance with the application submitted pursuant to this section* . . . shall be subject to appropriate enforcement action.

40 C.F.R. § 52.21(r)(1) (emphasis added).[21]  By subjecting facilities operating not in compliance with their permit application to enforcement action, this provision clearly applies NSR requirements to the operation of modified facilities.  *National Parks*, 480 F.3d at 418 (regulatory provision requiring enforcement action against facilities operating without a PSD permit imposed ongoing obligation); *see also* 325

---

[21]    The "application submitted pursuant to this section" refers to the PSD permit application required by 40 C.F.R. § 52.21(a)(2)(iii).  40 C.F.R. § 52.21(r)(1) makes the facility's PSD permit application enforceable, *inter alia*, in circumstances where a requirement of the application may not have been incorporated into the permit document.

I.A.C. 2-1, Section 10 (similar provision applicable to state permits).  The

regulations also require "post-construction" monitoring of emissions, further

confirming the ongoing nature of NSR obligations.  40 C.F.R. § 52.21(m)(2), (3).[22]

### E.     Cinergy's illegal modifications give rise to ongoing violations under Seventh Circuit authority.

Authority from this Circuit makes clear that the sorts of violation at issue

here – repetitive, ongoing violations that continue into the limitations period – are

not barred by the statute of limitations.  Every day Cinergy emitted pollutants in

violation of NSR requirements it committed a new act in violation of the statute.  In

cases involving ongoing violations, claims for violations that recur within the

limitations period are not barred.  *See, e.g, Lewis v. City of Chicago*, 528 F.3d 488,

492-93 (7th Cir. 2008) (repetitive violations that recur within five years of filing suit

are not time barred); *Heard v. Sheahan*, 253 F.3d 316, 318 (7th Cir. 2001) ("[e]very

day that [prison officials] prolonged [prisoner's] agony by not treating his painful

condition marked a fresh infliction of punishment that caused the statute of

limitations to start running anew"); *Palmer v. Bd. of Educ.*, 46 F.3d 682, 686 (7th

Cir. 1995) (school board's decision to "leave the building shuttered" each year was a

new, recurring violation).

---

[22] Subsequent to the district court's decision, the Eleventh Circuit issued a decision similarly, and incorrectly, relying on the artificial distinction between the initial construction and subsequent operation of a facility, based in large part on the unique structure of the SIP at issue.  *Nat'l Parks Conservation Ass'n v. TVA*, 502 F.3d 1316, 1326 (11th Cir. 2007).  The federal statutory and regulatory provisions applicable here create an ongoing obligation to comply with NSR.

In this case, Cinergy's illegal operation of the Wabash units without a permit and in excess of BACT and LAER requirements amounted to a new violation each day, subjecting Cinergy to daily civil penalties under 42 U.S.C. § 7413. Every day the units operated illegally, they emitted pollutants into the air in violation of NSR emission limitations, inflicting new injury in violation of the statute. Indeed, notwithstanding its earlier statute of limitations ruling, the district court ultimately found that Cinergy had illegally emitted over 350,000 tons of pollution in excess of the applicable NSR emission limitations. A00051. The ongoing, daily, illegal operation in violation of NSR requirements created repetitive violations that gave rise to separate claims for relief, each of which reset the statute of limitations. Thus, as the Sixth Circuit recognized, "this case presents a series of discrete violations" of the statute. *Nat'l Parks*, 480 F.3d at 417; *see also Marine Shale*, 81 F.3d at 1357 (operation in violation of minor source NSR requirements subjects source to daily penalties for emissions occurring within five years of filing complaint, even though illegal emissions first began more than five years prior to the complaint).

### F. Imposing penalties for Cinergy's ongoing violations is consistent with the purpose of the CAA.

When Congress established the NSR program, existing facilities were grand-fathered – that is, they were allowed to defer installing emissions controls. But Congress intended that modification of those facilities would trigger the requirement to install and operate such controls so as to reduce emissions.

