Nos. 09-3351, 09-3344, 09-3350

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee/Cross-Appellant*,

STATE OF NEW YORK, STATE OF NEW JERSEY, STATE OF CONNECTICUT,
*Plaintiff-Intervenor Appellees/Cross-Appellants*,

and

HOOSIER ENVIRONMENTAL COUNCIL, OHIO ENVIRONMENTAL COUNCIL,
*Plaintiff-Intervenor Appellees*,

v.

CINERGY CORPORATION, PSI ENERGY, INC.,
AND THE CINCINNATI GAS & ELECTRIC COMPANY,
*Defendant-Appellants/Cross-Appellees*.

Appeal from the United States District Court for the Southern District of Indiana,
Indianapolis Division, case no. 1:99-cv-1693,
the Honorable Judge Larry J. McKinney, presiding

DEFENDANT-APPELLANTS/CROSS-APPELLEES'
REPLY AND RESPONSE BRIEF

Marc E. Manly
Catherine S. Stempien
Dean M. Moesser
Julie L. Ezell
DUKE ENERGY CORP.
526 South Church Street
Charlotte, NC 28202
(704) 382-8000

Mark D. Hopson
    *Counsel of Record*
Peter D. Keisler
Frank R. Volpe
Peter C. Pfaffenroth
Ryan C. Morris
Lowell J. Schiller
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
(202) 736-8000 tel.
(202) 736-8711 fax
    *Attorneys for Appellants/Cross-*
        *Appellees*

March 22, 2010

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................iii

SUMMARY OF THE ARGUMENT ........................................... 1

ARGUMENT ............................................................................ 3

I.    The District Court Applied The Wrong Legal Standard. ................... 3

    A.    Indiana's Pre-1994 SIP Imposed A "Potential-To-Potential" NNSR Standard............................................................. 3

    B.    Cinergy Did Not Waive This Argument. ................................. 9

II.    The District Court Erroneously Admitted Rosen's And Koppe's Testimony. ............................................................................. 16

    A.    The District Court's Cursory Analysis Warrants No Deference. ......... 17

    B.    Rosen's Testimony Should Have Been Excluded. ................................. 18

        1.    Plaintiffs Do Not Contest The Critical Points Compelling The Exclusion Of Rosen's Testimony.......................................... 18

        2.    Plaintiffs' Arguments Cannot Justify The Admission Of Rosen's Testimony. ..................................................................... 21

            a.    Rosen's Failure To Test Cannot Be Excused Because He Was Making A "Prediction."........................ 22

            b.    Rosen's "Experience" Cannot Make His Testimony Reliable........................................................................ 23

            c.    Rosen's Constant Utilization Assumption Does Not Apply "Standard Industry Principles." ........................... 25

            d.    Plaintiffs' Post-Hoc Justifications For Rosen's Analysis Fail. ................................................................ 30

        3.    Rosen's Methodology Is Irrelevant Under The CAA And EPA's Implementing Regulations. .............................................. 32

    C.    Koppe's Testimony Should Have Been Excluded.................................. 35

III.    The Statute of Limitations Bars Plaintiffs' Civil Penalty Claims. ................. 38

     A.    Under the CAA and Its Regulations, Plaintiffs Alleged One-Time Violations That Accrued at the Time of Construction. ......................... 40

     B.    The Majority Of Courts Agree That NSR Violations Are Not Ongoing Violations. ............................................................................... 46

     C.    Policy Considerations Favor The Majority View. ................................. 49

CONCLUSION ........................................................................................................ 51

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 31(e)(1)

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page(s)

CASES

*3M v. Browner*,
  17 F.3d 1453 (D.C. Cir. 1994) ........................................................ 39, 40

*Amax Coal Co. v. Franklin*,
  957 F.2d 355 (7th Cir. 1992) ............................................................. 6, 8

*Bourelle v. Crown Equip. Corp.*,
  220 F.3d 532 (7th Cir. 2000) ............................................................... 21

*In re Brand Name Prescription Drugs Antitrust Litig.*,
  123 F.3d 599 (7th Cir. 1997) ............................................................... 15

*Chapman v. Maytag Corp.*,
  297 F.3d 682 (7th Cir. 2002) ............................................................... 20

*Citizens Against Ruining the Env't v. EPA*,
  535 F.3d 670 (7th Cir. 2008) ......................................................... 42, 46

*Clark v. Takata Corp.*,
  192 F.3d 750 (7th Cir. 1999) ............................................................... 21

*CleanCOALition v. TXU Power*,
  536 F.3d 469 (5th Cir. 2008), *cert. denied*, 129 S. Ct. 648 (2008)............. 45, 47, 48

*Cullen v. Ind. Univ. Bd. Of Trustees*,
  338 F.3d 693 (7th Cir. 2003) ............................................................... 21

*Cummins v. Lyle Indus.*,
  93 F.3d 362 (7th Cir. 1996) ............................................................... 32

*Daubert v. Merrell Dow Pharms., Inc.*,
  43 F.3d 1311 (9th Cir. 1995) ......................................................... 21, 26

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993) ......................................................................... 20, 24

*Dhillon v. Crown Controls Corp.*,
  269 F.3d 865 (7th Cir. 2001) ............................................................... 24

*Edwardsville Nat'l Bank & Trust Co. v. Marion Labs., Inc.*,
  808 F.2d 648 (7th Cir. 1987) ............................................................... 10

*Fuesting v. Zimmer, Inc.*,
  421 F.3d 528 (7th Cir. 2005), *rev'd on other grounds*,
  448 F.3d 936 (7th Cir. 2006) ...................................................................... 17, 20, 21, 22

*General Motors v. United States,*
  496 U.S. 530 (1990) ...................................................................... 4, 8, 9

*Johnson v. Burken,*
  930 F.2d 1202 (7th Cir. 1991) ............................................................ 15

*Klehr v. A.O. Smith Corp.,*
  521 U.S. 179 (1997) ................................................................ 39

*Kumho Tire Co. v. Carmichael,*
  526 U.S. 137 (1999) ................................................................ 24

*Lands Council v. Powell,*
  395 F.3d 1019 (9th Cir. 2005) ............................................................ 22

*Ledbetter v. Goodyear Tire & Rubber Co.,*
  550 U.S. 618 (2007), *abrogated by statute on other grounds*, Lilly Ledbetter
  Fair Pay Act Of 2009, Pub. L. No. 111-2 (2009) ............................................ 48, 49

*Lewis v. City of Chicago,*
  528 F.3d 488 (7th Cir. 2008), *cert. granted*, 130 S. Ct. 47 (2009)........................ 48

*Metro. Wash. Coal. for Clean Air v. Dist. of Columbia,*
  511 F.2d 809 (D.C. Cir. 1975) ................................................................ 8

*Naeem v. McKesson Drug Co.,*
  444 F.3d 593 (7th Cir. 2006) ............................................................ 18

*Nat'l Parks Conservation Ass'n, Inc. v. TVA,*
  480 F.3d 410 (6th Cir. 2007) ................................................................ 47, 48, 49

*Nat'l Parks & Conservation Ass'n, Inc. v. TVA,*
  502 F.3d 1316 (11th Cir. 2008), *cert. denied*, 128 S. Ct. 2958 (2008) .........*passim*

*Navistar Int'l Transp. Corp. v. EPA,*
  858 F.2d 282 (6th Cir. 1988) ................................................................ 9

*Neal v. Honeywell Inc.,*
  191 F.3d 827 (7th Cir. 1999) ............................................................ 14

*N. Ind. Pub. Serv. Co. v. Colo. Westmoreland, Inc.,*
  667 F. Supp. 613 (N.D. Ind. 1987), *aff'd*, 845 F.2d 1024 (7th Cir. 1988).... 19, 28, 32

*People Who Care v. Rockford Bd. Of Educ.*,
   111 F.3d 528 (7th Cir. 1997) ................................................ 21

*Russello v. United States*,
   464 U.S. 16 (1983) ............................................................ 42

*Sheehan v. Daily Racing Form, Inc.*,
   104 F.3d 940 (7th Cir. 1997) ............................................... 21

*Sierra Club v. Franklin County Power of Ill., LLC*,
   546 F.3d 918 (7th Cir. 2008), *cert. denied*, 129 S. Ct. 2866 (2009)...................... 47

*Smith v. Ford Motor Co.*,
   215 F.3d 713 (7th Cir. 2000) ............................................... 26

*Sokaogon Gaming Enter. Corp. v. Tushie-Montgomery Assocs.*,
   86 F.3d 656 (7th Cir. 1996) ................................................ 14

*United States v. AM Gen. Corp.*,
   34 F.3d 472 (7th Cir. 1994) ................................... 40, 41, 50, 51

*United States v. Brumley*,
   217 F.3d 905 (7th Cir. 2000) ............................................... 24

*United States v. Cinergy Corp.*,
   397 F. Supp. 2d 1025 (S.D. Ind. 2005) .................................. 47

*United States v. Cinergy Corp.*,
   618 F. Supp. 2d 942 (S.D. Ind. 2009) .................................. 51

*United States v. Ill. Power Co.*,
   245 F. Supp. 2d 951 (S.D. Ill. 2003) .................................... 47

*United States v. Kubrick*,
   444 U.S. 111 (1979) ...................................................... 39, 40

*United States v. Marine Shale Processors*,
   81 F.3d 1329 (5th Cir. 1996) ........................................... 43, 48

*United States v. Midwest Generation, LLC*,
   2010 WL 889986 (N.D. Ill. Mar. 9, 2010) ................... 41, 42, 47, 48, 50

*United States v. Murphy Oil USA, Inc.*,
   143 F. Supp. 2d 1054 (W.D. Wis. 2001) ............................... 47, 50

*United States v. S. Ind. Gas & Elec. Co.*,
   2002 WL 1760752 (S.D. Ind. July 26, 2002) ........................... 45, 47

*United States v. Stanley*,
    483 U.S. 669 (1987) ................................................................... 10

*United States v. Texas*,
    507 U.S. 529 (1993) ................................................................... 44

*United States v. Wilson*,
    484 F.3d 267 (4th Cir. 2007) .................................................... 24

*Whitman v. Am. Trucking Ass'ns*,
    531 U.S. 457, 468 (2001) ............................................................. 7

ADMINISTRATIVE DECISIONS

*In re Pet. of Duke Energy Ind. Energy, Inc.*,
    2007 Ind. PUC Lexis 380 (Ind. Util. Reg. Comm'n Nov. 20, 2007) ..................... 31

*In re Rate Pet. of Pub. Serv. Co. of Ind.*,
    1986 Ind. PUC Lexis 419 (Ind. Util. Reg. Comm'n Mar. 7, 1986) ........................ 51

STATUTES AND REGULATIONS

28 U.S.C. §1292(b) ................................................................ 14, 15

42 U.S.C. §7411(e) ...................................................................... 43

42 U.S.C. §7413(b) ................................................................... 4, 8

42 U.S.C. §7475 ...................................................................... 41, 42

42 U.S.C. §7477 .......................................................................... 43

42 U.S.C. §7479(3) ...................................................................... 42

42 U.S.C. §§7501-15 ...................................................................... 8

42 U.S.C. §7502(c)(5) ................................................................... 46

42 U.S.C. §7503(a) ....................................................................... 46

42 U.S.C. §7602 ................................................................... 4, 42, 46

42 U.S.C. §7661a ........................................................................ 43

40 C.F.R. pt. 51, App. S (1979) .................................................. 5, 7, 9

40 C.F.R. §52.21 (1981) ..................................................... 11, 33, 44, 45, 51

40 C.F.R. §52.793 ........................................................................ 44

44 Fed. Reg. 38,583 (July 2, 1979) ........................................... 8

44 Fed. Reg. 67,182 (Nov. 23, 1979) ......................................... 8

46 Fed. Reg. 54,941 (Nov. 5, 1981) ....................................... 5, 6

47 Fed. Reg. 6,621 (Feb. 16, 1982) ........................................... 7

57 Fed. Reg. 32,314 (July 21, 1992) .............................. 33, 34, 35

59 Fed. Reg. 51,108 (Oct. 7, 1994) ........................................... 6

325 Ind. Admin. Code §2-1.1-1 (1981) ..................................... 6

325 Ind. Admin. Code §2-3-1(l) (1981) ..................................... 6

325 Ind. Admin. Code §2-3-1(o) (1981) ..................................... 6

Indiana Air Pollution Control Regulation APC-1 (recodified as 325 Ind. Admin. Code §1.1-1) ........................................... 7

Indiana Air Pollution Control Regulation APC-19 (recodified as 325 Ind. Admin. Code §2-1) .......................................... *passim*

## RULES

Fed. R. Evid. 702 ......................................................................... 2

Fed. R. Evid. 702, 2000 amend ......................................... 24, 36

## LEGISLATIVE HISTORY

S. 1630, 101st Cong. § 609 (1990) .......................................... 43

## OTHER AUTHORITIES

R.F. Drenick, *The Failure Law Of Complex Equipment*, 8 Journal of the Society of Industrial and Applied Mathematics 680 (1960) ................................. 38

Barry Gower, *Scientific Method: An Historical and Philosophical Introduction* (1997) ......................................................... 22

Michael D. Green, *Expert Witnesses and Sufficiency of Evidence in Toxic Substances Litigation: The Legacy of* Agent Orange *and Bendectin Litigation*, 86 Nw. U. L. Rev. 643 (1992) ................................. 22

## SUMMARY OF THE ARGUMENT

Plaintiffs' brief fails to address many of Cinergy's central arguments, and their responses to the points they do address confirm that the district court erred in submitting their theory of liability to the jury. This Court should reverse the district court's judgment and remand with instructions to enter judgment in Cinergy's favor.