*Alabama Power*, 636 F.2d at 400; *WEPCO*, 893 F.2d at 909; *Cinergy*, 458 F.3d at 709. Congress could not simultaneously have intended that NSR requirements would apply only at the time of construction. *United States v. Am. Elec. Power Serv. Corp.*, 137 F. Supp. 2d 1060, 1066 (S.D. Ohio 2001). Moreover, the district court's conclusion that NSR violations can, at most, give rise to a one-day "discrete" violation subject to a penalty of $25,000 would effectively read the penalty provisions out of the Act, and encourage non-compliance with costly NSR requirements as a cost of doing business. *Cf. United States v. Duke Energy Corp.*, 278 F. Supp. 2d 619, 652 (M.D.N.C. 2003), aff'd on other grounds, 411 F.3d 539 (4th Cir. 2005), vacated on other grounds *sub nom. Environmental Def. v. Duke Energy Corp.*, 549 U.S. 561 (2007). Rather, once a facility has been modified, it forfeits any subsequent claim to defer installing emissions controls, and is subject to daily penalties for operation in violation of NSR requirements.

The CAA's imposition of ongoing obligations, the violation of which gives rise to ongoing violations of the statute, also mirrors the rule at common law that an action to abate a nuisance remains available during the continuation of the nuisance. "[E]ach day's continuance of a temporary nuisance creates a new cause of action," and therefore, "the statute of limitations begins to run day by day, and plaintiff may at any time recover for the nuisance committed during the statutory period next before the bringing of the action." 1 Fowler V. Harper, et al., *The Law of Torts* § 1.30, at 1:139 (3d ed. 1996); *see also* William L. Prosser, *Handbook of the*

*Law of Torts* § 90, at 616 (3d ed. 1964) (describing "a continuing trespass, such as the erection of a structure on the plaintiff's land" as affording "a continuing cause of action, which can hardly be distinguished from nuisance"); *Connecticut v. Am. Elec. Power Co., Inc.,* 582 F.3d 309, 352 (2d. Cir. 2009) (citing Restatement (Second) of Torts)). Like the common law nuisance analogue, permitting obligations similar to those contained in the CAA are presumptively treated as ongoing in nature. *See Newell Recycling Co., Inc. v. U.S. EPA*, 231 F.3d 204, 206-07 (5th Cir. 2000); *Carr v. Alta Verde Indus., Inc.*, 931 F.2d 1055, 1063 (5th Cir. 1991); *Harmon Indus. Inc., v. Browner*, 19 F.Supp. 2d 988, 998 (W.D. Mo. 1998), *aff'd*, 191 F.3d 894, 904 (8th Cir. 1999).

Finally, an ongoing requirement to comply with NSR, with civil penalties for violations, also ensures a level playing field for all companies. The district court's ruling wrongly immunizes a utility's continued illegal pollution from penalties as long as that pollution first began more than five years ago, even though the same utility would have faced daily penalties for the same pollution had it complied with the law by initially obtaining an NSR permit but then failed to operate in compliance with the required emission limitations. This creates a strong incentive for non-compliance with significant consequences for public health and the environment. To illustrate, just one year's worth of the excess pollution illegally emitted from the Wabash Plant is equivalent to the pollution from 324,000 heavy-duty diesel trucks, which is the total number of such trucks registered in Indiana,

Ohio, and Kentucky.  A00023.  Notwithstanding the fact that the trial court found that these emissions exceeded NSR emission limitations, continued unabated into the limitations period, and irreparably harmed public health, the district court's ruling shields Cinergy from liability for penalties for its illegally emitted pollution. A00047-54.

## CONCLUSION

The district court's May 29, 2009 judgment should be affirmed in part and reversed in part, as set forth herein, and the case should be remanded for a determination of the amount of civil penalties owed for Cinergy's violations at the Wabash Plant.