First, the district court instructed the jury to apply the wrong legal standard to the claims that Cinergy violated the Non-Attainment New Source Review ("NNSR") provisions of the Clean Air Act ("CAA"). For those claims, the jury had to determine whether the projects were "modifications" subject to permitting requirements according to the Environmental Protection Agency ("EPA")-approved Indiana state implementation plan ("SIP") in place when the repairs occurred. Although Plaintiffs now concede that the SIP is controlling, their interpretation of the SIP cannot be squared with its express language and EPA's orders approving it. At bottom, Plaintiffs seek to impose NNSR liability based on a subsequent standard rather than the one in place when the challenged conduct occurred.

Nor did Cinergy waive this argument by not raising it in the prior interlocutory appeal. The issue decided there governed most of Plaintiffs' claims below, but not the NNSR claims here. Cinergy could not have raised this issue in that appeal because Plaintiffs had expressly carved it out of the partial summary judgment they sought and obtained in the interlocutory order that this Court reviewed. Further, Cinergy had no reason to raise the issue because Plaintiffs' position at the time of the petition for interlocutory appeal was the *same as Cinergy's*. Only later did

Plaintiffs reverse course and create the dispute that is now properly, and for the first time, before this Court.

Second, with respect to all of their claims, Plaintiffs offered no reliable evidence on whether Cinergy's projects violated the standard on which the jury was instructed, because Dr. Rosen and Mr. Koppe's expert testimony should have been excluded under Fed.R.Evid. 702. Plaintiffs do not contest several of the principal reasons why that evidence should have been excluded: (i) the Rosen-Koppe methodology has never been tested or subjected to any independent verification such as peer review; (ii) the methodology ignores entirely the fundamental engineering reality that a utility system's generating units are interdependent, and therefore generation from a particular unit cannot be predicted, as the methodology does, by looking at that unit in isolation from the system as a whole; and (iii) the methodology impossibly predicts substantial increases in generation throughout Cinergy's system even when overall system demand is assumed to be flat.

Plaintiffs instead rest almost entirely on the repeated claim that Cinergy used the very same "constant utilization" methodology in analyzing the costs and benefits of certain repair projects. But even if that cost-benefit process could supply the scientific validation their testimony lacks—and it cannot—the documents Plaintiffs cite establish that Cinergy's analyses specifically assumed that these types of repair projects at Wabash River *would not increase generation*.

Plaintiffs' cross-appeal is meritless. The district court correctly held that Plaintiffs' claims for civil penalties were time-barred. As numerous courts have

held, failure to secure a preconstruction permit under the CAA is a one-time violation that accrues at the time of construction. Plaintiffs brought their suit outside the applicable five-year statute of limitations and thus far too late to include civil penalties. That holding presents no impediment to environmental enforcement because there is no reason such lawsuits cannot be brought within five years (or potentially limited to injunctive relief, as this one was). By contrast, Plaintiffs' theory would extend the time to seek civil penalties indefinitely, in contravention of the policies of reasonable repose underlying statutes of limitations.

## ARGUMENT

### I. The District Court Applied The Wrong Legal Standard.

#### A. Indiana's Pre-1994 SIP Imposed A "Potential-To-Potential" NNSR Standard.

Cinergy explained in its opening brief ("Op.Br." 22-23) that the court improperly instructed the jury on the four NNSR claims involving projects at Wabash River.[1] Specifically, Cinergy showed these claims were governed by the 1982 SIP in effect when the projects occurred (1989-92). Although the applicable SIP mandated a "potential-to-potential" test in determining whether these projects were "modifications" subject to NNSR permitting, the jury was instead instructed to use an "actual-to-projected-actual" test. A00575-76; Op.Br. 6-8 (explaining tests).

Resolution of this issue turns on a narrow legal question: the proper interpretation of the NNSR provisions in the Indiana SIP at the time of the projects.

---

[1] The CAA's new source review ("NSR") provisions contain both NNSR provisions, which govern permitting in areas not in attainment of the relevant national air quality standard, and Prevention of Significant Deterioration ("PSD") provisions, which govern permitting in areas that are in attainment or unclassifiable. *See* Op.Br. 5.

Plaintiffs do not contest much of the law that will guide this Court's analysis. First, the parties agree a utility's obligations under the CAA's NSR provisions are defined by the applicable SIP, not EPA's regulations. *See* Pls.Br. 6 ("States implement many of the CAA's provisions through the adoption of [SIPs, which] ... must contain emissions limitations and other measures necessary to meet NSR requirements ...."); Op.Br. 5-6. Although SIPs often mirror EPA's regulations, because SIP revisions do not become effective until EPA approves them, *see* 42 U.S.C. §§7413(b), 7602(q), "there will always be a period during which a State-proposed revision and a federally-approved SIP will differ," United States Br. at 36, *Gen. Motors v. United States,* 496 U.S. 530 (1990). Likewise, the parties agree the SIP provisions governing the NNSR claims at issue are contained in Indiana Air Pollution Control Regulation APC-19 (recodified as 325 IAC §2-1). Pls.Br. 22-25 (contesting meaning, not applicability, of APC-19); Op.Br. 26-29. Cinergy's appeal on this issue thus turns on APC-19's proper interpretation.

As Cinergy demonstrated (at 23-29), APC-19 prescribes a "potential-to-potential" standard that compares a source's maximum rated capacity before and after a project. APC-19 requires utilities to obtain pre-construction permits only for "modification[s]" that "will result in a *potential* increase in emissions of 25 tons per year or more." APC-19 §§1(b) and 4 (emphasis added). Further, the definitions accompanying APC-19 state a "modification" is a change that increases the "potential or legally allowed emissions" for a pollutant, defining these phrases in terms of a source's maximum rated capacity. *See* Op.Br. 25-26 (citing APC-1 §§2, 43,

4

58 (recodified at 325 IAC 1.1-1)). This "potential-to-potential" standard is consistent with the federal standard in place when Indiana submitted its SIP for federal approval (which is why Indiana drafted its SIP to include it). *See* 40 C.F.R. pt. 51, App. S (1979).

APC-19's meaning is so clear that Plaintiffs do not contest that, when read together with the definitions in APC-1, a "potential-to-potential" test is required. Instead, Plaintiffs contend that EPA "explicitly rejected" APC-1's definitions for use in the NNSR context.[2] Pls.Br. 22. First, this argument flatly contradicts the position Plaintiffs took in their Complaint. There, Plaintiffs expressly recognized that the definitions in APC-1 governed NNSR claims for Indiana projects before December 1994, quoting APC-1's definitions for "modification" and "potential emissions" and stating they applied "[i]n this context." A00147-48 (¶48) (quoting 325 IAC 1.1-1 §§43, 58). These are *precisely* the definitions Plaintiffs now contend EPA rejected.

Second, Plaintiffs' new litigating position is incorrect. It rests entirely on misuse of a single quotation. Pls.Br. 22 (asserting incorrectly that EPA "approv[ed] these definitions only for 'purposes other than new source review'") (emphasis omitted). EPA never rejected the APC-1 definitions for NNSR purposes but, rather, *expressly approved* them. 46 Fed. Reg. 54,941 (Nov. 5, 1981). As Cinergy explained (at 28), EPA acknowledged that, because it had updated federal regulations while Indiana's

---

[2] Plaintiffs also note that EPA disapproved "the only definition of 'major modification' included in [Indiana's proposed revision]." Pls.Br. 22. This is a red herring. The term "major modification" appears only in APC-19's PSD provisions, which EPA did indeed disapprove. But the NNSR provisions at issue regulate only "modification[s]," APC-19 §1(b), making the definition of "major modification" irrelevant for NNSR purposes.

definitions were pending approval, some of Indiana's proposed definitions had become "inconsistent with EPA's most recent definitions." 46 Fed. Reg. at 54,942. But because Indiana had agreed to submit updated NSR regulations and definitions, and because the definitions currently before EPA met the CAA's requirements "for purposes other than new source review," EPA explicitly "approv[ed] … Indiana's general definition regulation, [APC-1], for use with the Indiana regulations."[3] *Id.* Although Indiana promptly executed revisions, *see* 325 IAC §§2-1.1-1, 2-3-1(l), and 2-3-1(o) (1981), EPA did not approve them until after the projects at issue here, 59 Fed. Reg. at 51,108 (Oct. 7, 1994).

Moreover, even if EPA had rejected the APC-1 definitions for NNSR purposes, Plaintiffs' SIP interpretation is still incorrect. The regulations in APC-19 contain *no reference whatsoever* to "actual" emissions; rather, the regulations' applicability depends on whether a "modification" causes a "*potential* increase in emissions." APC-19 §1(b) (emphasis added). The district court should not have applied an "actual" emissions standard based on a SIP that says nothing about "actual" emissions. *E.g.*, *Amax Coal Co. v. Franklin*, 957 F.2d 355, 357 (7th Cir. 1992) (refusing to adopt interpretation that would "rewrite the regulation").

Because APC-19, taken alone, does not supply an "actual" emissions standard— and because it would be irrational for EPA to approve NNSR regulations without the definitions necessary to apply them—Plaintiffs are left to argue that EPA

---

[3] EPA explicitly rejected the definition for one term not relevant here, 46 Fed. Reg. at 54,942, demonstrating that, had EPA wanted to carve out other exceptions to its approval, it knew how to do so.

intended to fill this gap in the SIP with the CAA's general *statutory* definitions. Pls.Br. 22. Again, this is incorrect. Plaintiffs' theory would leave many key terms in APC-19 undefined. For instance, APC-19 employs the terms "commence construction" and "facility," APC-19 §4, terms the CAA does not define. APC-1, however, does. APC-1 §§20, 27. Even more significantly, the specific 40-ton limit the jury applied to the claims at issue, A00094, cannot be found anywhere in *either* APC-19 *or* the CAA.[4]

It is unreasonable to believe EPA intended to make such a mess out of Indiana's SIP. It is still more unreasonable to believe EPA did so *sub silentio*. Plaintiffs do not contest that EPA approved the APC-19 regulations shortly after acting on the APC-1 definitions. 47 Fed. Reg. 6,621 (Feb. 16, 1982). In that approval action, EPA said nothing about having rejected the APC-1 definitions, or about replacing Indiana's submitted definitions with the far more general statutory ones. *See id.* But under Plaintiffs' theory, EPA, in approving APC-19, dramatically altered its key provisions. If EPA had intended this result, it would have said so. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) (rejecting interpretation that would find "elephants in mouseholes"). In contrast, when EPA wanted to add new PSD provisions to Indiana's SIP, it first expressly rejected the proposed regulations, then explicitly incorporated federal regulations into the SIP. Op.Br. 27.

---

[4] Rather, it is contained in EPA's NNSR regulations. 40 C.F.R. Pt. 51, App. S §II(A)(5), (6), (10) (1979). But Plaintiffs do not contend that these regulations were part of Indiana's SIP after APC-19 was approved.