Respectfully submitted,

IGNACIA S. MORENO
  *Assistant Attorney General*


/s/ Jason A. Dunn
Katherine J. Barton
Thomas A. Benson
Phillip A. Brooks
Sarah D. Himmelhoch
Justin A. Savage
Jason A. Dunn (*counsel of record*)
  *Attorneys, Environment & Natural*
  *Resources Division*
  *Department of Justice*
  *P.O. Box 7611*
  *Washington, D.C. 20044-7611*
  *(202) 514-1111*

90-5-2-1-06965
February 19, 2010

ANDREW CUOMO
ATTORNEY GENERAL
OF NEW YORK

By:

<u>/s/ Jason A. Dunn with permission</u>
MONICA WAGNER
Assistant Solicitor General
MICHAEL J. MYERS
Assistant Attorney General
The Capitol
Albany, NY 12224
(518) 402-2594

ANNE MILGRAM                         RICHARD BLUMENTHAL
ATTORNEY GENERAL                     ATTORNEY GENERAL
OF NEW JERSEY                        OF CONNECTICUT

By:                             By:
<u>/s/ Jason A.Dunn with permission</u>    <u>/s/ Jason A. Dunn with permission</u>
JON C. MARTIN                        SCOTT N. KOSCHWITZ
JUNG W. KIM                          Assistant Attorney General
Deputy Attorneys General            55 Elm Street
Richard J. Hughes Justice Complex    P.O. Box 120
25 Market Street, P.O. Box 093       Hartford, CT 06141-0120
Trenton, NJ 08625-4503               (860) 808-5101
(609) 984-2845

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitations of Fed. R. App. P.

28.1(e)(2)(B) because it contains 15,559 words, excluding the parts of the brief

exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)

and Circuit Rule 32, and the type style requirements of Fed. R. App. 32(a)(6),

because it has been prepared in a proportionally spaced typeface using Corel

WordPerfect X3 in twelve point Century Schoolbook font.

February 19, 2010                                        /s/ Jason A. Dunn
                                                        Jason A. Dunn

**CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30(d)**

Pursuant to Circuit Rule 30(d), the undersigned counsel hereby certifies that all materials required by Circuit Rules 30(a), 30(b), and 30(c) are included in the Required Short Appendix.


February 19, 2010                                            /s/ Jason A. Dunn
                                                             Jason A. Dunn

**CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 31(e)(1)**

Pursuant to Circuit Rule 31(e)(1), the undersigned counsel hereby certifies that appendix materials required by Circuit Rules 30(a) and 30(b) are not available in searchable digital format.


February 19, 2010                                    /s/Jason A. Dunn
                                                     Jason A. Dunn

## CERTIFICATE OF SERVICE

I hereby certify that, on February 19, 2010, copies of this Brief and the

Required Appendix, and Supplemental Appendix were sent via Federal Express to

the Clerk of this Court and the following counsel:

MARK D. HOPSON
PETER D. KEISLER
PETER C. PFAFFENROTH
RYAN C. MORRIS
LOWELL J. SCHILLER
Sidley Austin LLP
1501 K Street, NW
Washington, DC 20005
(202) 736-8000

MARC E. MANLY
CATHERINE S. STEMPIEN
DEAN M. MOESSER
JULIE L. EZELL
Duke Energy Corp.
526 South Church Street
Charlotte, NC 28202
(704) 382-8000

**Attorneys for Defendants Cinergy Corp.,
PSI Energy, Inc. and The Cincinnati Gas &
Electric Company**

MONICA WAGNER
MICHAEL J. MYERS
Assistant Attorney General
The Capitol
Albany, NY 12224
(518) 402-2594
**Attorneys for State of New York**


JON C. MARTIN
JUNG W. KIM
Deputy Attorneys General
Richard J. Hughes Justice Complex
25 Market Street, P.O. Box 093
Trenton, NJ 08625-4503
(609) 984-2845
**Attorneys for State of New Jersey**


SCOTT N. KOSCHWITZ
Assistant Attorney General
55 Elm Street
P.O. Box 120
Hartford, CT 06141-0120
(860) 808-5101
**Attorney for State of Connecticut**


KEITH GUTHRIE
13242 South 600 East
Elizabethtown, IN 47232
(812) 579-5926
**Counsel for Intervenor-Plaintiffs**
**Hoosier Environmental Council**
**Ohio Environmental Council**


/s/ Jason A. Dunn
Jason A. Dunn