Plaintiffs attempt to mask the implausibility of their interpretation of APC-19 by arguing the CAA *itself* requires an "actual-to-projected-actual" test, and "that is the end of the matter." Pls.Br. 23 (internal quotation marks omitted). This assertion makes little sense given the unique State role mandated by the CAA. *See Gen. Motors*, 496 U.S. at 532. As Plaintiffs do not dispute, the NNSR provisions of the CAA impose no direct obligations on utilities, but instead subject utilities to federal liability only for violating the terms of an EPA-approved SIP. *See* 42 U.S.C. §§7501-15, 7413(b)(1). And because "'revisions are not to be considered part of a [SIP] until approved by the Administrator,'" *Metro. Wash. Coal. for Clean Air v. Dist. of Columbia*, 511 F.2d 809, 812 (D.C. Cir. 1975) (citation omitted), changes to the CAA—and changes in its interpretation—require regulatory action to be incorporated into a SIP. Quite simply, the SIP is the law until it is changed, and Plaintiffs do not dispute that (i) APC-19 was the relevant SIP or (ii) after EPA approved APC-19, it never approved any changes to the Indiana SIP's NNSR provisions until 1994.[5]

Finally, Plaintiffs incorrectly assert that their interpretation is necessary to advance the CAA's purposes and to avoid absurd results. *See* Pls.Br. 24, 25-26. The "potential-to-potential" standard in APC-19 is certainly *different* from the standard applied by the district court, but Plaintiffs have not demonstrated it was

---

[5] Insofar as Plaintiffs suggest (at 23) that Indiana's SIP could not have obtained approval unless it conformed fully to the federal NNSR program, they ignore established EPA practice. Under EPA's "conditional" approval process, EPA will approve a SIP not meeting all the CAA's requirements when the State assures it will later seek to correct the deficiencies. Those subsequent corrections likewise require EPA approval to become effective. 44 Fed. Reg. 38,583 (July 2, 1979); 44 Fed. Reg. 67,182 (Nov. 23, 1979).

insufficiently stringent or protective of the environment. To the contrary, the "potential-to-potential" standard in APC-19 was *four times* more stringent than the federal standard applicable when Indiana drafted its regulations. *Compare* APC-19 §§1(b) & 4 (permit required for 25-ton increase), *with* 40 C.F.R. pt. 51, App. S §II(A)(3), (5) (1979) (permit required for 100-ton increase).[6] In all events, the State-Federal partnership Congress created operates such that, whenever there is a pertinent amendment to, or new judicial or administrative interpretation of, the CAA, there will be a period when the terms of the CAA and a SIP differ, because a SIP cannot take effect until it has gone through EPA's approval process. *See supra* p. 4. Here, Indiana promptly revised its SIP, but EPA failed to act on it for over a decade. Any "absurd result" occurred because EPA left Indiana's revisions to gather dust.[7]

### B.    Cinergy Did Not Waive This Argument.

Plaintiffs also argue that Cinergy waived its right to seek review regarding APC-19's meaning by not raising it in an earlier, interlocutory appeal. Plaintiffs never raised this argument in the district court when the issue was briefed shortly

---

[6] *Navistar International Transportation Corp. v. EPA*, 858 F.2d 282 (6th Cir. 1988), actually undercuts Plaintiffs' position. *See* Pls.Br. 24. There, the court resolved ambiguity in the relevant SIP provisions by using testimony *from the SIP's drafters* that those provisions were intended to advance particular statutory goals. 858 F.2d at 287-88. Here, of course, APC-19 was drafted while the federal NNSR program clearly employed a "potential-to-potential" test, 40 C.F.R. pt. 51, App. S §II(A)(3), (5) (1979), *and the Indiana drafters followed suit*. Insofar as the drafters' intent matters, it supports Cinergy.

[7] Plaintiffs suggest (at 26 n.8) that, even if their SIP interpretation is incorrect, it is still fair to base *federal* liability on an actual emissions standard because separate *state-law* regulations employed that standard. This is wrong. Federal CAA compliance is based on the EPA-approved SIP, not state regulations implementing state law. *See Gen. Motors*, 496 U.S. at 540.

9

before trial,[8] *cf.* A00213-17; A01306-A01319, and it rests on a fundamentally misleading account of the proceedings before the district court and this Court.

Remarkably, Plaintiffs do not disclose that they carved out this issue when they sought the district court order that became the subject of the interlocutory appeal in this Court: Plaintiffs advised the district court that APC-19's meaning was not yet before it. SA001156 n.6. APC-19's meaning was thus beyond the scope of the order on which Cinergy sought interlocutory review and beyond the scope of this Court's interlocutory jurisdiction. *See United States v. Stanley*, 483 U.S. 669, 677 (1987) (jurisdiction under §1292(b) is "confined to the particular order appealed from"); *see also, e.g., Edwardsville Nat'l Bank & Trust Co. v. Marion Labs., Inc.*, 808 F.2d 648, 650 (7th Cir. 1987) ("the thing under review is the order"). Nor do Plaintiffs explain that at this time their position on this issue was the *same as Cinergy's* because Plaintiffs had not yet changed the position staked out in their Complaint. Only *after* Cinergy sought permission for interlocutory appeal did Plaintiffs indicate to the district court for the first time that, notwithstanding the contrary position in their Complaint, they were now disputing APC-19's meaning. SA001138-39. When they did, Cinergy opposed Plaintiffs' new SIP interpretation. A01274-98. Having delayed the dispute over APC-19's meaning until *after* the district court had issued the order subject to interlocutory review, Plaintiffs cannot credibly argue that Cinergy could have—let alone *must* have—presented the issue in the interlocutory appeal.

---

[8] Nor are Plaintiffs correct that the district court "acknowledg[ed] that this Court had already resolved that the actual emissions test applied." Pls.Br. 13. It said nothing that remotely resembles such an "acknowledgment." *See* A00002.

Cinergy could not "waive" an argument by not challenging a position that Plaintiffs had not yet taken and that the district court had not yet addressed.

Specifically, in December 2004, Plaintiffs filed a motion for partial summary judgment regarding the proper interpretation of the federal NSR program's emissions standard. A01200-04. Although NSR contains both PSD and NNSR components, Plaintiffs' brief dealt only with EPA's PSD regulations, 40 C.F.R. §52.21, explaining that those provisions "*generally* apply equally to the NNSR provisions." SA001154 n.3 (emphasis added). This contention was correct: the standards in 40 C.F.R. §52.21 did govern *most* of Plaintiffs' claims, because most of the applicable SIPs either incorporated that regulation directly or employed a materially-identical standard.[9] But, as Cinergy explained *supra* pp. 3-5, the standard in APC-19, which governs the four NNSR claims here at issue, was materially different.

With respect to the NNSR SIP provisions, Plaintiffs simply cited them (including APC-19), and advised in a footnote "[w]e are *not* asking the Court … to determine the correct applicable test *at this time*." SA001156 n.6 (emphasis added). Thus, while Plaintiffs asked the district court to interpret 40 C.F.R. §52.21, which contained standards generally applicable to the claims then at issue, they did *not* ask it to determine whether APC-19 applied that standard. Indeed, the only

---

[9] For Plaintiffs' PSD claims, the relevant SIPs from Indiana and Ohio (where all the underlying projects occurred) have long incorporated §52.21 by express reference. A00142-43 (citing 40 C.F.R. §§52.793, 52.1884). Likewise, after December 1994, the Indiana NNSR SIP provisions employed a standard materially identical to that in §52.21. A00146-50 (citing SIPs).

apparent point of Plaintiffs' footnote was to clarify for the court that the SIPs cited in their Complaint were controlling for NNSR purposes.

Cinergy opposed Plaintiffs' motion, and filed its own cross-motion for partial summary judgment, because it disagreed with Plaintiffs' interpretation of the standard in 40 C.F.R. §52.21. A01205-08. Nothing in Cinergy's motion or its briefing evinces an intent to expand the scope of the question presented to include the interpretation of APC-19.[10] To the contrary, Cinergy explained that the question involved "the *limited* issue of the proper emissions test under the [NSR] provisions of the [CAA]," arguing that "neither the CAA nor EPA's implementing rules" supported Plaintiffs' interpretation. A01205-06 (emphasis added). Given Plaintiffs' apparent acknowledgement that APC-19 controlled for NNSR purposes, Cinergy did not need to seek summary judgment on this issue because Cinergy agreed with Plaintiffs' position.

The district court granted Plaintiffs' motion and denied Cinergy's cross-motion, interpreting the standard in EPA's 1980 PSD regulations but saying nothing about

---

[10] Plaintiffs repeatedly assert that Cinergy took the position that EPA's PSD standard applied to the four NNSR claims at issue here. Pls.Br. 12 ("Cinergy argued on appeal that *all* of its modifications … were governed by EPA's 1980 NSR regulations" (emphasis added)); *id.* at 20 ("The premise of Cinergy's first appeal was that EPA's 1980 NSR regulations were the binding, 'controlling' legal authority for determining the emission increase test for *all* the claims at issue" (emphasis added)). Cinergy did no such thing: it said only that EPA's PSD standard "appl[ied] to the projects *at issue* in this case," not that it applied to "all" Plaintiffs' claims. SA001063 (emphasis added); *see also* SA001081-87; SA001113. Cinergy emphasized the applicability of EPA's *1980* PSD Rules to rebut Plaintiffs' argument that EPA's *1992* PSD Rules governed the projects at issue. SA001113-15.

Plaintiffs likewise incorrectly suggest that Cinergy admitted it once interpreted APC-19 as providing an "actual-to-potential" standard. *See* Pls.Br. 24-25. The testimony they reference relates solely to the PSD program. *See* A01268; A01273.

whether APC-19 applied that standard. A01248-61. Indeed, it would have been surprising had the court done so, given Plaintiffs' representation they were not seeking a ruling on that question. SA001156 n.6. As such, Cinergy *could not* have asked this Court to interpret the SIP, *see Stanley*, 483 U.S. at 677, and it certainly could not have waived its right to seek an interpretation of the SIP by failing to present arguments that this Court lacked jurisdiction to hear.

Were there any doubt about the scope of the district court's order, Plaintiffs' subsequent motion *in limine* regarding the applicable regulations confirms that the meaning of APC-19 was not at issue before the district court when Cinergy sought permission to take its appeal. In December 2005, *after* Cinergy had already sought interlocutory review but *while* this Court was considering Cinergy's request, Plaintiffs filed a motion to clarify the meaning of each of the specific SIP regulations applicable in this case. SA001125-42. *This was the first time Plaintiffs contended that the same "actual-to-projected-actual" test applied to all claims at issue, and Cinergy opposed Plaintiffs' motion.* Cinergy explained the motion was premature as to the *PSD claims* because the governing regulation was the subject of the interlocutory appeal. A01276; A01284. It accordingly asked the court to defer any decision until after this Court had ruled. A01276. Nonetheless, with respect to the various NNSR SIP provisions at issue, Cinergy explained Plaintiffs' new interpretation was simply incorrect and an effort to "apply[ ] across the board" a standard the parties had never agreed would govern every claim in this litigation. A01285-88. Had Plaintiffs thought this dispute was encompassed by the then-

pending appeal, they would not have raised it in the district court and then wholly failed to mention it before this Court.[11]

The decisions Plaintiffs cite (at 19-21) do not support their position. Those cases provide only that, once a party seeks review under 28 U.S.C. §1292(b), it may not later take a position that would render the interlocutory decision purely advisory. In *Neal v. Honeywell Inc.*, 191 F.3d 827 (7th Cir. 1999), this Court held that once an appellant has represented that the interlocutory question was "controlling," it cannot subsequently argue that the same question was "irrelevant." *Id.* at 830. Likewise, in *Sokaogon Gaming Enterprise Corp. v. Tushie-Montgomery Associates*, 86 F.3d 656 (7th Cir. 1996), this Court held that by moving for certification of an order ruling on two alternative arguments, a party waived its right to present a third alternative argument on the same point of law. *Id.* at 658. The Court reasoned that if it rejected the two arguments presented on interlocutory review, but the third argument later proved fruitful, the interlocutory decision would not "affect the course of the litigation in the district court, and in that event it would be difficult to see how the question of law presented by [the interlocutory] appeal could be 'controlling.'" *Id.*

Cinergy's appeal presents none of these concerns. It is undisputed the question this Court previously decided was (and remains) "controlling" as to almost every claim then at issue, and Cinergy's position regarding the meaning of APC-19 is, and

---

[11] The district court never ruled substantively on Plaintiffs' motion. When the district court lifted the stay after this Court's interlocutory decision, it issued a blanket order denying pending motions. A01302-05. Cinergy later raised the issue in its own motion *in limine*.

14

has been, consistent with that fact. When this Court granted Cinergy's petition for interlocutory appeal, Plaintiffs had 46 separate PSD or NNSR claims based on $SO_2$, $NO_x$, and ozone allegations from 23 separate projects in Indiana and Ohio. A01299-1301. Of those claims, 35 were governed directly by the federal PSD regulation that this Court was asked to interpret, *id.*, and Cinergy has never contended otherwise. Likewise, four NNSR claims were governed by Indiana's post-1994 SIP, *see id.*, which employs a similar standard to the one contained in EPA's PSD regulation.[12] But four other NNSR claims—those at issue here—were subject to the different, "potential-to-potential" standard in APC-19. Cinergy has never contended otherwise, and the different legal standard governing these claims in no way renders this Court's interlocutory decision unnecessary or advisory. To the contrary, a decision interpreting the legal standard governing *almost every claim* in a case resolves a "controlling" question of law and "materially advance[s] the ultimate termination of the litigation." *Cf.* 28 U.S.C. §1292(b); *see In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 605 (7th Cir. 1997) (hearing interlocutory appeal from order regarding only subset of claims and explaining that "the fact that [an issue] may in the end not prove decisive does not show that … we were wrong to certify [an order] on the issue under 28 U.S.C. §1292(b)"); *Johnson v. Burken*, 930 F.2d 1202, 1206 (7th Cir. 1991) (question is controlling "if interlocutory

---

[12] Three NNSR claims were governed by the Ohio SIP, *id.*, which differs in important respects from the federal PSD regulation. A01290-93. Those claims were never presented to a jury, *cf.* A00071-114, and neither party continues to litigate their governing standard.

reversal might save time for the district court, and time and expense for the litigants") (quotation omitted)).

                              *    *    *

Plaintiffs do not dispute that they presented no evidence the projects caused an increase in a unit's "potential" to emit $SO_2$, or that the district court's remedy rests predominantly on the NNSR violations. *Compare* Pls.Br. 18-26, *with* Op.Br. 23 & n.4. Because APC-19 requires a "potential-to-potential" test to be applied to the four claims at issue, judgment on these claims should be reversed and the remedy order vacated.

## II.    The District Court Erroneously Admitted Rosen's And Koppe's Testimony.

Plaintiffs do not dispute the central points establishing that their expert testimony should never have been admitted. In particular, they do not deny that Dr. Rosen never tested or otherwise scientifically verified his methodology. Nor do they even attempt to defend Rosen's central error: he analyzed each generating unit in isolation, as if it were an independent utility, and ignored that these units are instead part of an interdependent system. In an interdependent system, where customer demand for electricity must be allocated among multiple units, it is impossible to predict how much one unit will generate—as Rosen purported to do— while ignoring how much other units will generate. Indeed, Plaintiffs offer no response to Cinergy's showing that Rosen's methodology would make the prediction that generation from the system will increase even if demand remains constant— which is a physical impossibility. Plaintiffs' non-response to these and other fundamental errors confirms that Rosen's testimony should have been excluded.

16

Mr. Koppe's opinions were also inadmissible. Koppe's own data contradict his claim that a generating unit will regain all lost availability for a two-year period following a like-kind component replacement, and an expert's general reliance on his asserted "experience" cannot justify a self-refuting opinion.[13]

### A.    The District Court's Cursory Analysis Warrants No Deference.

Plaintiffs cannot show that the district court's order satisfies *Fuesting v. Zimmer, Inc.*, 421 F.3d 528, 535-37 (7th Cir. 2005), *rev'd on other grounds*, 448 F.3d 936 (7th Cir. 2006). There, this Court held that "[t]o satisfy its essential role, the gatekeeper must do more than just make conclusory statements." *Id.* at 535. When a district court fails to undertake the necessary analysis, this Court declines to give the court's ruling deference and will independently undertake the required *Daubert* inquiry. *Id.* at 535-37.

Plaintiffs claim (at 30) that *Fuesting* is "inapposite because it involved a trial court that focused almost exclusively on an expert's credentials." *Fuesting*, however, made clear that the district court's central error was its failure to explain "*how*" the expert's methodology "measures up to *Daubert*'s indicia of reliability." 421 F.3d at 535 (emphasis added). Following *Fuesting*, this Court has confirmed when a district "court [has] provided no analysis of [an expert's] methodology … the admission of [that] testimony should not be given the deference normally afforded to a district court." *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 608 (7th Cir. 2006). (By

---

[13] As explained in Cinergy's opening brief (at 49-50), because Rosen's analysis relied fundamentally upon Koppe's testimony, a finding that Koppe's testimony should have been excluded necessarily requires exclusion of Rosen's testimony.

contrast, the cases cited by Plaintiffs (at 29) supposedly upholding conclusory *Daubert* analyses all pre-date *Fuesting*.)

The two-sentence order below contained no analysis of how Rosen's methodology satisfied the *Daubert* reliability factors. A0007. *Fuesting* and *Naeem* establish that these conclusory statements receive no deference, much less the benefit of the "manifestly erroneous" standard urged by Plaintiffs (at 30).

Moreover, the absence of a *Daubert* analysis is particularly problematic here because the Rosen-Koppe methodology was created specifically for this litigation. Plaintiffs' resistance to that characterization of the "brainstorming" sessions in which the experts and litigators collaborated on the creation of the methodology, *see* Op.Br. 13-14, 34-35, is difficult to fathom because Plaintiffs acknowledge these issues "uniquely aris[e]" under the "NSR provisions," Pls.Br. 31, and do not dispute Rosen's concession that he never even considered how EPA had previously determined emissions changes, A00668.

## B.    Rosen's Testimony Should Have Been Excluded.

### 1.    *Plaintiffs Do Not Contest The Critical Points Compelling The Exclusion Of Rosen's Testimony.*

The critical points that require reversal of the district court's *Daubert* ruling are undisputed.

*First*, Rosen failed to subject his methodology to any independent validation. Nowhere do Plaintiffs dispute Rosen failed to test his methodology. *Cf.* Op.Br. 36-38. Nor do they dispute it was not peer reviewed or subject to any independent review by the relevant scientific and engineering community. *Cf.* Op.Br. 38-39.

*Second*, Rosen failed to consider the *interdependence* of the units within Cinergy's system. *Cf.* Op.Br. 44-45. If demand is constant—an assumption Plaintiffs concede EPA's regulations require, Pls.Br. 48—unit interdependence means any increase in generation from one unit must correspond with a decrease in generation from another unit. Op.Br. 10-11, 47. As the court explained in *Northern Indiana Public Service Co. v. Colorado Westmoreland, Inc.*, 667 F. Supp. 613, 616-19 (N.D. Ind. 1987) (Easterbrook, J.) ("*NIPSCo*"), because customer demand and the power generated by the system "must balance," the amount of generation from any individual unit at any given time depends upon how that demand is *allocated* among the system's facilities.

Given this fundamental principle, any expert testimony had to explain why increasing a particular generating unit's availability would cause it to be dispatched more—and, correlatively, why other units would be dispatched less—as well as provide a reliable basis for quantifying any predicted emissions increases above the regulatory threshold for the permit requirement. The need for such an inquiry is heightened by the undisputed facts that (i) the repairs at issue made no fundamental changes to the units that would allow them to generate electricity at lower costs, and (ii) the units had substantial excess capacity and were often not run when available. Op.Br. 44 (citing evidence).

Plaintiffs do not dispute that Rosen treated the individual generating units at issue in isolation. *Cf.* Op.Br. 44-45. Rosen admitted he did not look at the dispatch order of Cinergy's electrical generating units and he did not consider the

engineering and economic factors that determine how or when a unit will be dispatched, including factors that often could cause a unit to be dispatched *less* even if it gains additional availability. Op.Br. 45 (citing admissions).

*Third*, because Rosen's "constant utilization" methodology disregards unit interdependence, it produces demonstrably unreliable results. *Cf.* Op.Br. 42-43, 47-49. Plaintiffs repeatedly asserted availability was increasing at *all* of Cinergy's units, *see* Op.Br. 48 (discussing statements), and Rosen conceded his approach always would predict an increase in generation with an increase in availability, A00708; A00917-19. Plaintiffs do not contest that, by ignoring unit interdependence, Rosen's analysis thus predicts the impossible—substantial increases in generation throughout Cinergy's system while demand is assumed to be constant.

These undisputed points compelled the exclusion of Rosen's testimony under *Daubert*. The "first and most significant *Daubert* factor" is whether a theory or methodology has been tested. *Fuesting*, 421 F.3d at 536 (citation omitted); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593 (1993). Without testing, expert "opinions amount to nothing more than unverified statements unsupported by scientific methodology." *Chapman v. Maytag Corp.*, 297 F.3d 682, 688 (7th Cir. 2002). Courts accept methodologies as reliable when they have passed through some type of "dispassionate crucible," and the failure to test or verify a methodology generally signals its unreliability and calls for its exclusion. *Fuesting*, 421 F.3d at 536; *Bourelle v. Crown Equip. Corp.*, 220 F.3d 532, 537-39 (7th Cir. 2000); *Clark v. Takata Corp.,* 192 F.3d 750, 759 (7th Cir. 1999).

Rosen failed to test his methodology even though it predicts impossible results under the very facts Plaintiffs assert. This failure "fatally" undermined the reliability of his testimony. *Fuesting*, 421 F.3d at 536. This is particularly so because Rosen's methodology lacks any other indicia of dispassionate validation—it has not been peer reviewed and has no known error rate. Op.Br. 36-38. In short, there is no indication "it meets at least the minimal criteria of good science." *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1318 (9th Cir. 1995) ("*Daubert II*").

When a methodology fails to account for critical variables or generates counterfactual results, the need for testing or verification is essential to admissibility under Rule 702 and *Daubert. See People Who Care v. Rockford Bd. Of Educ.*, 111 F.3d 528, 537 (7th Cir. 1997); *Fuesting*, 421 F.3d at 537; *Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940, 942 (7th Cir. 1997). Rosen did not merely fail to control for some regression variable, *see* Pls.Br. 44, he failed to "'account[] for major factors'" *fundamental* to electrical generation, *Cullen v. Ind. Univ. Bd. Of Trustees*, 338 F.3d 693, 701 n.4 (7th Cir. 2003) (citation omitted). Testing and peer review would have revealed the true magnitude of the flaws in Rosen's methodology. Without them, there is no basis to conclude that his methodology was reliable.

       2.    *Plaintiffs' Arguments Cannot Justify The Admission Of Rosen's Testimony.*

Despite these undisputed facts, Plaintiffs attempt to justify the admission of Rosen's testimony by (i) claiming that testing is irrelevant because Rosen was only

making a "prediction"; (ii) citing Rosen's "experience"; (iii) arguing Rosen applied "standard industry principles"; and (iv) trying to supply after-the-fact explanations for the omissions in Rosen's analysis. These arguments, individually and collectively, do not justify the admission of this testimony under *Daubert*.

a.    **Rosen's Failure To Test Cannot Be Excused Because He Was Making A "Prediction."**

Despite the critical importance under *Daubert* of testing an expert's methodology, Plaintiffs argue Rosen's "lack of precision or error rate testing is beside the point" because "[c]ompliance with NSR requires a prediction." Pls.Br. 41. But the predictive nature of the inquiry reinforces, rather than vitiates, the need for the "crucible" of the "'scientific method.'" *Fuesting*, 421 F.3d at 536. The whole point of the scientific method is to determine through testing "whether a *prediction* is true or false." Barry Gower, *Scientific Method: An Historical and Philosophical Introduction* 13 (1997) (emphasis added). Only "if a hypothesis repeatedly withstands falsification [may] one … tend to accept it, even if conditionally, as true." Michael D. Green, *Expert Witnesses and Sufficiency of Evidence in Toxic Substances Litigation: The Legacy of* Agent Orange *and Bendectin Litigation*, 86 Nw. U. L. Rev. 643, 646 (1992). The scientific process of testing a methodology is how one determines whether the prediction a methodology yields is generally "'dead on' or 'dead wrong.'" *Lands Council v. Powell*, 395 F.3d 1019, 1035 (9th Cir. 2005) (reliance on predictive models without any "verification of the model's predictions" rendered the models unreliable). That is why EPA guidance specifically requires the highest degree of testing for predictive models. Op.Br. 37. Indeed, Rosen admitted

22

testing can determine the "reliability of any forecasting model"; he just did not bother to engage in this "complex undertaking." A00702-03; Op.Br. 37.

That deficiency is particularly stark in light of Plaintiffs' success in precluding Cinergy from cross-examining Rosen on his failure to test his methodology. The district court sustained Plaintiffs' objection to any questioning about testing, A01347; A01350, ruling that cross-examination on testing necessarily would implicate the issue of actual post-project emissions—an issue on which the court had excluded evidence and argument because of the risk of juror confusion. *See* A01350-53. But, cross-examination on testing would not necessarily have required inquiry into the actual post-project emissions of the projects at issue. For example, Rosen could have tested his methodology against repairs at comparable Cinergy projects that Plaintiffs had not challenged or even at comparable projects at other utilities. More fundamentally, having precluded the jury from hearing that Rosen's methodology was untested, Plaintiffs cannot now argue that the absence of such testing or verification merely went to the weight of the evidence rather than its admissibility. *See* Pls.Br. 44.

> b.   **Rosen's "Experience" Cannot Make His Testimony Reliable.**

Plaintiffs also argue (at 38) that Rosen's "extensive professional experience" excused his failure to validate his methodology. They fail to appreciate the distinction between scientific and experience-based expert testimony. Although in some cases experience may establish the reliability of expert testimony, scientific and engineering expert testimony that can be objectively verified require validation.

*See* Fed. R. Evid. 702, 2000 amend. ("expert testimony [that is] objectively verifiable[, is] subject to the expectations of falsifiability, peer review, and publication," rather than experience); *Daubert,* 509 U.S. at 590 ("in order to qualify as 'scientific knowledge,' an inference or assertion must be derived by the scientific method. [It] must be supported by appropriate validation …."); *see also United States v. Wilson*, 484 F.3d 267, 274 (4th Cir. 2007). This Court has followed this distinction and emphasized the need to test science-based testimony. *See Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 870 (7th Cir. 2001) ("the theory here easily lends itself to testing and substantiation by this method, such that conclusions based only on personal opinion and experience do not suffice"); *United States v. Brumley*, 217 F.3d 905, 911 (7th Cir. 2000) ("engineering testimony rests on scientific foundations, but [i]n other cases, the relevant reliability concerns may focus upon personal knowledge or experience" (citation omitted)).

Those principles apply here. Rosen predicted an emissions increase by positing a mathematical relationship between changes in unit availability and generation. This was clearly engineering testimony purporting to rest upon scientific foundations, *see Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999), and his claimed mathematical relationship generates predictions that are testable. Indeed, EPA's own policies require predictive methodologies like Rosen's be tested; they cannot be validated by "experience." Op.Br. 37-38. His opinion was therefore entirely different from the experience-based expert testimony addressed in the cases Plaintiffs cite, cases which pertain to non-scientific issues like dry-wall installation

practices and how methamphetamines are packed by drug dealers. *See* Pls.Br. 38-39 (citing cases).

Moreover, the experts in the cases Plaintiffs cite had actual experience with the precise practice at issue. By contrast, Rosen had no experience with predicting the emissions (or generation) that result from component replacements at electrical generating units. Although Plaintiffs vaguely tout Rosen's "experience analyzing utility operations," Pls.Br. 37, Rosen conceded that he "had never before calculated air emissions increases stemming from parts replacements at a power plant," A01362, or used his methodology to "project future generation associated with a component replacement," A01368. Indeed, he had "never before been involved in planning, maintenance, repair, replacement activities in a power plant." A01365.

### c.   Rosen's Constant Utilization Assumption Does Not Apply "Standard Industry Principles."

Plaintiffs also contend Rosen's methodology requires no independent validation because he merely applied "standard industry principles." *E.g.*, Pls.Br. 31, 32, 34, 38, 39. That is false.

Plaintiffs initially argue Rosen's "mathematical interpretation" of the NSR regulations required no testing because he only used "'basic definitions of commonly used industry terms.'" Pls.Br. 34; A00939; *see also* A00561 ("my equations do not require 'error rates' [because] they are generally just simple ratios or fractions"). That a witness uses established terms and definitions in proposing a contested *relationship* between them—here, that the utilization factor will remain constant as availability increases—neither establishes the relationship's general acceptance nor

insulates it from the need for validation. *See Daubert II*, 43 F.3d at 1319 (rejecting "experts' unadorned assertions that the methodology they employed comports with standard scientific procedures"). When Einstein developed his mass-energy-equivalence theorem ($E=mc^2$), for example, energy, mass, and the speed of light were all "commonly used" terms, but Einstein tested his hypothesis multiple times, and scientists today continue to attempt to validate it.[14]

Plaintiffs also claim—repeatedly—that the techniques used in Cinergy's 1991 project guidelines provide the necessary validation for Rosen's testimony. Indeed, that is the *deus ex machina* Plaintiffs invoke in response to almost every Cinergy point they choose to address. *See* Pls.Br. 3, 10-11, 14-15, 17, 27, 33-35, 37, 40, 43-44, 46-48. Although Rosen acknowledged that Cinergy's use of a technique for capital budgeting "does not mean this methodology is correct for use under the NSR regulations," A000526, Plaintiffs now rely upon Cinergy's process as virtually the sole asserted source of validation for Rosen's approach.

But the Cinergy cost-benefit guidelines relied upon by Plaintiffs—rudimentary as they were—flatly *contradict* Rosen's approach to the Wabash River units at issue. Plaintiffs erroneously assert, like Rosen, that Cinergy's cost-benefit guidelines "multiplied the expected increase in availability" by a constant "utilization factor" "to calculate the expected *change in capacity factor* caused by

---

[14] For similar reasons, *Smith v. Ford Motor Co.*, 215 F.3d 713 (7th Cir. 2000), does not absolve Rosen of having failed to validate his methodology. Pls.Br. 39. This is not a situation in which Rosen applied "well-established engineering techniques" for predicting emissions increases to the particular projects at issue. *Smith*, 215 F.3d at 720-21. He developed a new methodology.

each project." Pls.Br. 33 (emphasis added). Even if that proposition generally is true for Cinergy's large "baseload" units in Indiana (Gibson and Cayuga), Cinergy did *not* apply a constant utilization factor to an increase in availability in analyzing projects for the remainder of Cinergy's units.

Rather, the 1991 Cinergy guidelines Plaintiffs cite expressly indicate that, for Wabash River and similar units, Cinergy projected a constant *capacity factor*.[15] The capacity factor is the measure of how much electricity Cinergy expects a unit to generate. A01340-41 ("Capacity factor is just a measure of how much electricity the unit produced."); SA001617. Thus, for Wabash River and similar units, by assuming a *constant* capacity factor, Cinergy's cost-benefit analyses assumed that the repairs would *not* increase generation at those facilities. SA000137; SA000160. Correlatively, Cinergy's project guidelines assumed for Wabash River that if a repair increased availability, the result would be a *decrease* in that unit's utilization factor, not the constant utilization factor Rosen presumed.[16]

Cinergy projected a constant capacity factor for Wabash River and other units because their use depended heavily on the constraints of an interdependent system. The facilities for which Cinergy's 1991 economic evaluation guidelines used a

---

[15] SA00086 (a constant "utilization factor" should be "used to compute the savings in replacement energy costs resulting from an improvement in availability at Gibson and Cayuga stations," whereas a constant "capacity factor" should be used for "calculation[s] at Gallagher, Wabash River, Edwardsport and Noblesville stations"); SA00136-37 (in §6.3.3, providing constant utilization factors for Cayuga and Gibson, and in §6.3.2 providing constant capacity factors for Wabash River and elsewhere); *id.* (projecting expected and constant capacity factor of 40 percent for Wabash River units 1-5 during entire 1991-2010 period).

[16] Because the utilization factor is the capacity factor divided by the equivalent availability factor, a constant capacity factor divided by an increase in availability would produce a *decreased* utilization factor. *See* SA00086 ("UF = CF/EAF").

constant utilization factor—Cayuga and Gibson—were large baseload units, which generally would be among the first called upon to meet demand and run whenever possible. *See NIPSCo*, 667 F.Supp. at 629; A00994; A01047; A01336-37; A01356. Other units like Wabash River, however, would typically run less frequently, as dictated by the needs of the system. *See id.* Cinergy therefore did not anticipate that any increase in availability would increase generation from units like those at Wabash River. Rather, using computer models, A00795, Cinergy made specific predictions of the total amount of generation the system would need from these units, and any change in availability would not alter this level of generation. Whatever general probative value Cinergy's capital budgeting techniques may or may not have, under no circumstances can those budget documents provide support for Rosen's use of a constant utilization factor for the Wabash River units at issue.

Plaintiffs make the same mistake with respect to the engineering literature they cite, which they claim proves the "general acceptance" of Rosen's techniques. Pls.Br. 30-31, 37, 39-40. Most of the documents Plaintiffs cite have nothing to do with Rosen's methodology, and instead relate to Koppe's. Only one of the documents relates to Rosen's theories—the 1985 study from EPRI, *see* Pls.Br. 37, 40—and it confirms the different treatment given the largest baseload units versus other units in Cinergy's budgeting guidelines. *See* SA001371 (employing a constant utilization factor for "Olympia 2" unit); SA001351 (describing Olympia 2 as one of the "largest baseload units"). Moreover, unlike Rosen's approach, the EPRI study noted that

even large baseload units were "quite sensitive" to the factors affecting generation by interdependent units. SA001373.

In all events, Cinergy's capital budgeting process could not remedy the complete absence of scientific validation for Rosen's "constant utilization" assumption even if, contrary to fact, that process employed a constant-utilization assumption for the Wabash units. As Cinergy showed (at 41-42), its budgeting guidelines were never subject to testing or validation for purposes of predicting actual generation or emissions increases and cannot, therefore, "verify" another untested methodology as scientifically sound. Recognizing that basic point does not "denigrate[ ]" the "reliability of the economic evaluations of [Cinergy's] engineers." Pls.Br. 46. It simply acknowledges the narrow purposes and limitations of that analysis.[17]

Those limitations are particularly relevant because, as Plaintiffs do not dispute, Cinergy used a far more sophisticated "dispatch model" to project future generation. Op.Br. 40-42. Although Plaintiffs contend (at 42) that Rosen's "conceptual approach" was "functionally equivalent" to a dispatch model, that is not so. Rosen conceded that computer models account for unit interdependence and, unlike his methodology, do not hold everything except availability constant. A00952-56. Those are fundamental differences, which is why Rosen agreed that such computer models were a "preferable" means to predict future generation. A00563.

---

[17] Plaintiffs suggest (at 47) that the question whether these documents support Rosen's methodology was "appropriately left for the jury to decide." That is wrong: *Daubert* and *Fuesting* require this Court to determine whether Rosen's testimony was sufficiently reliable to reach the jury.

d.    **Plaintiffs' Post-Hoc Justifications For Rosen's Analysis Fail.**

Plaintiffs also argue (at 44-45) that Rosen's constant utilization assumption makes economic sense in these circumstances. They assert that generation from the Wabash River units would be expected to increase because these units operated at lower costs than alternatives and were therefore likely to be dispatched more if availability increased.

Tellingly, Plaintiffs do not cite any of Rosen's work for this assertion. That is because, as explained, Rosen conceded that he never analyzed the dispatch order of Cinergy's units or considered any of the other real-world factors that dictate the actual generation from generating units. Op.Br. 45 (citing evidence).[18]

In any event, Plaintiffs' *post hoc* analysis incorrectly assumes Wabash River was a large baseload station that generally would run whenever available. But, as discussed *supra* pp. 28-29, the Wabash units were not among those units that Cinergy would first call into service. A01047. In fact, "the Wabash units would have been in that spectrum that … would have been *last* to have been called upon" to generate electricity. *Id.* (emphasis added). As Cinergy demonstrated, the Wabash

---

[18] Nor did Cinergy's expert Kenneth Slater support Rosen's decision to ignore those factors. Pls.Br. 42-43. Slater stated only that a dispatch model would predict increased generation from fewer forced outages if one *assumed*—as Rosen does, and contrary to Slater's normal approach—that everything except availability is held constant. *See* SA001230 ("You made no other changes whatsoever? Yes."); SA001231 ("I ask you to go in there and make one change on one unit" but assume all else remains the same); A01392-93, A01397-98. He explained an appropriate use of such a model would instead consider all factors bearing on the dispatch of a unit within an interdependent system. A01383-89, A01396-97.

units had plenty of headroom—that is, excess unused availability—confirming that these units were *not* run whenever available. Op.Br. 54-55.[19]

Further, Plaintiffs' argument assumes everything in a future period will be exactly as it was during the baseline period with only one exception: the past outages that shifted demand from (hypothetical) Unit 1 to (hypothetical) Unit 2 will not occur in the future because a component-replacement project was completed at Unit 1. This one change is assumed to cause this increment of demand in the future to be met by Unit 1, thereby increasing generation from Unit 1 as compared to the pre-project period. But among other failings, this assumption ignores that, while demand may have been shifted from Unit 1 to Unit 2 on one day because of an outage at Unit 1, demand may also have been previously shifted another day from Unit 2 to Unit 1 because of an outage at Unit 2. If, as Plaintiffs contend, availability was increasing over time at all units throughout the system, A00411, *there is no way to determine whether generation at Unit 1 will experience a net increase or decrease—much less how much of an increase or decrease—by simply looking at the*

---

[19] Relatedly, Plaintiffs suggest (at 45, 47) that Cinergy would not have "invested millions" on these projects unless it believed they would increase availability, generation, and revenue. Similarly, Plaintiffs argue (at 46), because Cinergy justified the projects "based upon replacement energy cost," Cinergy must have believed the projects would increase generation. Plaintiffs ignore that the purpose of these like-kind component replacements was to *maintain* historic levels of availability at existing units. *See, e.g.*, A01014 ("All we're trying to do is restore and maintain availability."); A01070 ("The general purpose of recommending those kinds of projects was to maintain the availability of the units at the respective stations."); SA000341 ("The benefit estimate has assumed, *if not replaced*, tube failure rate will *increase*." (emphases added)). Cinergy must constantly maintain its units to meet its "obligation to provide reliable service." *In re Pet. of Duke Energy Indiana Energy, Inc.*, 2007 Ind. PUC Lexis 380, *132 (Ind. Util. Reg. Comm'n ("IURC") Nov. 20, 2007). This means Cinergy should and does invest millions of dollars to maintain the availability of its units.

*presumed availability increase at Unit 1 in isolation, as Rosen did.* That would be true even if the Wabash River units produced power at the *lowest* cost of any Cinergy unit. *See NIPSCo*, 667 F. Supp. at 618 (dispatch not dictated "wholly by reference to marginal cost"). Although anyone can hypothesize different scenarios in which generation goes up or down, such speculation is no substitute for scientifically testing the constant-utilization hypothesis using real-world data—the validation that *Daubert* requires and that Rosen refused to attempt. *Cummins v. Lyle Indus.*, 93 F.3d 362, 368 (7th Cir. 1996) (gatekeeper "task requires the district court to consider whether the testimony has been subjected to the scientific method; it must rule out 'subjective belief or unsupported speculation'" (citations omitted)).

Finally—and remarkably—Plaintiffs assert Rosen's constant-utilization-factor assumption is "conservative" because "demand … was rising" during the relevant period and therefore utilization was rising too. Pls.Br. 45 (quoting SA001266). Although Cinergy ran its units more to meet increased demand, *see* SA001266, applicable regulations require increases in demand to be excluded in predicting any increase in emissions, as Rosen himself acknowledged. Op.Br. 45, 52; A00527 (citing 40 C.F.R. 52.21(b)(33)(ii)). That overall system generation may increase as demand increases says nothing about what happens at individual units when demand remains constant.

      3.    *Rosen's Methodology Is Irrelevant Under The CAA And EPA's Implementing Regulations.*

Rosen's testimony also should have been excluded because it failed to provide scientifically reliable evidence on the requirements imposed by the CAA and EPA's

implementing regulations for projecting emissions increases. Op.Br. 52-56. Plaintiffs' contrary arguments are unavailing.

Plaintiffs do not contest that "NSR will not apply unless EPA finds that there is a *causal link* between the proposed change and any post-change increase in emissions." 57 Fed. Reg. 32,314, 32,326 (July 21, 1992) (emphasis added); *see also, e.g.*, 40 C.F.R. §52.21(2)(i). Plaintiffs also do not deny that this causation must be established "on a case-by-case basis and is dependent on the individual facts and circumstances of the change at issue," 57 Fed. Reg. at 32,327, and that EPA refused to create a "presumption" of causation even following an efficiency-enhancing change, *id.* Nor do Plaintiffs dispute that the like-kind component replacements at issue had no impact on efficiency or dispatch order and, therefore, provide no reason to believe these units would be dispatched more often.

Instead, Plaintiffs merely repackage the argument they made before the district court—mostly rephrasing their response to avoid stating, as they did below, that Rosen "assumed" constant utilization and that this assumption "[b]y definition" established causation (A00277). *Compare* Pls.Br. 48, *with* Op.Br. 53-55. The argument remains *ipse dixit* that assumes its conclusion—i.e., that Rosen "calculated only that portion of increased generation definitively caused by the change in availability" and his calculations "resulted in only that portion of the expected generation increase that was directly caused by Cinergy's availability improvements." Pls.Br. 48. Nowhere do Plaintiffs explain *why* these conclusions are correct. That is, nowhere do Plaintiffs explain why it was reasonable for Rosen to

assume that a unit's past utilization rate, at one level of availability, would apply to that unit in the future, at a different level of availability. These are not self-evident propositions one can simply assume to be true, and certainly not with respect to the "individual facts and circumstances" of each specific project at issue. *See* 57 Fed. Reg. at 32,327.

To the extent Plaintiffs attempt to respond to Cinergy's argument, they mischaracterize it. Plaintiffs do not dispute that the Wabash River units here had substantial excess generating capacity. Pls.Br. 48-49. Rather than address the argument Cinergy actually made based on this undisputed fact, Plaintiffs attack a strawman: Cinergy did not argue that "headroom" at the Wabash River units exempted Cinergy from NSR liability, even if Plaintiffs could demonstrate that a project would cause a substantial increase in emissions. Rather, Cinergy showed that this unused excess capacity was an additional factor undermining Rosen's central assumption that any increase in availability would necessarily result in increased generation. Op.Br. 54-55. Rosen, however, nowhere attempted to explain why units that already had substantial excess availability would suddenly generate more simply because they had gained slightly more excess availability.

Cinergy also demonstrated Rosen failed to provide scientifically reliable testimony relevant to projected emissions increases because he used an improper "baseline emissions period." Op.Br. 55. Cinergy explained that under EPA's rules, periods in which "the source's capacity was reduced due to physical problems" should be excluded as baselines because these periods do not represent "normal

34

operations." 57 Fed. Reg. at 32,323. Rosen's methodology improperly disregarded this rule by using as a baseline the two-year period immediately before the component was replaced—the precise period when the unit was experiencing forced outages from the problematic component. *See* A00520.

Plaintiffs' response is confined to a brief footnote. Pls.Br. 49 n.17. First, Plaintiffs argue there is "no support for such a contra-factual calculation." *Id.* But, as explained above, EPA's rules expressly mandate this approach, and this is the standard EPA applied in its remand in *WEPCo*. *See* Op.Br. 55 n.9. Plaintiffs do not contest Cinergy's reading of these authorities.

Alternatively, Plaintiffs contend "Cinergy admitted at trial that it had not identified any other baseline that was representative of normal operations." Pls. Br. 49 n.17. In fact, the witness testified only that he was not aware whether at the time of the projects anyone considered an appropriate baseline for determining historic pre-repair availability. *See* SA001707. Cinergy expressly argued below that Rosen's baseline violated EPA's rules and a baseline prior to the onset of the problems at issue should have been used. A01328-29.[20]

## C. Koppe's Testimony Should Have Been Excluded.

As Cinergy demonstrated, Koppe's testimony also should have been excluded. Op.Br. 35-39, 49-51. Koppe opined an electrical generating unit, after certain like-

---

[20] In its initial appendix, Cinergy inadvertently omitted the page in which Rosen acknowledged that Cinergy's preferred baseline "of a period before the equipment that was replaced was experiencing failures" would generally produce results "less favorable" to Plaintiffs, and it mistakenly cited to a different page. *See* Op. Br. 55 (citing A00727). The correct page has been included in Cinergy's reply appendix and can be found at A01373.

kind component replacements, will regain within a two-year period *all* of the availability the unit had lost as a result of the identified mechanical problem. Op.Br.15-16. Plaintiffs principally argue Koppe's testimony is reliable because his theory is consistent with his experience. Pls.Br. 38; *id.* at 35-37. But as explained above, testimony that rests on scientific principles cannot be justified on that basis. *See supra* pp. 24-25. Rather, "expert testimony [that is] objectively verifiable[ is] subject to the expectations of falsifiability, peer review, and publication." Fed. R. Evid. 702, 2000 amend.

Contrary to Plaintiffs' suggestion (at 40), Koppe did not conduct any meaningful testing. When asked, Koppe admitted he could not even describe his testing, let alone produce any data to validate his results. Op.Br. 37; A00632 ("I don't recall having any data on the analyses that I did do."); A00637 ("I cannot be sure whether … I specifically reviewed generation results that involve generation for coal-fired units."). Moreover, Koppe stated that testing was not "really a basis" for his conclusion because he relied "on the data [he] saw pre-project and … [his] experience." SA001434. Because Koppe supplied Rosen with specific calculations of increased availability, Koppe could not merely claim his experience with a general directional trend of increasing availability supported his thesis; he had to verify that all hours lost are in fact recovered from these repairs for the following two-year period.

The need for rigorous testing is underscored by the fact that Koppe's own data show that substantial outages and derates associated with the repaired component

36

often continued post-repair. Op.Br. 49. Plaintiffs do not dispute this and, in fact, confirm it: they cite (at 41) SA000700 for support, but there Koppe admitted that "problems continued to affect the unit for the two and half years after the radiant superheater tubes had been replaced" and the availability "impact … was equal to or somewhat higher than the impact pre-project." If the repairs analyzed by Koppe did not fully remedy the outages they were intended to address, Koppe could not reliably predict these repair projects would recover all lost availability. This is particularly true given these repairs did nothing to address potential outages from thousands of other randomly-failing components. As Plaintiffs correctly argued to the district court, "a particular analysis that is directly contradictory to the actual conclusion" renders the expert testimony "inherently unreliable." SA000798; *see also* SA000801.[21] Below, Koppe attempted to elide the stark contradictions between his data and his testimony by asserting that the problems that persist after a replacement can be ignored because they will eventually be eliminated "many years in the future." A00826-27. The CAA regulations, however, consider only emissions increases in the two years following a repair, not "many years in[to] the future." Op.Br. 50.

Finally, Koppe's "experience" is insufficient to establish the reliability of his testimony because the failure rate of complex machines has been well-studied by

---

[21] Plaintiffs also argue that "industry publications … validated [Koppe's] approach and demonstrated that renovations of deteriorated components increase unit availability." Pls.Br. 40. But the book upon which they rely (*Steam*) nowhere establishes an empirical basis for concluding, as Koppe did, that a generating unit will regain *all* lost availability for a two-year period after the like-kind replacements at issue. *See* SA000225-26; SA000233.

the relevant scientific and engineering community. A00489; *see* R.F. Drenick, *The Failure Law Of Complex Equipment*, 8 Journal of the Society of Industrial and Applied Mathematics 680 (1960). In one of the leading works in this area, Professor Drenick concluded that mature, well-maintained complex systems have a constant expected failure rate. A00483; A00489; A00498-500. Put simply, "Drenick's theorem" predicts that for well-maintained complex systems "'[e]very time you fix one thing something else fails.'" A00489. Cinergy followed this principle in its generation-planning models, which used a long-term average of a unit's historic availability (5 years) to determine the future availability of that unit regardless of like-kind replacements. A00287-88; A00615-16; A00620-21; A00599-604; A00607-08.

To be sure, it is theoretically possible the conditions for Drenick's theorem did not apply here. Conceivably, (i) repairing certain deteriorating generating-unit components might restore all of the availability previously lost from problems with those components, and (ii) those components might be reliably identified and distinguished from thousands of other components repaired in that unit. But whether this is true can be determined only through the rigorous application of the scientific method and statistically valid testing. It cannot simply be asserted to be true based on "experience."

## III.    The Statute of Limitations Bars Plaintiffs' Civil Penalty Claims.

Statutes of limitations "represent a pervasive legislative judgment that it is unjust to fail to put the adversary on notice to defend within a specified period of time and that 'the right to be free of stale claims in time comes to prevail over the right to prosecute them.'" *United States v. Kubrick*, 444 U.S. 111, 117 (1979)

(citation omitted). They also protect expectations that have become settled, *3M v. Browner*, 17 F.3d 1453, 1457 (D.C. Cir. 1994), and prohibit plaintiffs from "'sleeping on their rights,' as the pattern continues" only to sue "long after the 'memories of witnesses have faded or evidence is lost,'" *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 187 (1997) (citation omitted).

This suit was initiated nearly a decade after the Wabash River projects in question, and the district court correctly held civil penalties were time-barred. Plaintiffs challenge this result by urging an unnatural reading of the CAA and implementing regulations that disregards their plain language, the nature of these particular violations, and the design of the statutory scheme. The claimed violations involved construction projects done without a permit, and the district court held such violations accrue when the construction is undertaken. Plaintiffs emphasize such violations may have consequences that extend indefinitely into the future, but that does not mean that those consequences constitute new violations that create an endless series of new accrual dates. Congress could have written such a scheme into the CAA, but did not do so.

That is the conclusion reached by most of the courts to address the issue, and it imposes no unreasonable burden. The federal government in this case was able to secure extensive and costly equitable injunctive relief, notwithstanding the limitations on civil penalties. Plaintiffs nevertheless seek to contort the CAA's plain language solely to cure the consequences of their own sudden shift in enforcement policy. EPA was on notice of the projects at issue as well as similar projects

nationwide, and the five-year limitations period gave the government more than enough time to seek penalties.[22]

### A.     Under the CAA and Its Regulations, Plaintiffs Alleged One-Time Violations That Accrued at the Time of Construction.

The residual federal five-year statute of limitations applies to these civil penalty claims, *see United States v. AM Gen. Corp.*, 34 F.3d 472, 475 (7th Cir. 1994) (citing 28 U.S.C. §2462), "affording plaintiffs what the legislature deems a reasonable time to present their claims," *Kubrick*, 444 U.S. at 117. The claims accrue on "the date of the violation giving rise to the penalty." *3M*, 17 F.3d at 1462. Determining the accrual date therefore depends upon identifying "the violation." The district court correctly found the claimed violation here was engaging in construction without a permit, not operating the plants indefinitely into the future.

The CAA was designed "to achieve environmental controls without unduly hampering economic growth," *Nat'l Parks & Conservation Ass'n, Inc. v. TVA*, 502 F.3d 1316, 1319 (11th Cir. 2007) ("*TVA CA11*"), and thus Congress deliberately did not extend NSR obligations to existing facilities until they are modified, *see id.* Further, until the 1990 amendments to the CAA, EPA only had limited direct authority over current plant operations. *See AM Gen.*, 34 F.3d at 474, 475 (even though EPA enforcement action was barred, 1990 amendments would prospectively permit EPA to veto state operating permits).

---

[22] If the Court rules in Cinergy's favor on the grounds set forth in Part II, it need not reach any aspect of Plaintiffs' statute of limitations cross-appeal. Similarly, if the Court rules in Cinergy's favor on the grounds set forth in Part I, it need not construe the statute of limitations governing Plaintiffs' NNSR claims.

Reflecting that legislative compromise, the plain language of the NSR provisions exclusively addresses preconstruction permitting, not ongoing operations. The applicable PSD provision is entitled "Preconstruction Requirements," and its terms govern planning in *anticipation of operations*, rather than standards and enforceable duties applicable to post-construction operations. *See TVA CA11*, 502 F.3d at 1323; *see also United States v. Midwest Generation, LLC*, 2010 WL 889986, *7 (N.D. Ill. Mar. 9, 2010) ("these enumerated requirements in 42 U.S.C. §7475 are not freestanding; each is a specific prerequisite to obtaining a preconstruction permit"). The provision specifies the circumstances under which a modification "may be constructed." 42 U.S.C. §7475. As Plaintiffs note, it requires, *inter alia*, predictive "demonstrat[ions]" that modifications "*will* not cause" excess air pollution beyond certain standards, and "agree[ments] to conduct … monitoring." *Id.* (emphasis added). Contrary to Plaintiffs' argument (at 54-56), however, these requirements are discrete prerequisites to engaging in construction and do not establish ongoing violations if a preconstruction permit is not sought.

Similarly, §7475 repeatedly provides that its requirements apply to a "*proposed*" facility and permit. For example, it mandates advance "approv[al]" by the Administrator that the "best available control technology" ("BACT") will apply to the "proposed facility." Because BACT is elsewhere defined based upon "emission limitation[s]," 42 U.S.C. §7479(3), which is defined still elsewhere (in the Act's general "Definitions" section) as a requirement that constrains emissions "on a continuous basis, including any requirement relating to the operation or

maintenance of a source to assure continuous emission reduction," 42 U.S.C. §7602(k), Plaintiffs claim (at 53-54) the BACT requirement effectively transforms PSD preconstruction permits into operating permits. But under NSR, BACT only applies to a "proposed facility" that "may be constructed," *see* 42 U.S.C. § 7475(a), and it is a prerequisite for approval of a preconstruction permit, which must include BACT *designed* to provide for continuing emissions reductions. Courts therefore have properly deemed BACT a "preconstruction requirement." *Citizens Against Ruining the Env't v. EPA*, 535 F.3d 670, 673 n.3 (7th Cir. 2008) ("*CARE*"); *TVA CA11*, 502 F.3d at 1325 & n.2 (related regulation contains "no caveat continuing the [BACT] obligation for the operating life of the source if it was not met during the construction phase"); *Midwest Generation*, 2010 WL 889986, *7.

Moreover, Congress knows how to define operating violations and did so elsewhere. *See Russello v. United States*, 464 U.S. 16, 23 (1983) (where "'Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion'"). For instance, the separate provisions of the CAA concerning New Source Performance Standards ("NSPS") provide "it shall be unlawful ... to *operate* [a] source in violation of any [NSPS] applicable to such source." 42 U.S.C. §7411(e) (entitled "prohibited acts") (emphasis added). Similarly, in adding the Title V operating permit program to the CAA in 1990, Congress provided that "it shall be unlawful for any person ... to operate ... a major source ... except in compliance with a permit issued ... under [Title V]." *Id.*

§7661a(a). There, Congress further distinguished operating permits from construction permits, providing "Nothing in [Title V] shall be construed to alter the applicable requirements of this chapter that a permit be obtained before construction or modification." *Id.*; *see also United States v. Marine Shale Processors*, 81 F.3d 1329, 1356 (5th Cir. 1996) (noting that before Title V, "no federal law required states to maintain operating permit programs, but the CAA has always compelled states to administer a program of preconstruction review").

The PSD enforcement statute, in contrast, is limited to "prevent[ing] the construction or modification of a major emitting facility" when it would be contrary to law. 42 U.S.C. §7477. Moreover, in 1990, even as it was enacting Title V to govern operating permits, Congress considered and rejected adding operational enforcement to §7477. *Compare* S. 1630, 101st Cong. §609 (1990) (in engrossed Senate bill, adding terms "operation" and "modification"), *with* 42 U.S.C. §7477 (adding only "modification"). Accordingly, Congress did not intend to allow enforcement of operating violations through the PSD program.[23]

PSD regulations confirm that the program is limited to a one-time duty to secure preconstruction permits for major modifications. Federal PSD regulations, incorporated into Indiana's SIP, *see* 40 C.F.R. §52.793, provide that no utility "shall begin actual construction without a permit." 40 C.F.R. §52.21(i)(1). Plaintiffs attempt to turn PSD into an operating permit program through its BACT

---

[23] Plaintiffs' citation to *post hoc* legislative history indicating that two senators in 1990 believed the *1977* NSR provisions encompassed operational enforcement, Pls.Br. 55-56, is irrelevant, *see United States v. Texas*, 507 U.S. 529, 535 n.4 (1993).

regulations, Pls.Br. 57-58, but those regulations, like their statutory counterpart, apply only to "*proposed* emissions unit[s]," 40 C.F.R. §52.21(j)(3) (emphasis added), and the requirement that a modification "shall apply [BACT]," *id.*, is simply one of many design criteria that must be satisfied before a preconstruction permit may issue. *TVA CA11*, 502 F.3d at 1324 ("the obligation to apply [BACT] … was solely a prerequisite for approval of the modification, not a condition of [the] unit['s] lawful operation"). The very next subsection confirms BACT findings are fixed in time during the planning process and must be determined sufficiently far in advance of construction to allow them to be executed simultaneous with the construction. 40 C.F.R. § 52.21(j)(4) (requiring BACT determination at least 18 months before commencement of construction of each phase).

Further, the PSD enforcement regulation cited by Plaintiffs applies only to a party that files an "'application submitted pursuant to this section'" and then takes action inconsistent with that application, *see* Pls.Br. 57-58 (quoting 40 C.F.R. §52.21(r)(1)). It has no relevance to a party that, like Cinergy, did not believe a permit was required and therefore did not apply for one. *Cf. CleanCOALition v. TXU Power*, 536 F.3d 469, 475 (5th Cir. 2008) (distinguishing preconstruction permits from operating permits and holding that NSR preconstruction requirements hinge upon *issuance* of a permit, and "[u]ntil the permit issues, however, no 'permit' exists to be violated"). In the absence of such an application, Plaintiffs "cannot successfully charge that [Cinergy] failed to operate in accordance with its non-existent construction permit." *United States v. S. Ind. Gas & Elec. Co.*,

44

2002 WL 1760752, *5 n.3 (S.D. Ind. July 26, 2002) ("*SIGECO*"). This includes whatever BACT requirements might have been included in such a permit. *CleanCOALition*, 536 F.3d at 472, 477 ("Congress has set forth explicit substantive and procedural requirements that must be met prior to the construction of any major emitting facility," and "the preconstruction requirements … such as evidence that the facility will utilize [BACT], are preconditions for *granting* a preconstruction permit").

Moreover, there generally are no regulatory mechanisms for determining retroactively what the BACT requirements would have been if a preconstruction permit had not previously been sought. *Cf. TVA CA11*, 502 F.3d at 1324-25. A utility accordingly cannot violate BACT standards, much less do so on a daily basis, where such "case by case" standards have never even been determined for a particular source. *See* 40 C.F.R. §52.21(b)(12).

Like the PSD program, NNSR focuses on preconstruction permitting, and thus a preconstruction NNSR violation is also a one-time event that triggers the statute of limitations. *TVA CA11*, 502 F.3d at 1319 n.1 (treating PSD and NNSR programs identically). Indeed, Plaintiffs concede that "NNSR permits must, like PSD permits, be obtained prior to construction." Pls.Br. 54; *see also CARE*, 535 F.3d at 673 n.3 (NNSR permit is "preconstruction" requirement). Nonetheless, Plaintiffs contend NNSR allows enforcement for *operating* without "lowest available emissions rate" ("LAER") technology. Pls.Br. 54 (citing 42 U.S.C. §§7502(c)(5), 7503(a)). That is incorrect. NNSR authorizes permitting by states of "construction and operation of

new or modified major stationary sources." 42 U.S.C. §7502(c)(5). Although §7503 imposes requirements that State NNSR permit programs must meet (which include the LAER requirement, *id.* §7503(a)(2)), not all parts of §7503 apply to both preconstruction permits and operating permits. Many provisions of §7503 apply only to preconstruction permits,[24] and that is unquestionably true of the LAER requirement: for LAER, as with the parallel BACT requirement, the Act provides that "the *proposed* source is required to comply with [LAER]," 42 U.S.C. §7503(a)(2) (emphasis added), and the requirement thus applies only to preconstruction permits. Further, as shown *supra* p. 4, NNSR is enforceable only through approved State SIPs, which constitute the applicable law. Here, at the time of the Wabash River projects, the Indiana SIP, like the federal NNSR provisions, applied LAER only to "*proposed[]* construction, modification or reconstruction." APC-19 §8(a)(3) (emphasis added).

## B.     The Majority Of Courts Agree That NSR Violations Are Not Ongoing Violations.

The district court's holding is consistent with the majority of decisions addressing the issue. Every court of appeals to consider the question, except a divided panel of the Sixth Circuit, has concluded that an NSR violation is a one-time event that accrues at the time of construction. *See CleanCOALition*, 536 F.3d

---

[24] *E.g.,* 42 U.S.C. §7503(a)(1)(A) (imposing requirement "by the time the source is to commence operation"); *id.* §7503(a)(3) (using past tense, requiring that applicant for "proposed" source "has demonstrated" that all its major stationary sources are "in compliance"); *id.* §7503(a)(4) (using past tense, precluding issuance of permit if Administrator "has [ ] determined" that SIP "for the nonattainment area in which the *proposed* source *is to be* constructed or modified" is not being adequately implemented) (emphasis added); *id.* §7503(a)(5) (analysis of alternatives for "proposed source[s]").

at 478 (5th Cir.); *TVA CA11*, 502 F.3d at 1322; *cf. Sierra Club v. Franklin County Power of Ill., LLC*, 546 F.3d 918, 928 (7th Cir. 2008) ("the *last* possible moment at which a preconstruction violation occurs is 'when the actual construction is commenced, and not at some later point in time'" (emphasis added and citations omitted)); *compare Nat'l Parks Conservation Ass'n, Inc v. TVA*, 480 F.3d 410, 418-19 (6th Cir. 2007) ("*TVA CA6*"). Every district court within this circuit to decide the question agrees. *See Midwest Generation*, 2010 WL 889986, *7-9 (N.D. Ill.); *United States v. Cinergy Corp.*, 397 F. Supp. 2d 1025, 1030 (S.D. Ind. 2005); *United States v. Ill. Power Co.*, 245 F. Supp. 2d 951, 957 (S.D. Ill. 2003); *SIGECO*, 2002 WL 1760752, *5 (S.D. Ind.); *United States v. Murphy Oil USA, Inc.*, 143 F. Supp. 2d 1054, 1083-84 (W.D. Wis. 2001). And a "long line of district court cases" nationwide supports this majority approach. *CleanCOALition*, 536 F.3d at 478. There are contrary decisions, as Plaintiffs note, but they are a decided minority. *Midwest Generation*, 2010 WL 889986, *6 n.7 (collecting cases).

Moreover, the one circuit decision to embrace the approach Plaintiffs advocate involved a peculiar Tennessee PSD rule that, unlike the federal PSD regulations applicable in Indiana, imposed a continuing obligation to obtain construction permits, even retroactively, and is therefore inapposite. *TVA CA6*, 480 F.3d at 413, 419. The Eleventh Circuit affirmatively rejected, for the reasons explained above, another portion of the Sixth Circuit's decision holding that PSD's BACT requirements created an ongoing enforceable duty. *See TVA CA11*, 502 F.3d at 1325

n.2.[25] The *TVA CA6* dissent likewise rejected "plaintiffs' strained attempt to circumvent their failure to act within the statute of limitations." 480 F.3d at 420, 421 (Batchelder, J., dissenting).[26]

Plaintiffs' attempts to analogize their NSR claims to repetitive violations from other contexts fail. Rather, as observed in *Lewis v. City of Chicago*, 528 F.3d 488, 492 (7th Cir. 2008), *cert. granted*, 130 S. Ct. 47 (2009) (discussed at Pls.Br. 59), when a party brings suit based not on a "fresh act," but rather one that is "the automatic consequence of an earlier one," the statute of limitations bars the claim. *Id.*; *see Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618, 627, 636 (2007) (same), *abrogated by statute on other grounds*, Pub. L. No. 111-2 (2009). So too here, the alleged harms flow automatically from Cinergy's lack of a preconstruction permit decades ago. There is no new, discrete actionable wrong that serves to restart the limitations period.[27]

*TVA CA6* misunderstood this principle. The majority conflated "a series of discrete *harms*"—emissions following modifications without an NSR

[25] Plaintiffs attempt to distinguish *TVA CA11* by claiming the Alabama SIP at issue there was "unique." Pls.Br. 58 n.22. This is wrong; that SIP is materially identical to the federal PSD regulations discussed herein.

[26] Plaintiffs (at 53) incorrectly cite *Marine Shale*, 81 F.3d at 1355-56, in support of their theory. That decision involved the distinct rules governing minor sources, not major sources. *Id.* at 1352. Courts have further recognized that *Marine Shale* fails to explain whether its brief statute of limitations ruling concerned a construction or operating permit violation. *E.g., Midwest Generation*, 2010 WL 889986, *6. In all events, *Marine Shale* cannot mean what Plaintiffs suggest in light of the Fifth Circuit's subsequent adoption of the majority position. *See CleanCOALition*, 536 F.3d at 478.

[27] Similarly, Plaintiffs' analogies (at 61) to other environmental contexts are inapt. None of their authorities involves *preconstruction* permits, which are fundamentally different than permits regulating specific ongoing discharges or acts of disposal, and common law nuisance is irrelevant to NSR's reticulated permitting scheme.

preconstruction permit—with "a series of discrete *violations*." 480 F.3d at 420 (Batchelder, J., dissenting). And since *TVA CA6*, the Supreme Court decided *Ledbetter*, which clarified that "just because [a current harm] is related to some past act" does not make the new harm a discrete, actionable injury. 550 U.S. at 636.

## C.    Policy Considerations Favor The Majority View.

The principles underlying statutes of limitations—including dissuading parties from unduly delaying suit, as well as facilitating effective adjudication of suits before evidence grows stale and protecting the settled expectations of potential defendants—bolster the district court's conclusion that NSR does not give rise to ongoing violations, and that the statute of limitations therefore bars civil penalties here. Plaintiffs' contrary policy argument—that the holding below will subvert NSR by "immuniz[ing]" and "incentiv[izing]" non-compliance, Pls.Br. 61-62—makes no sense. Plaintiffs had *five years* to seek civil penalties. There was no "immunity," and no company would make its compliance decisions by *assuming* that Plaintiffs would sleep on their rights.[28] And in any event, the district court ordered substantial equitable relief, including shutdown of three Wabash River units years before they otherwise would be retired. The threat of such burdensome relief,

---

[28] Plaintiffs contend (at 56) that the ruling below would "inappropriately limit the scope of NSR" because "NSR penalty claims [would have] to be litigated as Title V violations." But preconstruction permit penalties could still be pursued under NSR if sought within five years of construction, and operating permit violations can be pursued under Title V. Indeed, plaintiffs alleged Title V violations here, A00180, and have not appealed the dismissal of those claims (on unrelated grounds). Plaintiffs assert (at 56) that the district court's view is somehow "untenable because Title V was not enacted until 1990," but this Court has already recognized that prior to Title V certain operating violations were not remediable. *AM Gen.*, 34 F.3d at 475.

combined with possible civil penalties in actions brought within the generous five-year limitations period, is sufficient incentive for compliance under this or any other statutory scheme.[29]

At bottom, Plaintiffs' position is that there should be no repose on civil penalties in NSR cases. Plaintiffs cannot contest that they could have brought suit within five years of the projects at issue, or indeed could have enjoined them during construction, as Congress intended. *E.g.*, A01402, A01422 (1989 EPA internal request for information "to determine if any facilities have improperly avoided either prevention of significant deterioration (PSD) permits or applicability of new source performance standards (NSPS)," and specifically listing Wabash River's "potential … life extension projects"). Plans to refurbish the units at the Wabash station were no secret; as Plaintiffs acknowledge, Pls.Br. 7-8, Cinergy's predecessor publicly testified as early as 1985 before Indiana regulators about these "'plant life extension plan'" projects. *United States v. Cinergy Corp.*, 618 F. Supp. 2d 942, 945 (S.D. Ind. 2009); *see also, e.g.,* SA0030, SA0043-47 (1985 testimony about replacing superheater at Wabash River unit 3); *In re Rate Pet. of Pub. Serv. Co. of Ind.*, 1986 Ind. PUC Lexis 419, *163-66 (IURC Mar. 7, 1986). Yet Plaintiffs will neither accept responsibility for their failure timely to act nor acknowledge that "there is such a

---

[29] Moreover, because a preconstruction permit violation occurs only once—i.e., upon construction—it may lead at most to one day's worth of civil penalties. *Murphy Oil*, 143 F. Supp. 2d at 1083 (threat of injunctive remedies, including shutdown, and $25,000 penalty "does not amount to a cost-free decision for defendant"); *compare* Pls.Br. 55. The provision for multi-day penalties in 42 U.S.C. §7413 does not compel a different result, as it "may apply for violations of other statutory provisions under the CAA." *Midwest Generation*, 2010 WL 889986, *8.

thing as an incomplete remedial scheme." *AM Gen.*, 34 F.3d at 475 (rejecting EPA argument that another CAA provision necessarily provides for civil penalties and noting that "it would not be surprising if Congress did not equip the EPA with a complete quiver of enforcement arrows"). Accepting Plaintiffs' view would subvert the policy underlying limitations periods of encouraging plaintiffs to bring suit promptly.

The NSR enforcement provisions were designed to address violations not decades thereafter, but rather contemporaneous with modifications' construction, such as by immediately enjoining further construction. *E.g.*, 40 C.F.R. §52.21(r)(1) (providing for enforcement against any owner "who *commences* construction … without applying for and receiving approval") (emphasis added); *see also AM Gen.*, 34 F.3d at 475 (expressing doubt whether EPA could wait "as many as five years" after a modification to challenge it, and noting agency's "langorous pace"). Further, the company has at substantial expense shut down three units prematurely, because at this late date it is cost-prohibitive to do what EPA now maintains should have been done two decades ago. The emissions Plaintiffs contend were illegal could have been addressed earlier if Plaintiffs had respected the statute of limitations. Their after-the-fact re-interpretation of NSR's scope is not a valid justification for twisting its enforcement provisions in order to permit civil penalties decades after the Wabash River projects were completed.

## CONCLUSION

For the foregoing reasons and those in Cinergy's opening brief, this Court should reverse the district court's judgment and remand with instructions to enter

judgment in Cinergy's favor. If the Court reaches the cross-appeal, it should affirm

the district court's holding that civil penalties were precluded.

Respectfully submitted,

Marc E. Manly
Catherine S. Stempien
Dean M. Moesser
Julie L. Ezell
DUKE ENERGY CORP.
526 South Church Street
Charlotte, NC 28202
(704) 382-8000

_____

Mark D. Hopson
    *Counsel of Record*
Peter D. Keisler
Frank R. Volpe
Peter C. Pfaffenroth
Ryan C. Morris
Lowell J. Schiller
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
(202) 736-8000 tel.
(202) 736-8711 fax
    *Attorneys for Appellants/Cross-*
    *Appellees*

March 22, 2010

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 13,987 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Circuit Rule 32, and the type style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word in twelve point Century Schoolbook font.

March 22, 2010
                          _____
                          Mark D. Hopson

## CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 31(e)(1)

Pursuant to Circuit Rule 31(e)(1), the undersigned counsel hereby certifies that appendix materials required by Circuit Rules 30(a) and 30(b) are not available in searchable digital format.


March 22, 2010

_____

Mark D. Hopson

## CERTIFICATE OF SERVICE

Pursuant to Federal Rules of Appellate Procedure 25 and 27, I, Tacy F. Flint,

hereby certify that on March 22, 2010, I served two copies of this brief and one copy

of the appendix thereto by first class mail, postage pre-paid, to the following counsel

at the following addresses:

PHILLIP A. BROOKS
JUSTIN A. SAVAGE
JAMES A. LOFTON
JASON A. DUNN
THOMAS A. BENSON
LOREN A. REMSBERG
Environmental Enforcement Section
Environment & Natural Resources Div.
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20530
(202) 514-5293

MICHAEL MYERS
Assistant Attorney General,
Environmental Protection Bureau
The Capitol
Albany, NY 12224
(518) 402-2594
**Attorney for State of New York**

JON MARTIN
Deputy Attorney General
Richard J. Hughes Justice Complex
25 Market Street, P.O. Box 093
Trenton, NJ 08625-4503
(609) 984-2845
**Attorney for State of New Jersey**

TIMOTHY M. MORRISON
United States Attorney
Southern District of Indiana

THOMAS E. KIEPER
Assistant United States Attorney
Southern District of Indiana
10 West Market Street, Suite 2100
Indianapolis, IN 46204-3048

**Attorneys for the United States of
America**

SCOTT N. KOSCHWITZ
Assistant Attorney General
55 Elm Street
P.O. Box 120
Hartford, CT 06141-0120
(860) 808-5101
**Attorney for State of Connecticut**

KEITH GUTHRIE
13242 South 600 East
Elizabethtown, IN 47232
(812)579-5926
**Attorney for the Hoosier
Environmental Council and the Ohio
Environmental Council**

Tacy F. Flint